IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

――――――――――――――――――――――――――――

PATRICK PROCTOR,

                                                    Civil Action No.
                                Plaintiff,          9:09-CV-1114 (GLS/DEP)

            v.

LUCIEN J. LECLAIRE, JR., Deputy
Commissioner, Department of
Correctional Services,

                                Defendant.

――――――――――――――――――――――――――――

APPEARANCES:                              OF COUNSEL:

FOR PLAINTIFF:

PATRICK PROCTOR, *Pro Se*
89-A-9763
Clinton Correctional Facility
P.O. Box 2000
Dannemora, NY 12929

FOR DEFENDANT:

HON. ERIC SCHNEIDERMAN          ADRIENNE J. KERWIN, ESQ.
Office of the Attorney General   Assistant Attorney General
State of New York
Department of Law
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Plaintiff Patrick Proctor, a convicted murderer with a chronicled history of violent behavior and escapes from custody, has commenced this action pursuant to 42 U.S.C. § 1983 against the Deputy Commissioner of the New York State Department of Correctional Services ("DOCS") alleging deprivation of his civil rights.  Plaintiff, who has been confined in administrative segregation at various DOCS prison facilities for nearly seven years, coming on the heels of a nine-year term of disciplinary special housing unit ("SHU") confinement, while not now challenging the initial administrative segregation determination, contends that he has received only perfunctory, meaningless periodic reviews of his status following that initial determination, and has thereby been deprived of procedural due process.[1]

In response to plaintiff's complaint defendant has moved seeking its dismissal for failure to state a claim upon which relief may be granted.  In support of his motion defendant advances three arguments, asserting that 1) plaintiff's complaint fails to state a plausible claim reflecting defendant's personal involvement in the due process deprivations alleged; 2) plaintiff's

---

[1]     The initial administrative segregation determination was challenged in an earlier action brought by the plaintiff in this court.  *See Proctor v. Kelly*, Civil Action No. 9:05-CV-692 (GTS/GJD) ("*Proctor I*").

claims are barred by claim preclusion based upon the court's decision in the earlier proceeding in which his periodic review claims were addressed by the court; and 3) plaintiff's claims are barred, in whole or in part, by the governing statute of limitations.  For the reasons set forth below, I find that defendant's claim preclusion argument warrants dismissal of plaintiff's claims and therefore recommend that defendant's motion be granted.

I.     BACKGROUND[2]

Plaintiff is a prison inmate entrusted to the care and custody of the DOCS as a result of a conviction for murder and attempted escape, resulting in a sentence of thirty-two and one-half years to life imprisonment, which plaintiff began serving on or about August 23, 1989.[3]   At the times relevant

---

[2]     In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion.  *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 1734 (1964).

[3]     Although this action is before the court on a motion to dismiss, the court is nonetheless entitled to take judicial notice of plaintiff's conviction, which is a matter of public record.  *See* Federal Rules of Evidence 201 and 1005; *see also*, *Wilson v. Limited Brands, Inc.,* 08 CV 3431, 2009 WL 1069165, *1 n. 1 (S.D.N.Y. April 17, 2009) (a copy of this as well as all of those unreported decisions referred to in this report and recommendation is attached for the *pro se* plaintiff's convenience).  Moreover, it is well established that a district court may rely on matters of public record in deciding whether to dismiss a complaint.  *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir.1998)(citations omitted); *see also Anderson v. Coughlin*, 700 F.2d 37, 44 n. 5 (2d Cir. 1983).  Finally, I note hat plaintiff has admitted the fact of his conviction in a separate but
(continued...)

to the issues raised in his complaint plaintiff has been designated to various

prison facilities operated by the DOCS including, most recently, the Clinton

Correctional Facility ("Clinton"), located in Dannemora, New York.  *See*

*generally* Amended Complaint (Dkt. No. 19).

On December 8, 2003, plaintiff completed a term of nine years and one

month of disciplinary SHU confinement at the Great Meadow Correctional

Facility ("Great Meadow"), located in Comstock, New York.  Amended

Complaint (Dkt. No. 19) ¶ 8.  According to the plaintiff, that term of

disciplinary confinement was imposed for various infractions, including

escape, weapons possession, and assault.[4]  *Id.*

Instead of being released into general population following the

completion of his disciplinary sentence, on December 9, 2003 plaintiff was

served with an administrative segregation recommendation, which was dated

December 8, 2003 and authorized by DOCS Deputy Inspector General

George Suifret; it listed fourteen specific allegations of prior misconduct as

---

[3](...continued)
related proceeding in this court.  *See Proctor I,* Response to Defendants' Local Rule
7.1(a)(3) Statement (Dkt. No. 98-1) ¶ 12(a).

[4]     It appears that the lengthy term of disciplinary confinement was precipitated
in large part by plaintiff's successful escape in November of 1994 from the Shawangunk
Correctional Facility pursuant to a plan involving three other inmates and a parolee.  *See*
Civil Action No. 9:05-CV-692, Report and Recommendation dated September 30, 2008
(Dkt. No. 104) at p. 3.

4

well as general references to alleged inappropriate behavior on the part of the plaintiff ranging over a twenty-year period as a basis for the recommendation.[5]  Amended Complaint (Dkt. No. 19) ¶ 9.  On December 24, 2003, following a hearing, Corrections Captain Charles F. Kelly, Jr. accepted the recommendation and determined that plaintiff should be placed in administrative segregation.  *Id.* at ¶ 10.  That determination was unsuccessfully challenged by the plaintiff in *Proctor I*, the court in that case rejecting plaintiff's claim that his right to procedural due process under the Fourteenth Amendment was violated in connection with the administrative segregation determination.  *Id.* at ¶ 11; *see also Proctor I*, Memorandum-Decision and Order, dated December 16, 2008 (Dkt. No. 110) at pp. 9-12.

Since that initial determination, plaintiff's status has been subjected to

---

[5]     In the New York State prison system, administrative segregation is subject to a comprehensive regulatory scheme which requires, *inter alia*, that a hearing be conducted within fourteen days of an inmate's admission into administrative segregation. 7 N.Y.C.R.R. § 301.4(a).  "Administrative segregation admission results from a determination by the facility that the inmate's presence in general population would pose a threat to the safety and security of the facility."  7 N.Y.C.R.R. § 301.4(b). The regulations also provide for periodic post-segregation review of the inmate's circumstances at sixty-day intervals.  7 N.Y.C.R.R. § 301.4(d).   Administrative segregation inmates are housed in the SHU and are subject to most of the restrictions that apply to disciplinary SHU inmates. *Edmonson v. Coughlin*, 21 F. Supp. 2d 242, 248-249 (W.D.N.Y. 1998).  SHU inmates are confined in their cells between twenty-two and twenty-three hours per day, but are not completely restricted.  *Husbands v. McClellan,* 990 F. Supp. 214, 217 (W.D.N.Y. 1998); *see also* 7 N.Y.C.R.R. pt. 304.  In general, they are allowed two showers per week and one hour of outdoor exercise per day, unlimited legal visits and one non-legal visit per week and have access to counselors and sick call.  *Id.*  Additionally, they can participate in cell study programs and can receive books from the library.  *Id.*

periodic reviews at approximately sixty-day intervals pursuant to New York's prescribed regulatory protocol.  *See generally* Amended Complaint (Dkt. No. 19).  Plaintiff maintains that those periodic reviews have not been meaningfully conducted, but have taken into account past misconduct, reasons not originally cited for placing him in administrative segregation (*e.g.* his murder conviction), and incidents for which he has been acquitted through the disciplinary process, which should have been expunged from his records. *See, e.g., id.* at ¶¶13-14  Plaintiff maintains that the periodic administrative reviews are a sham, that the reasons stated for retaining him in administrative segregation are a pretext, and that in reality he is being punished for having escaped on election day and, plaintiff maintains, costing Governor Mario Cuomo to the lose the gubernatorial election in 1994.  *See id.* at ¶¶ 92-96.

According to the plaintiff, defendant LeClaire has had significant involvement in the process by which he has been confined for several years in administrative segregation.  Plaintiff maintains that it is defendant LeClaire who is the ultimate decision-maker in the review process, *see, e.g.,* Amended Complaint (Dkt. No. 19) ¶ 12, and that his signature appears on the periodic review forms.  *Id.*

6

Plaintiff has complained regarding his continued administrative segregation through various avenues.  On March 24, 2004, for example, he submitted a supplemental administrative appeal to former DOCS Commissioner Glenn Goord; that appeal was forwarded to defendant LeClaire.  Amended Complaint (Dkt. No. 19) ¶ 15.  Plaintiff subsequently wrote directly to defendant LeClaire regarding his sixty-day reviews, alleging that inaccurate information was being factored into the review process.  *Id.* at ¶ 17.  Plaintiff also wrote letters to the superintendent at Great Meadows requesting that the letters be taken into consideration at his periodic reviews. *Id.* at ¶¶ 21, 23, 25, 33, 54, 67.  Plaintiff again wrote to former DOCS Commissioner Goord in connection with this continued administrative segregation on August 16, 2005; that letter also was referred to defendant LeClaire.  *Id.* at ¶¶ 32, 34.

On September 25, 2007, plaintiff wrote to DOCS Commissioner Brian Fischer, questioning the need for his continued placement in administrative segregation.  Amended Complaint (Dkt. No. 19) ¶ 60.  In apparent response to that correspondence, plaintiff received a letter dated October 29, 2007 from defendant LeClaire stating that "[a]ll pertinent information, including your letter, will be included as part of the review process during the next meeting

7

of the Ad Seg. Review Committee."  *Id.* at ¶ 61.  Commissioner Fischer also

responded to plaintiff's September 25, 2007 correspondence by letter dated

February 29, 2008, in which he wrote "your disciplinary record, and your

attempt to escape, do not suggest that placement in general population is

appropriate, your claims to the contrary notwithstanding."  *Id.* at ¶ 63.  On

October 28, 2008, plaintiff wrote to New York State Governor David

Patterson requesting a pardon and his release from administrative

segregation.  *Id.* at ¶ 75.

In addition to sending letters to DOCS officials, plaintiff has complained

of his status through the filing of various grievances, including on July 27,

2007, May 20, 2009, and July 29, 2009.  Amended Complaint (Dkt. No. 19)

¶¶ 56, 81, 84 and Exhs. A-Z.  While the July 27, 2007 grievance was

dismissed, the remaining two were unsuccessfully pursued by the plaintiff

through the DOCS Central Office Review Committee ("CORC").  *See id.*

II.     PROCEDURAL HISTORY

Plaintiff commenced this action on October 2, 2009, and later filed an

amended complaint, with the court's approval.  Dkt. Nos. 1, 19.  In his

complaint, as amended, plaintiff names Lucian J. LeClaire, Jr., the Deputy

Commissioner of the DOCS, as the sole defendant and asserts a single claim

alleging deprivation of his right to procedural due process as guaranteed

under the Fourteenth Amendment.  *Id.*  Plaintiff's amended complaint seeks

various forms of injunctive relief as well as compensatory and punitive

damages.  *Id.*

In lieu of answering plaintiff's amended complaint, on January 28, 2010

defendant filed a motion pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure for dismissal.[6]  Dkt. No. 7.  Plaintiff has since responded in

opposition to defendant's motion, Dkt. No. 21, which is now fully briefed and

ripe for determination and has been referred to me for the issuance of a

report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and

Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P.

72(b).

## III.   DISCUSSION

### A.   Dismissal Motion Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of

the Federal Rules of Civil Procedure, calls upon a court to gauge the facial

sufficiency of that pleading, utilizing as a backdrop a pleading standard

---

[6]      Defendant's motion, which was filed in response to plaintiff's initial complaint, *see* Dkt. No. 7, was refiled and deemed to relate to plaintiff's amended complaint, as directed by Memorandum-Decision and Order issued by District Judge Gary L. Sharpe on May 18, 2010.  *See* Dkt. No. 18.

which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny.  *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, (2007)).  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal,* 129 S. Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).  As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.).  However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Iqbal*, 129 S. Ct. at 1949.  In the wake of *Twombly* and *Iqbal*, the burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) remains substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, "'but whether the claimant is entitled to offer evidence to support the claims.'" *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp.2d 435, 441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995)) (citations and quotations omitted).

B.    Personal Involvement

In his motion, defendant LeClaire first argues that plaintiff's complaint fails to plausibly allege his personal involvement in the constitutional deprivations alleged, and that all claims against him should be dismissed on

11

that basis.  In support of that argument defendant asserts that according to plaintiff's amended complaint, his role in the ongoing administrative segregation review process is limited to making a determination based upon information provided to him by his subordinates.  Defendant maintains that plaintiff's claim that the information passed on to defendant LeClaire may have included unspecified new accusations which plaintiff was not afforded an opportunity to refute, allegations of conduct of which plaintiff was exonerated, and false information unknown to the defendant, does not inculpate LeClaire in the due process violation alleged.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  As the Supreme Court has noted, a defendant may only be held accountable for his or her actions under section 1983.  *Iqbal*, 129 S. Ct. at 1952.  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must therefore show some tangible connection between the constitutional violation alleged and that particular defendant.  *See Bass v.*

12

*Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Defendant LeClaire is the Deputy Commissioner of the DOCS, and apparently the administrator tasked with oversight of the administrative segregation review process.  As such, it appears that plaintiff's complaint may name him as a defendant because of his supervisory position.  It is well-established, however, that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring.[7]  *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*,

---

[7]     It remains to be seen how many of the *Colon* factors, if any, retain vitality in the wake of the Supreme Court's decision in *Iqbal*.  The Second Circuit has yet to address the impact of *Iqbal* upon the categories of supervisory liability under *Colon*.  Lower courts

(continued...)

21 F.3d at 501.

In this instance plaintiff's amended complaint, when liberally construed and after drawing all inferences in his favor, sufficiently alleges defendant LeClaire's participation in the violations asserted.  In it Proctor alleges, for example, that an appeal filed with Commissioner Goord on March 24, 2004, reflecting that a toenail clipper incident which may have been relied on in connection with his various administrative segregation reviews should have been expunged from plaintiff's records.  *See* Amended Complaint (Dkt. No. 19) ¶ 15.  Defendant LeClaire presumably was aware of that contention since, according to the plaintiff, Commissioner Goord forwarded the appeal to the defendant LeClaire.  *Id.*  Similarly, plaintiff alleges that on May 30, 2004 he wrote directly to defendant LeClaire, placing him on notice of his claim that

_____

[7](...continued)
have struggled with this issue, and specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability.  *See Sash*, 674 F. Supp. 2d at 542-544; *see also Stewart v. Howard*, No. 9:09-CV-0069 (GLS/GHL), 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) ("The Supreme Court's decision in [*Iqbal*] arguably casts in doubt the continued vitality of some of the categories set forth in *Colon*.") (citations omitted), *report and recommendation adopted*, 2010 WL 3907137 (Sept. 30, 2010) .  While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, No.07 CIV. 1801, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed. App'x 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular case depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi*, Nos. 09 Civ. 7283 (JSR), 09 Civ. 9952 (JSR), 2010 WL 2428128, at *5 (S.D.N.Y. Jun. 15, 2010); *Qasem v. Toro*, No. 09 Civ. 8361 (SHS), 2010 WL 3156031, at *4 (S.D.N.Y. Aug. 10, 2010).

inaccurate information was being relied upon in connection with the periodic

administrative segregation reviews.  *Id. at* ¶ 17.  In light of plaintiff's claim that

these and other communications were directly forwarded to LeClaire, who

oversees the administrative review process, plaintiff has plausibly alleged

that LeClaire was involved in making decisions based upon arguably false or

improper information.

Plaintiff's amended complaint also alleges that pursuant to 7

N.Y.C.R.R. § 301.4 LeClaire was delegated the responsibility for making the

final determination to maintain plaintiff in administrative segregation and that

the periodic processes over which LeClaire has presided are a sham and do

not represent meaningful reviews.[8]  *See, e.g.,* Amended Complaint (Dkt. No.

---

[8]     The governing DOCS regulations require review of administrative
segregation status every sixty days.  7 N.Y.C.R.R. § 301.4(d).  Pursuant to the outlined
procedures the periodic reviews are general conducted by a three-member committee
consisting of a representative of the facility executive staff, a security supervisor, and a
member of the guidance and counseling staff, which is responsible for examining the
inmate's institutional record and preparing and submitting to the superintendent or his or
her designee a report setting forth the reasons why the inmate was initially put in
administrative segregation, information regarding the inmate's subsequent behavior and
attitude, and any other relevant factors in favor of retention or release.  *Id.*  That report,
together with any statement from the inmate, is forwarded to the superintendent or
designee who must then make a determination as to whether to retain or release the
inmate from administrative segregation.  *Id.* However, the regulation also allows the DOCS
central office to conduct such periodic reviews, providing,

> Where the deputy commissioner for correctional facilities has
> notified the superintendent that an inmate in administrative
> segregation is to receive central office review, the superintendent or designee shall a

(continued...)

15

19) ¶¶ 4, 20, 22, 24, 26, 27, 29, 30, 31, 35, 40, 41, 42, 43, 46, 50, 51, 52, 53, 55, 57, 59, 62, 66, 68, 71, 72, 73, 77, 78, 80, 82, and 88.  This allegation similarly implicates defendant LeClaire directly in the constitutional violations alleged.

In sum, plaintiff's allegations, which at this early juncture must be accepted as true, suffice to assert a plausible claim of liability on the part of defendant LeClaire for the due process violation alleged.

C.    Claim Preclusion

Although the question of periodic reviews was not initially presented in his complaint in *Proctor I*, plaintiff raised the issue in briefing on cross-motions for summary judgment.  While Magistrate Judge Gustave J. DiBianco chose not to address the claim in his report and recommendation

---

[8](...continued)
of every 60-day review thereafter, refer the committee report, and any written statement received from the inmate, to a three-member central office committee consisting of a representative from the office of facility operations, a member of the department's inspector general's staff, and an attorney from the office of counsel. The central office committee shall then complete its review and forward the paperwork along with its recommendation to the deputy commissioner for correctional facilities. Upon receipt of the materials from the central office committee, including any written statement received from the inmate, the deputy commissioner shall make the determination to retain the inmate in or release the inmate from administrative segregation.

*Id.* at § 301.4(d)(3).

regarding those motions, in his decision addressing objections to the report

and recommendation District Judge Glenn T. Suddaby initially concluded that

the issue was not properly before the court, but nonetheless went on "in the

interest of thoroughness" to address the merits of that claim.  *See* 9:05-CV-

0092 (GTS/GJD) Dkt. Nos. 104, 110.  After reviewing plaintiff's motion

submission, Judge Suddaby concluded as follows:

> Here, the Court can find no evidence in the record
> that plaintiff continued to remain in administrative
> segregation as a result of a new reason that arose
> after the date on which he was originally placed in
> administrative segregation.  Nor can the Court find
> any record evidence that Plaintiff's confinement is not
> being reviewed in some manner.

*Id.*, Dkt. No. 110, *slip op.* at 16.  Defendant maintains that plaintiff's assertion

of the argument in the prior action, together with the court's determination

addressing its merits, warrant a finding of claim preclusion barring him from

relitigating the administrative segregation review claim now raised.

"The preclusive effect of a judgment is defined by claim preclusion and

issue preclusion, which are collectively referred to as 'res judicata.'"  *Taylor v.*

*Sturgell*, 553 U.S. 880, 892, 128 S. Ct. 2161, 2171 (2008).  While under claim

preclusion a final judgment forecloses successive litigation of the very same

claim regardless if relitigation of the claim raises the same issues as in the

prior suit, issue preclusion bars successive litigation of an issue of fact or law actually litigated and resolved by a court, even if the issue recurs in a different context in a new claim.  *Id.* at 892*,* 128 S. Ct. at 2171 (citing *New Hampshire v. Maine,* 532 U.S. 742, 748-49, 121 S. Ct. 1808, 1814 (2001)).  Both doctrines protect against "the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions" while precluding parties from bringing claims they have already had a full and fair opportunity to litigate.  *Montana v. United States*, 440 U.S. 147, 153-54, 99 S. Ct. 970, 973-74 (1979).  Succinctly stated, "[t]he doctrine of *res judicata* . . . was established as a means to promote legal economy and certainty."  *Expert Electric, Inc. v. Levine*, 554 F.2d 1227, 1232 (2d Cir.), *cert. denied*, 434 U.S. 903, 98 S. Ct. 3000 (1977).

"[C]laim preclusion generally prevents litigation of any ground that could have been advanced in the earlier suit in support of the claim… made there…".  *USM Corp. v. SPS Technologies, Inc.*, 694 F.2d 505, 508 (7th Cir.1982), *cert. denied*, 462 U.S. 1107, 103 S. Ct. 2455 (1983).  Before claim preclusion will bar a subsequent lawsuit, it must be shown that there was a final judgment on the merits in a previous proceeding, involving the same

parties or their privies, and arising out of the same transaction or connected series of transactions is at issue.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286-87 (2d Cir. 2002); *see also Faye v. South Colony Cent. Sch. Dist.*, 802 F.2d 21, 28 (2d Cir. 1986), *overruled on other grounds by*, *Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768 (2d Cir. 2002).

Clearly, plaintiff's administrative review due process claim should have been, and in fact was, raised in the prior action.  By the time of plaintiff's submission of his summary judgment brief in that case on February 11, 2008, wherein he raised the issue, *see* Dkt. No. 98, twenty-five periodic reviews of administrative segregation determined had already been conducted.  *See* Amended Complaint (Dkt. No. 19) ¶ 66.  Plaintiff's amended complaint alleges nine additional periodic reviews occurring after February 11, 2008.  It is true that the sufficiency of these more recent periodic reviews obviously was not directly addressed in Judge Suddaby's decision.  This alone, however, is insufficient to bar the application of *res judicata.  Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 289 (2d Cir.) (citing cases), *cert. denied*, 531 U.S. 1035, 121 S. Ct. 623 (2000).  Rather, the focus of the court's inquiry is on "whether the same transaction or *connected series of transactions* is at issue."  *Id.* (quoting *N.L.R.B. v. United Techologies Corp.*,

19

706 F.2d 1254, 1260 (2d Cir. 1983)) (emphasis in original).  The term "transaction" is interpreted flexibly, using common sense, and recognizing the reality of circumstances at hand.  *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997).  The issue turns on whether the underlying facts are "'related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.'" *Id.* at 90 (quoting Restatement (Second) of Judgments § 24(b)) (other citation omitted).

Plaintiff's due process claim in this case is the same as that advanced in *Proctor I* as it related to the periodic reviews pre-dating February of 2008. The origin of plaintiff's claim is his allegation that the original administrative segregation determination as well as the subsequent periodic reviews are and have been perfunctory and a sham, employed by defendant LeClaire as a pretext for indefinite punitive confinement of plaintiff in SHU.  *See* Amended Complaint (Dkt. No. 19) ¶ 64.  In fact, plaintiff's complaint alleges that the start of defendant's discriminatory policy or practice relating to these reviews occurred on or about February 23, 2004, *see id.* at ¶¶ 13-14, and that for each periodic review since April of 2008, defendant has continued to employ this policy and use material that has been expunged from his record, as well

20

as erroneous information regarding past "assaults" on staff, and "the same

issues, subjects, allegations, lies, twisted opinions and rote manner of

answering these reviews."  *Id.* at ¶ 77.  Simply put, as plaintiff's own

allegations make clear, "all of these facts derive ultimately from the same

origin or motivation. . ." that drove his claims in his previous complaint.

*Waldman v. Village of Kiryas Joel*, 207 F.3d 105, 111-12 (2d Cir. 2000).[9]

Turning to the second *Interoceanica* factor, this lawsuit would have formed a

convenient trial unit with the previous action since both involve substantially

the same occurrences regarding the plaintiff's periodic reviews of his

administrative confinement, and third, "it would seem clear that treating the

various overlapping facts as a single transaction or series of related

transactions would have 'conform[ed] to the parties' expectations.'" *Id.* at 112

(quoting *Interoceanica*, 107 F.3d at 90).

   To be sure, allowing the plaintiff's claims to proceed in this action would

contravene the paramount policy considerations underlying the doctrine of

---

[9]      Indeed, the plaintiff's position on the timeliness issue is supportive of a
finding that claim preclusion should apply and bar litigation even with respect to
subsequent reviews. In his opposition to the pending motion, Proctor argues that the
statute of limitations does not bar this claim, invoking the continuing violation doctrine and
alleging that the meaningless periodic reviews result from an overarching discriminatory
policy or practice aimed at keeping him segregated indefinitely.  Plaintiff's Opposition Brief
(Dkt. No. 24) at pp. 9-11.

*res judicata* and serve only to invite multiple lawsuits involving the same parties and circumstances, which would also risk uncertainty.  If the court were to entertain this action, each sixty-day interval when plaintiff's administrative confinement is reviewed could give rise to a new claim and expose the defendant to a new lawsuit even though there has been no change in the underlying facts and circumstances for defendant's determinations.

This is not to say, however, that a future action or series of future occurrences involving plaintiff's administrative segregation review could not at some point suffice to create a new, viable section 1983 action.  *See Waldman*, 207 F.3d at 113.  It may well be that some time in the future the plaintiff can sufficiently allege changed circumstances altering the factual predicate of his procedural due process claim such that it would not be barred by the original judgment.  *Monahan*, 214 F.3d at 290.  "Claims based on conduct or procedures which were not contemplated by, or a direct result of, the earlier action would not necessarily be precluded."[10]  *Id*.

---

[10]     While plaintiff is correct in his assertion that the periodic reviews must be "meaningful and not simply perfunctory", *McClary* v. Kelly, 4 F. Supp. 2d 195, 213 (W.D.N.Y. 1998) (citing *Giano v. Kelly*, 869 F. Supp. 143, 150-51 (W.D.N.Y. 1994)), the Supreme Court made it clear in *Hewitt* that they will not necessarily require that prison officials permit the submission of any additional evidence or statements, stating

(continued...)

At this time, however, plaintiff challenges the very same alleged unconstitutional conduct relating to his sixty-day reviews.  The discriminatory policy and practice complained of here not only should have been raised in connection with the earlier suit, but in fact was both raised and addressed by Judge Suddaby, and plaintiff is therefore barred by the doctrine of *res judicata* from raising it again here*.*

_____

[10](...continued)

> [t]he decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner – which will have been ascertained when determining [whether] to confine the inmate to administrative segregation – and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for "proof" in any highly structured manner. Likewise, the decision to continue confinement of an inmate pending investigation of misconduct charges depends upon circumstances that prison officials will be well aware of – most typically, the progress of the investigation.

*Hewitt*, 459 U.S. at 477 n.9, 103 S. Ct. at 874 n.9.  Indeed, as Judge Suddaby recognized in his decision in *Proctor I*, "'[t]he reviews do not require the present of the accused and do not require the reviewer to always consider new information, since the original reasons for placing the inmate in [administrate segregation] may continue to be compelling.'" *Proctor I*, Memorandum-Decision and Order (Dkt. No. 110) at p. 15 (quoting *Giano v. Selsky*, 91-CV-0166, 2002 WL 31002803, at *7 (N.D.N.Y. Sept 5, 2002) (Kahn, J.)).  Thus, plaintiff's assertion that defendant is precluded from relying on past conduct is misplaced. Additionally, "[i]f the reasons for his confinement do not change, . . . the inmate need not be informed each time his confinement is reviewed.  If the reasons for administrative segregation do change, [however,] the inmate should be informed of the new reasons and given an opportunity to respond."  *Giano*, 2002 WL 31002803, at *7.  At least one court has held that these essential elements of minimal due process are easily satisfied by the detailed regulations that govern placement of inmates in administrative segregation in DOCS facilities. *McClary*, 4 F. Supp. 2d at 213.

D.   Issue Preclusion

Although defendant's motion does not directly raise the issue, plaintiff's claims are also subject to issue preclusion, a more narrow doctrine than claim preclusion often referred to as collateral estoppel.  Issue preclusion bars a party that has had a full and fair opportunity to litigate an issue of fact from relitigating the same issue once it has been decided against that party or its privy.  *McKithen v. Brown,* 481 F.3d 89, 105 (2d Cir. 2007), *cert. denied*, 552 U.S. 1179, 128 S. Ct. 1218 (2008); *Marvel*, 310 F.3d at 288-89.

In this instance, as was previously indicated, in his decision Judge Suddaby considered and addressed the merits of plaintiff's procedural due process claim stemming from the contention that period reviews of his administrative segregation status have not been meaningful, but instead are sham proceedings based upon false information.  Accordingly, issue preclusion also bars litigation of the claim now raised.

E.   Statute of Limitations

Defendant's third and final argument in this case is that plaintiff's claims are barred, at least in part, by the applicable statute of limitations.  Consistent with the Supreme Court's pronouncement that actions brought under 42 U.S.C. § 1983 are subject to the limitations period derived from the general or

24

residual statute of limitations for personal injury actions under the laws of the forum state, *see Owens v. Okure,* 488 U.S. 235, 249-50, 109 S. Ct. 573, 582 (1989), plaintiff's federal claim in this action is governed by the three-year statute of limitations which applies in New York to personal injury claims of an otherwise unspecified nature.  *See* N.Y.C.P.L.R. § 214(5); *see also Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997) (quoting *Owens*); *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1156 (2d Cir. 1995); *Lugo v. Senkowski*, 114 F. Supp. 2d 111, 113 (N.D.N.Y. 2000) (Kahn, J.) (citing *Pinaud* and *Owens*). For purposes of gauging the timeliness of his claims, I have deemed plaintiff's complaint in this action to have been filed on September 30, 2009.[11] Accordingly, any of plaintiff's claims that accrued before September 30, 2006 are untimely.

In certain circumstances, the continuing violation doctrine has been applied to toll the statute of limitations in the context of section 1983 claims. *See Shomo v. City of New York,* 579 F.3d 176, 182 (2d Cir. 2009) (finding

---

[11]    While plaintiff's complaint was not formally filed with the court until October 5, 2009, Dkt. No. 1, it is dated September 30, 2009.  Affording plaintiff the benefit of the doubt, I have therefore treated the action as having been commenced on that earlier date, applying the prison mailbox rule recognized in this circuit and elsewhere as controlling for purposes of measuring a statute of limitations in an action brought by a prison inmate, *see Houston v. Lack,* 487 U.S. 266, 270-76, 108 S. Ct. 2379, 2382-85 (1988); *Jones v. Waterbury Police Dep't*, No. 04CV2137, 2005 WL 1185723, at *2 (D. Conn. May 12, 2005).

the continuing violation doctrine can apply "when a prisoner challenges a series of acts that together comprise an Eighth Amendment claim of deliberate indifference to serious medical needs."); *see also Matthews v. Connecticut Dep't of Pub. Safety*, No. 3:10cv325,  2010 WL 3984645, at *6 (D. Conn. oct. 8, 2010) (applying continuing violation doctrine to a section 1983 First Amendment retaliation claim).  To demonstrate entitlement to application of the doctrine, a plaintiff must establish both the existence of an ongoing unconstitutional policy or practice and one or more acts taken in furtherance of that policy within the governing limitation period*.  See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-15, 122 S. Ct. 2061 (2002);

In this case, again drawing all inferences in plaintiff's favor, I find that he has sufficiently alleged the existence of an unconstitutional policy and practice as well as manifestations of that policy occurring well within the three years statute of limitations.  Accordingly, were his claims in this action not precluded by claim and issue preclusion, I would recommend rejection of defendant's statute of limitations argument finding that the plaintiff is entitled to the benefit of a continuing violation rule.

F.    Whether to Permit Amendment

Generally, when a complaint filed by a *pro se* plaintiff is dismissed the plaintiff should be allowed to amend his pleading.  *See Gomez v. USAA Federal Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999).  However, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (finding that repleading would be futile) (citation omitted); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.")  (affirming, in part, dismissal of claim with prejudice) (citation omitted); *cf. Gomez*, 171 F.3d at 796 (granting leave to amend is appropriate "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim.").

Here, for the reasons discussed above, I find the deficiencies discerned with respect to plaintiff's claims in this action are substantive.  Accordingly, I recommend a finding that providing an opportunity to amend would be futile.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

Plaintiff's claims in this action, addressing the constitutional sufficiency

of the periodic administrative segregation reviews conducted in connection

with his continued administrative segregation confinement, sufficiently allege

defendant LeClaire's personal involvement in the claimed deprivation.  I

therefore recommend rejection of defendant's personal involvement

argument.  Defendant's statute of limitations argument is similarly deficient,

since plaintiff has alleged the existence of a pattern and practice of

unconstitutional behavior coupled with one or more instances in which that

practice was carried out within the three years prior to commencement of

suit.

Turning to defendant's claim preclusion argument, I find that the claims

now raised should have been, and in fact were, presented in an earlier action

which resulted in a determination adverse to the plaintiff, the court in *Proctor I*

finding no existence of a pattern or practice suggesting an unconstitutional

policy regarding those periodic reviews.  Plaintiff's claims are therefore

subject to dismissal on the basis of both claim preclusion and issue

preclusion.   Accordingly, it is hereby respectfully

RECOMMENDED that defendant's motion to dismiss (Dkt. No. 30) be

GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

28

written objections to the foregoing report.  Such objections must be filed with

the clerk of the court within FOURTEEN days of service of this report.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72;

*Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

ORDERED the clerk is also serve a copy of the Report and

Recommendation upon the parties in accordance with this court's local

David E. Peebles
U.S. Magistrate Judge

Dated        February 17, 2011
             Syracuse, NY



Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

(Cite as: 2009 WL 1069165 (S.D.N.Y.))

**c**

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Adrella E. WILSON, Plaintiff,

v.

LIMITED BRANDS, INC., et al., Defendants.

No. 08 CV 3431(LAP).

April 17, 2009.

West KeySummary**Administrative Law and Procedure 15A** ⚷ **501**

15A Administrative Law and Procedure

  15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents

    15AIV(D) Hearings and Adjudications

      15Ak501 k. Res Judicata. Most Cited Cases

**Civil Rights 78** ⚷ **1711**

78 Civil Rights

  78V State and Local Remedies

    78k1705 State or Local Administrative Agencies and Proceedings

      78k1711 k. Hearing, Determination, and Relief; Costs and Fees. Most Cited Cases

**Civil Rights 78** ⚷ **1712**

78 Civil Rights

  78V State and Local Remedies

    78k1705 State or Local Administrative Agencies and Proceedings

      78k1712 k. Judicial Review and Enforcement of Administrative Decisions. Most Cited Cases

**Constitutional Law 92** ⚷ **4178**

92 Constitutional Law

  92XXVII Due Process

    92XXVII(G) Particular Issues and Applications

      92XXVII(G)7 Labor, Employment, and Public Officials

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

(Cite as: 2009 WL 1069165 (S.D.N.Y.))

92k4176 Regulation of Employment

92k4178 k. Employment Discrimination Laws. Most Cited Cases

An Article 78 proceeding that affirmed the New York State Division of Human Rights' (SDHR) determination that there was no probable cause that an employer engaged in unlawful discriminatory practices provided a former employee with a full and fair opportunity to litigate her claims, which she asserted in the instant federal action as well. Thus, SDHR's determination of no probable cause was entitled to preclusive effect because the SDHR's procedure for investigating complaints, coupled with judicial review, comported with due process. That the employee might have been unaware of an administrative appeal process was of no import. The employee's failure to avail herself of the full range of available procedures did not render those procedures inadequate under the Due Process Clause. U.S.C.A. Const.Amend. 14; McKinney's CPLR 7801 et seq.

*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, District Judge.

**\*1** Defendants Victoria Secret Stores, L.L.C. and Limited Brands, Inc. ("VSS" or "Defendants") move pursuant to Rule 12(c) for judgment on the pleadings, arguing that collateral estoppel precludes Plaintiff Adrella E. Wilson from re-litigating claims she has already litigated in the State Division of Human Rights ("SDHR") and through an Article 78 proceeding in Bronx County. For the reasons set out below, the motion is granted.

The Supreme Court has held that a federal court "must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). In adherence to this rule, the Court of Appeals has previously held that a "New

York state court affirmation of the [SDHR's] finding of no probable cause would preclude federal litigation based on the same facts." *Yan Yam Koo v. Dep't of Bldgs. of the City of New York,* 218 Fed. Appx. 97, 98 (2007) (Summary Order), affirming *Yan Yam Koo v. NYC Dep't of Bldgs.,* No. 04 Civ. 9628, 2006 WL 963883 (S.D.N.Y. Apr. 12, 2006) (Summary Order). Therefore, a "judgment pursuant to Article 78 may preclude relitigation of issues already decided in that earlier judgment." *LaFleur v. Whitman,* 300 F.3d 256, 272 (2d Cir.2002).

New York law applies collateral estoppel "if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." *LaFleur,* 300 F.3d at 271. In *Kremer v. Chem. Constr. Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982), the Supreme Court held that an Article 78 proceeding that affirmed the SDHR's determination of no probable cause was entitled to preclusive effect because the SDHR's procedure for investigating complaints, coupled with judicial review, comported with due process. *See* 456 U.S. at 483-485. See *Hill v. Coca Cola Bottling Co. of New York,* 786 F.2d 550, 552 (2d Cir.1986) ("Since [plaintiff's] administrative proceeding before the state labor department was judicially confirmed in the Article 78 proceeding, we are required by *Kremer* to apply New York's law on collateral estoppel.").

Here, Plaintiff filed a Verified Complaint with the SDHR on April 25, 2005. [FN1] Following the SDHR finding of no probable cause on October 10, 2007 (Ex. I to the Amended Complaint ("Am.Compl.")), Plaintiff commenced an Article 78 proceeding seeking "to overturn [the] decision of the [SDHR] as well as investigate ministerial acts which delayed this case for 31 months." (Verified Petition, attached to the Article 78 Decision.) As noted in the Article 78 Decision, a hearing was held in that proceeding on May 19, 2008 at which both parties presented evidence.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

(Cite as: 2009 WL 1069165 (S.D.N.Y.))

FN1. The entire administrative record from the SDHR is attached to the June 27, 2008 Decision in *Wilson v. Victoria's Secret, et al* Supreme Court of the State of New York, County of Bronx, Index No. 34095707 (the "Article 78 Decision") which, in turn, is attached as Exhibit A to Defendants' moving papers. The Court may consider these papers and the documents attached to the Amended Complaint herein on this motion. *See Stewart v. Transp. Workers Union of Greater New York, Local 100,* 561 F.Supp.2d 429, 435-36 (S.D.N.Y.2008) (noting that a district court may rely on matters of public record of which the court may take judicial notice in resolving a Rule 12(c) motion); *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006) (district court may rely on documents incorporated in a complaint on a Rule 12(c) motion).

On June 27, 2008, the State Court determined that "based upon the hearing held on May 19, 2008 and review of the file of the New York State Division of Human Rights the court finds that the determination of respondent of October 10, 2007 was not arbitrary or capricious." Accordingly, the State Court dismissed Plaintiff's Article 78 petition.

**\*2** The Amended Complaint was filed in this Court on July 25, 2008, and this motion followed.

*Same Issues Raised*

Plaintiff claims national origin discrimination in both the SDHR and in her Amended Complaint in this Court. Plaintiff admits that the claims raised in both fora were claims of national origin discrimination raised under Title VII:

Plaintiff "agrees that she filed a Verified Complaint against Victorias Secret [sic] ('VSS') with the New York State Division of Human Rights ('SDHR') ... and agrees that the charge was based on National Origin." *See* Pl. Opposition at 10.FN2 The charge filed with the SDHR alleged a violation of both state law and Title VII. *See* Pl. Opposition, at 15; Amended Complaint, Exh. I. The SDHR determined that there was "no probable cause to believe that [VSS] has engaged in or is engaging in the unlawful discriminatory practice complained of." *See* Am. Compl., Exh. I.

FN2. Reference is to Plaintiff's Affirmation in Opposition to Motion dated February 11, 2009.

Plaintiff "agrees that on December 5, 2007 an Article 78 [proceeding] was filed in the Bronx County New York State Supreme Court ... to overturn the decision of the SDHR." *See* Pl. Opposition at 15. That Court held that "the SDHR actions/determination was not arbitrary and capricious and dismissed the Article 78 petition." *Id.* at 17.

Finally, Plaintiff "agrees that an amended complaint was filed on July 25, 2008 in this [federal] court based on national origin discrimination in violation of Title VII." *Id.* at 19.

More specifically, a comparison of Plaintiff's pleadings in the Article 78 proceeding and in this action confirms that the two claims are based on precisely the same facts and circumstances. For example, in both fora, Plaintiff complains of:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

(Cite as: 2009 WL 1069165 (S.D.N.Y.))

Harassment by management by their cutting her hours and putting false write ups in her personnel files, *compare* letter of 1/3/06 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 3, l. 9, p. 5, ll. 1-4.

Unfair or "un-American" working conditions, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) with Am. Compl., ¶ 2E, p. 2 l. 8.

Transfer of sales to favored associates, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 3, l. 16.

Management's failure to inform her of late night cab reimbursement policy, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p.4, ll. 8-10.

Management's refusal to grant her time off to attend a funeral, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 6, ll. 1-2.

Retaliation for reporting sexual harassment, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 6, ll. 6-7, ll. 15-16.

Management's insulting remarks, *compare* letter received 10/4/06 to SDHR (attached to Article 78 Decision) *with* Am. Compl ., ¶ 2E, p. 3, l. 9.

**\*3** Retaliation of the April 13, 2005 incident which led to her termination, *compare* letter received 10/4/06 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 8, l. 1.

The issues raised in the SDHR proceeding were, of course, necessarily decided by the State Court in the Article 78 Decision.

*Full Opportunity to Litigate Had*

A "full and fair opportunity to litigate" means that "state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause." *Kremer,* 456 U.S. at 481. As noted above, the Supreme Court has clearly stated that an Article 78 proceeding that affirms the SDHR's determination of no probable cause is entitled to preclusive effect because the SDHR's procedure for investigating complaints, coupled with judicial review, comport with due process. *Id.* at 483-485. Thus, the Article 78 proceeding here provided Plaintiff with a full and fair opportunity to litigate her claims. That she might have been unaware of the administrative appeal process, *see* Pl. Op. at 5-6, is of no import. Plaintiff's failure to avail herself of the full range of available procedures does not render those procedures inadequate under the Due Process Clause. *Kremer,* 456 U.S. at 485. ("The fact that Mr. Kremer failed to avail himself of the full procedures provided by state law does not constitute a sign of their inadequacy.")

*Plaintiff's Other Arguments Against Collateral Estoppel Without Merit*

To the extent that Plaintiff suggests that her naming VSS in her SDHR proceeding and Limited Brands in this action somehow avoids the application of collateral estoppel, she is mistaken. Identity of defendants is not required. *See, e.g., LaFleur,* 300 F.3d at 274 (holding that the proper inquiry with respect to collateral estoppel is *"not* whether the respondent-defendants were identical in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

(Cite as: 2009 WL 1069165 (S.D.N.Y.))

both cases"); *Republic Gear Co. v. Borg-Wamer Corp.,* 381 F.2d 551, 555, n. 1 (2d Cir.1967) (explaining that "collateral estoppel may bar relitigation of an issue even against different defendants," provided that the issue in contention was necessary to the result reached in the prior proceeding); *Yan Yam Koo,* 218 Fed. Appx. at 99 (holding that the fact "[t]hat the plaintiff did not name the identical parties in the state and federal actions does not disturb our finding of [issue] preclusiveness").

In any event, the party defendants are sufficiently closely related to permit preclusion. Victoria's Secret Stores, L.L.C.-Plaintiff's actual employer (*see* Am. Compl. at ¶ 11E)-is a wholly-owned subsidiary of Limited Brands Store Operations, Inc., a Delaware corporation that is a wholly-owned subsidiary of Intimate Brands, Inc. Intimate Brands, Inc. is a Delaware corporation that is a wholly-owned subsidiary of LBI, which is also a publicly traded Delaware corporation.[FN3]

> **FN3.** The Court may take judicial notice of this fact, as this information is attached to the LBI Form 10K that is filed with the Securities and Exchange Commission. Accordingly, it is a matter of public record. *See Stewart,* 561 F.Supp.2d at 435-36.

Finally, to the extent that Plaintiff argues that she did not raise all her federal causes of action in her Article 78 proceeding, she is nevertheless barred from raising them now pursuant to the doctrine of *res judicata.*[FN4] Under New York law, the doctrine of *res judicata* bars a "later claim arising out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Because Plaintiff's claims indisputably arise from the same set of facts, *res judicata* applies to bar any legal theories she now raises that are different from those raised in the state court proceeding. *See Kremer,* 456 at 465 n. 3, 481

n. 22 (noting that *res judicata* has been taken to bar claims arising from the same transaction even if brought under different statutes; also noting that a " 'party cannot escape the requirements of full faith and credit and res judicata by asserting its own failure to raise matters clearly within the scope of a prior proceeding' " (quoting *Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident & Health Ins. Guar. Ass'n,* 455 U.S. 691, 710, 102 S.Ct. 1357, 71 L.Ed.2d 558 (1982))).

**FN4.** Although Plaintiff named VSS as the defendant in the state court case and LBI in this case, the identity of the parties is nonetheless the same for purposes of determining *res judicata.* LBI has a sufficiently close relationship to VSS and both defendants were known to Plaintiff at the time she filed her first lawsuit. *See, e.g., Official Publ'ns, Inc. v. Kable News Co.,* 811 F.Supp. 143, 147 (S.D.N.Y.1993) (holding that the "doctrine of *res judicata* also bars litigation of the same causes of action against defendants who were known to plaintiff at the time the first action was filed but were not named where the newly-added defendants have a sufficiently close relationship to the original defendant"); *Alpert's Newspaper Delivery Inc. v. The New York Times Co.,* 876 F.2d 266, 270 (2d Cir.1989) (noting that in determining privity for *res judicata* purposes, the issue is one of substance rather than the names of the caption of the case). Because LBI is merely a holding company of which VSS is a wholly-owned subsidiary, and the defenses raised by VSS sufficiently represented LBI's interests, VSS and LBI are in privity for *res judicata* purposes. *See G & T Terminal Packaging Co. v. Consol. Rail Corp.,* 719 F.Supp. 153, 159 (S.D.N.Y.1989) (holding that "[s]ubsidiaries are in privity with their principal for res judiciata purposes when, as here, they sufficiently represent the principal's interests"). Additionally, the same counsel who represented VSS in the prior state court litigation represents LBI and VSS in the current litigation. *See Melwani v. Jain,* No. 02 Civ. 1224, 2004 WL

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

(Cite as: 2009 WL 1069165 (S.D.N.Y.))

1900356, *2 (S.D.N.Y. Aug. 24, 2004) (stating that "the fact that the parties in the prior and current litigation had the same attorney is of singular significance in the privity analysis" (quotation marks omitted)).

### Conclusion

**\*4** For the reasons set out above, Defendants' motion for judgment on the pleadings [dkt. no. 14] is granted.

The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED.

S.D.N.Y.,2009.

Wilson v. Limited Brands, Inc.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jesse L. STEWART, Jr., Plaintiff,

v.

Gary HOWARD, D. Monell, N. Marsh, D. Spangenburg, D. Swarts, E. Hollenbeck, J. Edwards, D. Russell, Defendants.

No. 9:09-CV-0069 (GLS/GHL).

April 26, 2010.

Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for Defendants.

**REPORT-RECOMMENDATION**

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Jesse L. Stewart alleges that Defendants, all employees of the Tioga County Jail, violated his constitutional rights by limiting his ability to send legal mail, depriving him of his mattress and bedding during daytime hours, subjecting him to excessive force, denying him medical care after the alleged use of excessive force, and conducting biased disciplinary hearings. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) For the reasons that follow, I recommend that Defendants' motion be granted.

**I. FACTUAL AND PROCEDURAL SUMMARY**

This action involves Plaintiff's experiences at Tioga County Jail, where he was incarcerated from August 19, 2008, to January 13, 2009. (Dkt. No. 30-4 at 14:2-11.) The complaint consists almost entirely of copies of grievances and letters that Plaintiff submitted to other individuals and organizations. The "facts" section of the civil complaint form merely directs the reader to "see attached." As such, the precise contours of Plaintiff's claims are difficult to discern. The documents attached to the complaint show that:

On September 22, 2008, Plaintiff requested a grievance form so that he could complain about the facility's legal mail procedures. (Dkt. No. 1 at 41.) A grievance form was issued. *Id.*

On October 27, 2008, Plaintiff requested a grievance form so that he could complain about being denied access to the courts. (Dkt. No. 1 at 44.) Sgt. William "spoke with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

[Plaintiff] but he refuses to sign off. He states he needs these letters to go out to these courts because he's fighting extradition." *Id.*

On October 30, 2008, Defendant Officer Earl Hollenbeck issued an Inmate Rule Infraction Notice to Plaintiff accusing him of sending mail using another inmate's account. (Dkt. No. 1 at 31.)

In a "notice of intention" dated November 30 2008, Plaintiff alleged that, pending disciplinary action against him, staff at the Tioga County Jail deprived him of his mattress, sheets, and blanket when temperatures were as low as fifteen degrees at night and forced him to sit directly on his steel bed for periods up to seventeen hours. (Dkt. No. 1 at 8.) In support of Defendants' summary judgment motion, Defendant Lt. David Monell declares that when inmates are accused of violating a disciplinary rule, they are placed in administrative segregation pending a hearing. During that time, the inmate's bedding is removed during the day. If this was not done, "inmates may intentionally violate rules in order to be assigned to administrative segregation so they could sleep in the cell all day instead of having to adhere to the normal inmate routine." (Dkt. No. 30-11 at 6 ¶ 12.) The parties agree that inmates' mattresses and bedding are returned at night. (Dkt. No. 1 at 10; Dkt. No. 30-11 at 6 ¶¶ 13-15.)

**\*2** In his "notice of intention," Plaintiff alleged that on November 3, 2008, he asked for a grievance form. (Dkt. No. 1 at 8.) Defendant Officer Douglas Swarts told him "if you don't shut the fuck up I'll have a few people shut you up." *Id.* Two or three minutes later, several other officers, including Defendant Sergeant Dennis Spangenburg, arrived and stood in front of Plaintiff's locked cell. *Id.* Plaintiff asked Defendant Spangenburg why he was denying Plaintiff the right to file a grievance. *Id.* at 8-9. Defendant Spangenburg replied "I can deny you anything I want." *Id.* at 9. Defendant Officers Jonathan Edwards and David Russell then entered Plaintiff's cell

and handcuffed Plaintiff so tightly that the handcuffs "stopp[ed] the flow of blood to [Plaintiff's] hands." *Id.* Defendants Edwards and Russell then escorted Plaintiff to the intake area of the facility. Along the way, they used Plaintiff's "head and body as a ram to open the electronically control[l]ed doors," which cut Plaintiff's lip and caused his nose to bleed. *Id.* Attached to Plaintiff's complaint are affidavits from inmates who state that they witnessed this incident. *Id.* at 14-15.

Plaintiff alleged in his "notice of intention" that upon arrival at the intake area, he was placed in a strip isolation cell. (Dkt. No. 1 at 9.) Several officers "entered in behind me, at what time I was hit with closed fist[s] and what felt like kicks from all directions to my head, back, ribs, and groin area several times." *Id.* Plaintiff was punched in the right eye. *Id.* After that, Plaintiff's handcuffs were removed and Defendant Sergeant Nathaniel Marsh entered the cell, grasped Plaintiff around the neck with one hand, held his mace an arm's length away from Plaintiff's face, and repeated "get the fuck up you little asshole" over and over. *Id.*

Defendants Marsh, Spangenburg, Swarts, Edwards, and Russell have submitted notarized affidavits in support of Defendants' motion for summary judgment stating that they did not assault Plaintiff. (Dkt. No. 30-11 at 10, 12, 18, 22, 24.)

At 10:50 a.m., Defendant Swarts issued two Inmate Rule Infraction Notices. The first stated that Plaintiff "refused to lock in his cell after numerous orders to do so. Duress alarm was activated." (Dkt. No. 1 at 32.) The second stated that Plaintiff "disrupted the pod by yelling threats to jail personnel." *Id.* at 33.

In his "notice of intention," Plaintiff alleged that he needed medical attention but was locked in the cell alone

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

without such attention for approximately fourteen hours. (Dkt. No. 1 at 9.) At 11:30 p.m., Plaintiff was escorted back to his usual cell. *Id.* All of his personal property had been removed and he was given only a mattress and a blanket. *Id.* The next morning, officers removed the mattress. *Id.* Plaintiff was told that he could only shower if he remained handcuffed and shackled. *Id.* He was given only two sheets of toilet paper. *Id.* at 9-10. This pattern of being given a mattress at night and having it removed in the morning continued for ten days. *Id.* at 10.

**\*3** On November 6, 2008, Plaintiff submitted an Inmate Request Form asking to "be released from ... restraint and receive my property back today." (Dkt. No. 1 at 45.) His request was denied. *Id.*

In his "notice of intention," Plaintiff alleged that when his property was finally returned to him, he "became submissive" and "did not file any more grievances as I was told not to or the next time it may be worse." *Id.* at 10.

In his "notice of intention," Plaintiff alleged that Defendant Marsh conducted a biased disciplinary hearing and found him guilty "on all of the infractions." (Dkt. No. 1 at 10.) Another attachment to the complaint shows that on November 12, 2008, Defendant Marsh found Plaintiff guilty and sentenced him to twenty-eight days of keeplock with no programs, no commissary, twenty minute hygiene, and legal phone calls only. *Id.* at 34.

In his "notice of intention," Plaintiff alleged that there is no "inhouse mail, or legal outgoing mail system" at Tioga County Jail and that Defendants refused to mail any item that would cost more than eighty-four cents. (Dkt. No. 1 at 10.)

On December 1, 2008, Officer Sean Shollenberger issued an Inmate Rule Infraction Notice stating that Plaintiff used stamps from another inmate to send personal mail. (Dkt. No. 1 at 35.) A hearing was scheduled for December 17, 2008. Plaintiff filed a written request stating that he had been informed of the hearing and requesting "that any decision to be determined may be done so without my participation or presence ... I do not wish to participate in such hearing." (Dkt. No. 1 at 36.) Plaintiff's request was approved. *Id.* At the hearing, Defendant Marsh found Plaintiff guilty and sentenced him to fourteen days of keeplock, no programs, no commissary, twenty minute hygiene, and legal calls only. *Id.* at 37. Defendant Marsh noted that "this is not the first infraction hearing due to [Plaintiff's] abusing the U.S. Postal Service." *Id.* On December 18, 2008, Plaintiff appealed the decision. *Id.* at 38. Plaintiff stated that he had refused to attend the hearing because of Defendant Marsh's previous use of force against him and because the hearing was not recorded. *Id.* at 39. The Chief Administrative Officer denied the appeal on December 23, 2008, because the "sanctions imposed are appropriate." *Id.* at 38.

On December 17, 2008, Plaintiff requested two grievance forms so that he could complain about the lack of bedding and facility disciplinary and hearing procedures. Grievance forms were issued. (Dkt. No. 1 at 46-47.)

On December 18, 2008, Plaintiff submitted a grievance complaining about the lack of bedding, visits, food, medical care, access to courts, and water. (Dkt. No. 1 at 20.) The grievance coordinator denied the grievance because "[d]iscipline is not grievable. There is an appeal process which the inmate can follow." *Id.* at 22. Plaintiff appealed to the Chief Administrative Officer. *Id.*

**\*4** On December 18, 2008, Plaintiff submitted a grievance complaining about Defendant Marsh's conduct during the disciplinary hearing [FN1] and requesting that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

disciplinary hearings be recorded or monitored by another hearing officer. (Dkt. No. 1 at 23-24.) The Grievance Coordinator denied the grievance because "NYS Minimum Standards requires that records be kept of infraction hearings. Records are kept of the infraction hearing. The TCJ does not have more than one officer available to do infraction hearings." *Id.* at 25. Plaintiff appealed to the Chief Administrative Officer. *Id* . On December 22, 2008, Defendant Marsh completed a Grievance Investigation Form stating that he interviewed Plaintiff. Defendant Marsh found that "this facility keeps all hearing records as well as provide a copy of the hearing record to the inmate. This facility has more than one hearing officer available." *Id.* at 26.

> FN1. Although it is not clear, Plaintiff was presumably referring to the November 12, 2008, hearing, which he attended, rather than the December 17, 2008, hearing that he refused to attend.

On December 18, 2008, Plaintiff submitted an Inmate Request Form asking to speak with the Undersheriff or Captain. (Dkt. No. 1 at 48 .)

On December 22, 2008, Plaintiff wrote a letter to the Chairman of the New York Commission of Corrections; the Hon. Thomas J. McAvoy, Senior United States District Judge, and the New York State Attorney General regarding conditions at Tioga County Jail. (Dkt. No. 1 at 16-17.) Specifically, Plaintiff complained about the bedding issue, the grievance and appeal system, and the legal mail system. *Id.*

On December 28, 2008, Plaintiff submitted a grievance complaining about the facility's legal mail procedure. (Dkt. No. 1 at 27.) The Grievance Coordinator denied the grievance because "[t]his facility is not denying

you access to the courts. Minimum standards ha[ve] been and will be controlled by the State of NY, therefore this issue is not grievable. NYSCOC was contacted regarding your reference to a 'new' state directive regarding legal mail. No such directive exists." *Id.* at 28. Plaintiff checked the box indicating that he wanted to appeal to the Chief Administrative Officer and wrote a note that he "was told that Lt. D. Monell is the Chief Officer and that I could not appeal this decision any higher." *Id.*

In his "notice of intention," Plaintiff alleged that on December 31, 2008, he was summoned to the front of the jail for an interview with Defendant Lt. D. Monell. (Dkt. No. 1 at 11.) Defendant Monell questioned Plaintiff about his December 22, 2008, letter to the Commission of Corrections. *Id.* Defendant Monell said that he did not give a damn about federal standards regarding bedding. *Id.* Defendant Monell told Plaintiff he should save his weekly postage allowance until he had enough to send a large document and did not respond when Plaintiff informed him that he was not allowed to do. *Id.* Regarding Plaintiff's complaint that he had received only two sheets of toilet paper, Defendant Monell replied that this was facility policy. (Dkt. No. 1 at 12.) Defendant Monell stated that he had reviewed the videotape of the alleged excessive force incident and did not see anything. *Id.* Defendant Monell asked "in a sarcastic manner" whether Plaintiff wanted protective custody because he felt threatened by the facility's officers. Plaintiff said no. *Id.*

**\*5** On January 1, 2009, Plaintiff filed an Inmate Request Form stating that he had not received responses to his appeals regarding disciplinary hearings. (Dkt. No. 1 at 49.) Defendant Russell responded that "Grievance # 36 was upheld so there is no appeal. Grievance # 35 was not a grievable issue because it regarded disciplinary sanctions." (Dkt. No. 1 at 50.)

On January 1, 2009, Plaintiff wrote to the Commission of Corrections informing them of his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

conversation with Defendant Monell and requesting an outside investigation. (Dkt. No. 1 at 18.)

On January 5, 2009, Plaintiff filed an Inmate Request Form asking for a grievance form. He stated that "the taking of bedding is not a disciplinary sanction but in fact an illegal practice." (Dkt. No. 1 at 42.) Defendant Monell replied that "removal of bedding is a disciplinary sanction and as such is not a grievable issue. Do not put in any more requests on this matter." *Id.*

On January 5, 2009, Plaintiff filed an Inmate Request Form stating that "the grievant has the right to appeal any decision by the grievance committee to the highest level for confirmation of such determination." (Dkt. No. 1 at 43.) Defendant Monell replied that Plaintiff should "read minimum standards-once the action requested has been met-there is no grounds for appeal. Request for grievance is denied. Do not put in any more requests on this matter ." *Id.*

On January 5, 2009, Plaintiff wrote to the Commission of Corrections again. He stated that he was being illegally denied the right to file grievances and that Defendant Monell "attempted to intimidate me." (Dkt. No. 1 at 19.) In a separate letter, he stated that his "grievance is not in regards to any disciplinary sanctions, but in fact an illegal local procedural practice at Tioga County Jail." (Dkt. No. 1 at 29.) He stated that he had been deprived of bedding, food, medical care, visits, and mail without due process. *Id.* at 29-30.

On January 8, 2009, Plaintiff filed an Inmate Request Form stating that he wanted to file a grievance about "the issue of periodicals and the donation/reading of them." (Dkt. No. 1 at 51.) A sergeant (signature illegible) responded that "this is not a grievable issue-this is a requestable issue which will be denied due to security

problems encountered in the D-pod housing unit involving the newspaper. Donations of books and magazines are allowed-you also are allowed to release property to persons outside of the jail." *Id.* at 52.

Plaintiff filed this action on January 21, 2009. (Dkt. No. 1.) Defendants now move for summary judgment. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) Defendants have filed a reply. (Dkt. No. 36.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

*Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

**\*6** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added).

"Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

Defendants argue that they are entitled to summary judgment because (A) Plaintiff refused to cooperate with his deposition; (B) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") regarding the November 3 excessive force incident "and other claims such as lack of toilet paper"; (C) Plaintiff has failed to state an Eighth Amendment conditions of confinement claim; (D) Plaintiff's allegations regarding the lack of bedding do not state a due process claim; (E) Plaintiff has failed to state a claim that he was denied access to the courts; and (F) Plaintiff has not alleged that Defendants Howard or Hollenbeck were personally involved in any alleged constitutional violation.

**A. Deposition**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

*7 Defendants move, pursuant to Federal Rule of Civil Procedure 37, to dismiss this action because Plaintiff unilaterally ended his deposition before answering any substantive questions. (Dkt. No. 30-12 at 10-11.) In the alternative, Defendants request an order precluding Plaintiff from offering sworn testimony in opposition to any motion brought by Defendants or at trial. *Id.* at 11. I find that Defendants' motion is untimely.

This Court's Mandatory Pretrial Discovery and Scheduling Order, issued on March 31, 2009, granted Defendants permission to depose Plaintiff. The order stated that "[t]he failure of the plaintiff to attend, be sworn, and answer appropriate questions may result in sanctions, including dismissal of the action pursuant to [Rule] 37." (Dkt. No. 21 at 3 ¶ D.) The order also noted that "any motion to compel discovery in the case must be filed not later than ten (10) days after the deadline for completing discovery." [FN3] *Id.* at 4 n. 5. The order set July 29, 2009, as the deadline for completing discovery. *Id.* at 4 ¶ A.

FN3. Effective January 1, 2010, the deadlines in the local rules were amended. The local rule now requires that discovery motions be filed no later than fourteen days after the discovery cut-off date. Local Rule 7.1(d)(8).

On July 2, 2009, Defendants requested permission to depose Plaintiff. (Dkt. No. 22.) The Court denied the motion as moot, noting that permission had already been granted. (Dkt. No. 23.) On July 31, 2009, Defendants requested an extension of the discovery cut-off date to allow them time to take Plaintiff's deposition. (Dkt. No. 24.) The Court granted Defendants' request and extended the discovery deadline to September 19, 2009. (Dkt. No. 27.)

On September 14, 2009, Defendants conducted Plaintiff's deposition. (Dkt. No. 30-4 at 9-17.) When defense counsel began asking Plaintiff about his criminal history, Plaintiff stated "[y]ou're browbeating me here, and I'll write to the judge and tell him why I didn't cooperate." *Id.* at 15:14-15. Plaintiff then ended the deposition. *Id.* at 15:20-22. No questions were asked or answered about the events at issue in this action.

Discovery in this case closed on September 19, 2009. Defendants did not file a motion to compel Plaintiff's deposition or for sanctions until they filed the pending motion on October 27, 2009. Because Defendants did not file their motion within ten days of the discovery cut-off date or request an extension of time in which to file a discovery motion, I recommend that their motion to dismiss the case as a sanction for Plaintiff's refusal to cooperate with his deposition be denied.

**B. Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims regarding the November 3, 2008, alleged use of excessive force and the alleged failure to provide medical care after the incident must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 30-12 at 2-3.) Defendants are correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007).

**\*8** Tioga County Jail has an inmate grievance procedure. (Dkt. No. 30-10 at 8-11.) Under the procedure, the Corrections Officer assigned to the inmate's housing unit initially receives complaints either verbally or in writing and attempts to resolve the complaint informally. *Id.* at ¶ 1.2(A)(1-2). If the complaint cannot be resolved informally, the inmate files a written complaint form, which is forwarded to the Shift Supervisor. *Id.* at ¶ 1.2(A) (3-4). If the Shift Supervisor cannot resolve the complaint, the complaint is forwarded to the Grievance Coordinator, who provides the inmate with a grievance form. *Id.* at ¶ 1.2(A)(5-8). The Grievance Coordinator is responsible for investigating and making a determination on the grievance and must give a written copy of his or her decision to the inmate. *Id.* at ¶ 1.2(A)(9). This written decision must be issued within five business days of receipt of the grievance. *Id.* at 1.3(C). If the inmate does not accept the Grievance Coordinator's determination, "an appeal will be forwarded to the Jail Chief Administrative Officer." *Id.* at ¶ 1.2(A)(11). The inmate must appeal within two business days of receipt of the Grievance Coordinator's determination. *Id.* at ¶ 1.3(D). At the request of the inmate, a copy of the appeal will be mailed by the Jail Administrator to the Commission of Corrections. *Id.* at ¶ 1.2(A)(13). The Jail Administrator must make a determination within two working days. *Id.* at ¶ 1.3(E). The inmate may appeal within three business days of receipt of the decision to the Commission of Corrections. *Id.* at ¶ 1.3(F).

Here, Plaintiff did not file a grievance regarding the alleged use of excessive force on November 3, 2008. (Dkt. No. 30-11 ¶ 6.) Therefore, he did not exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN4]

> **FN4.** The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81 (2006), in which the Supreme Court held that each step of an available grievance procedure must be "properly" completed before a plaintiff may proceed in federal court. *Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

**\*9** Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by raising it in their answer. (Dkt. No. 19 at ¶¶ 8-10.) Plaintiff appears to argue that Defendants are estopped from asserting the defense or that special

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

circumstances exist justifying the failure to exhaust. Specifically, Plaintiff states that exhausting his administrative remedies would have been futile and "may have caused more harm to the plaintiff" because the officers who allegedly assaulted him "are the persons that operate and give the decisions" regarding grievances. (Dkt. No. 32 at 1.)

Plaintiff's explanation is belied by his actual conduct. Plaintiff alleges that Defendant Marsh was involved in the use of excessive force. (Dkt. No. 1 at 9.) Despite this fact, Plaintiff filed a grievance three weeks after the incident complaining about Defendant Marsh's conduct during a disciplinary hearing. (Dkt. No. 1 at 23-24.) This indicates that Plaintiff was not, in fact, afraid to file grievances against the Defendants who allegedly assaulted him and denied him medical care. Thus, Plaintiff has not plausibly alleged that special circumstances prevented him from exhausting his administrative remedies. Therefore, I find that Plaintiff failed to exhaust his administrative remedies regarding the alleged use of excessive force and I recommend that the Court dismiss that claim.

**C. Eighth Amendment Conditions of Confinement**

Plaintiff alleges that Defendants violated his Eighth Amendment rights by removing his personal property, taking away his bedding and mattress during the day, allowing him to shower only if he remained handcuffed and shackled, and providing him with only two sheets of toilet paper. (Dkt. No. 1 at 9-10.) Defendants move for summary judgment of this claim. (Dkt. No. 30-12 at 5.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Specifically, an inmate must show that he was deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Here, Plaintiff does not allege that he was deprived of any human need. He was provided with a mattress and blankets at night, had the opportunity to shower, and received toilet paper. Although his conditions may not have been pleasant, the Eighth Amendment "does not mandate comfortable prisons." *Farmer,* 511 U.S. at 932 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's conditions of confinement claim.

**D. Due Process**

1. *Bedding*

**\*10** Defendants construe Plaintiff's complaint as asserting a claim that the removal of his bedding during the day violated his right to due process. Defendants argue that this claim should be dismissed. (Dkt. No. 30-12 at 5-6.) Defendants are correct.

An individual claiming that he was deprived of an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

interest in property "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Plaintiff had not legitimate claim of entitlement to possessing bedding during the day. Therefore, I recommend that the Court dismiss this claim.

2. *Disciplinary Hearing*

Plaintiff appears to allege that Defendant Marsh deprived him of due process by conducting a biased disciplinary hearing. (Dkt. No. 1 at 10.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Assuming *arguendo* that the state has granted inmates in county jails an interest in remaining free from keeplock confinement, the issue is whether Plaintiff's confinement imposed an "atypical and significant hardship" on him in relation to the ordinary incidents of prison life. Courts in the Second Circuit have routinely declined to find a liberty interest where an inmate's keeplock confinement is an "exceedingly short" period, less than thirty days, and there is no indication that the inmate suffered any "unusual conditions" during the confinement. *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) ("Confinements in ... keeplock of less than thirty days will not suffice to demonstrate a protected liberty interest absent other extraordinary circumstances of the confinement demonstrating that it was atypical or significant for other reasons.") (Sharpe, J.) (Homer, M.J.).[FN5]

FN5. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Defendant Marsh sentenced Plaintiff to twenty-eight days of keeplock after the November 12, 2008, hearing that followed the alleged excessive force incident. (Dkt. No. 1 at 34.) Defendant Marsh sentenced Plaintiff to fourteen days of keeplock after the December 17, 2008, hearing regarding Plaintiff's alleged use of another inmate's stamps. (Dkt. No. 1 at 37.) There is no indication that Plaintiff suffered any unusual conditions during these keeplock confinements. Notably, Plaintiff's allegations regarding the removal of his bedding occurred not during these keeplock sentences, but rather during earlier administrative segregation periods in October and November. (Dkt. No. 1 at 8-10.) Thus, Plaintiff has not alleged facts plausibly suggesting, or raised a triable issue of fact, that he was deprived of a liberty interest. Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Marsh *sua sponte.*

**E. Access to the Courts**

**\*11** Defendants argue that Plaintiff's claims regarding Tioga County Jail's legal mail procedures must be dismissed because (1) Plaintiff has not alleged the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

personal involvement of any Defendant; and (2) Plaintiff has not alleged any actual harm resulting from the procedures. (Dkt. No. 36-3 at 1.) Defendants did not raise this argument in their moving papers. Normally, due process would thus require that I disregard the argument or give Plaintiff an opportunity to file a sur-reply. Here, however, Plaintiff addressed this issue in his opposition despite Defendants' failure to raise it initially. (Dkt. No. 32 at 1.) Moreover, even if he had not, I would recommend that the Court dismiss the claim *sua sponte.*

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff has not raised a triable issue of fact that he suffered any actual injury. In his "notice of intention," he stated that the facility's mail policies *"could*

cause a great effect" and *"could* cause irreparable harm" to two pending *habeas corpus* cases. (Dkt. No. 1 at 10, emphasis added.) In his opposition to the motion for summary judgment, Plaintiff states that he "suffered the loss of one of the court actions" because he could not mail a brief. (Dkt. No. 32 at 1.) However, I note that this statement is not "evidence" because Plaintiff's opposition was not signed under penalty of perjury and does not contain any other language bringing it into substantial compliance with 28 U.S.C. § 1746. *See, LeBoeuf, Lamb, Greene & MacCrae, L.L.P. v. Worsham,* 185 F.3d 61, 65-66 (2d Cir.1999). Therefore, I recommend that Plaintiff's claim regarding legal mail be dismissed.

**F. Personal Involvement**

*12 Defendants argue that Plaintiff has failed to allege personal involvement by Defendants Howard or Hollenbeck. (Dkt. No. 30-12 at 11-12.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).[FN6] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[FN7] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN8] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN9] Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [FN10]

> **FN6.** *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

> **FN7.** *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

> **FN8.** *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

> **FN9.** *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

> **FN10.** The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* --- F.Supp.2d ----, No. 08-CV-116580, 2009 U.S. Dist. LEXIS 116580, at *32-39, 2009 WL 4824669, at*10-11 (S.D.N.Y. Dec. 15, 2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The only allegation in the complaint regarding Defendant Hollenbeck is that he issued an Inmate Rule Infraction Notice to Plaintiff on October 30, 2008. (Dkt. No. 1 at 31.) Plaintiff has not alleged any facts plausibly suggesting, or raised a triable issue of fact, that Defendant Hollenbeck's conduct violated Plaintiff's constitutional rights. Therefore, I recommend that any claims against Defendant Hollenbeck be dismissed.

The complaint's only reference to Defendant Howard is in the caption of the "notice of intention." (Dkt. No. 1 at 7.) Plaintiff could, perhaps, have argued that, as Sheriff, Defendant Howard was responsible for creating or allowing to continue unconstitutional policies. However, Plaintiff did not allege any facts plausibly suggesting, or raise a triable issue of fact, that Defendant Howard was responsible for the policies about which Plaintiff complains. Even if he had, as discussed above, Plaintiff has not provided sufficient evidence for any of his claims regarding those policies to survive summary judgment. Therefore, I recommend that any claims against Defendant Howard be dismissed.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be *GRANTED;* and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*13** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85 (2d Cir.1993)* (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Stewart v. Howard

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Jerome BELLAMY, Plaintiff,

v.

MOUNT VERNON HOSPITAL, in its official and individual capacity, Dr. Marc Janis, in his official and individual capacity, New York State Department Of Correctional Services, Dr. Lester Wright, in his official and individual capacity, and Dr. J. Pereli, in his official and individual capacity, Defendants.

No. 07 Civ. 1801(SAS).

June 26, 2009.

West KeySummary**Civil Rights 78** &#x232B;      1358

**78** Civil Rights

    **78III** Federal Remedies in General

        **78k1353** Liability of Public Officials

            **78k1358** k. Criminal law enforcement; prisons. Most Cited Cases

**Prisons 310** &#x232B;      203

**310** Prisons

    **310II** Prisoners and Inmates

        **310II(D)** Health and Medical Care

            **310k203** k. Reproductive issues. Most Cited Cases

**Sentencing and Punishment 350H** &#x232B;      1546

**350H** Sentencing and Punishment

    **350HVII** Cruel and Unusual Punishment in General

        **350HVII(H)** Conditions of Confinement

            **350Hk1546** k. Medical care and treatment. Most Cited Cases

    A correctional services doctor was not deliberately indifferent to a prisoner's serious medical needs under the Eighth Amendment in connection with the alleged denial of testosterone treatments. The prisoner brought a § 1983 action which alleged that he was denied the treatments which he needed after he developed hypogonadism after an epididymectomy. The doctor not liable for the alleged harm because he was not involved with any denials of the prisoner's treatment and did not create a policy that contributed to the prisoner's alleged harm. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

Jerome Bellamy, Alden, NY, pro se.

Julinda Dawkins, Assistant Attorney General, New York, NY, for Defendants.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

***OPINION AND ORDER***

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

**\*1** Jerome Bellamy, presently incarcerated and proceeding pro se, alleges that the New York State Department of Correctional Services ("DOCS") and Dr. Lester Wright, the remaining defendants in this case FN1, violated Bellamy's constitutional rights. His claims surround denials of requested testosterone treatment by Wright, a doctor and supervisory official for the DOCS. Wright and the DOCS now move for summary judgment. For the reasons stated below, their motion for summary judgment is granted in its entirety.

> FN1. The original and amended complaints were also filed against Mount Vernon Hospital, Dr. Mark Janis, Dr. J. Pereli, in their individual and official capacities. The claims against Mount Vernon Hospital and Dr. Mark Janis were dismissed in *Bellamy I* and the claim against Dr. J. Pereli was dismissed in a subsequent order issued by this Court on January 15, 2009. Wright and the DOCS are the only remaining defendants.

## II. BACKGROUND FN2

> FN2. For more detailed background, see *Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801, 2008 WL 3152963 (S.D.N.Y. Aug. 5, 2008) (*"Bellamy I"*). Some of the facts recounted here are drawn from the prior opinion.

### A. Facts

### 1. Parties

Bellamy is presently in the custody of the DOCS at the Wende Correctional Facility in Alden, New York. FN3 The DOCS is a state agency responsible for the care, custody and control of inmates convicted of crimes under New York State laws. FN4 Wright is both a New York-licensed medical doctor and the Deputy Commissioner and Chief Medical Officer ("CMO") of the DOCS. FN5 As CMO, he is responsible for the development and operation of a system to provide necessary medical care for inmates in the custody of the DOCS. FN6

> FN3. *See* Defendants' Rule 56.1 Statement of Facts ¶ 1.

> FN4. *See id.* ¶ 2.

> FN5. *See id.* ¶ 3.

> FN6. *See id.*

### 2. Bellamy's Surgery

In August 2004, while in DOCS custody at Sing Sing Correctional Facility in Ossining, New York, Bellamy underwent an epididymectomy. FN7 Bellamy was HIV positive at the time of his surgery. FN8 Around that time, Bellamy developed hypogonadism (a deficiency in the hormone testosterone) as well as a deficiency in the hormone Cortisol. FN9 As a result of these conditions, Bellamy was prescribed various medications, including a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

testosterone patch called "Androderm." [FN10] Bellamy contends that without testosterone treatment, he suffers from mood swings, fatigue, nausea, headaches, and lack of appetite.[FN11] However, he also experiences similar symptoms even with medication.[FN12]

> FN7. *See Bellamy I,* 2008 WL 3152963, at *1. An epididymectomy is defined as the surgical removal of the epididmis (the cord-like structure along the posterior border of the testicle). The epididmis is essential to the male reproductive system. *See* Dorland's Illustrated Medical Dictionary 639, 1342, 1770 (31st ed.2007).

> FN8. *See* 3/6/08 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. I") at 139:15-17 (where Bellamy says that, prior to the surgery, he was on HIV medication).

> FN9. See *Bellamy I,* 2008 WL 3152963, at *2. These conditions had many side effects, including sexual maladies and dramatic weight loss. *See id.* While Bellamy contends that the surgery caused the hypogonadism, his treating doctor claims "with a reasonable degree of medical certainty" that the hypogonadism preceded the surgery. *See* 4/22/08 Affidavit of Dr. Harish Moorjani ("Moorjani Aff."), Ex. J to 6/5/09 Supplemental Declaration of Julinda Dawkins, counsel to defendants, ¶ 4.

> FN10. *See, e.g.,* Amended Complaint ("Am.Compl."), Statement of Facts ¶¶ 5, 7. Androgel is a similar medication. The Amended Complaint is divided into various parts with overlapping paragraph and page numbers. As a result, references to the Amended Complaint are

made by noting first the relevant topic header and then the cited or quoted paragraph number.

> FN11. *See* 1/12/09 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. II") at 35:23-24. Bellamy's hypogonadism may have been caused by his HIV. Bellamy complained of similar symptoms before the surgery and, therefore, before any alleged denial of Androgel or similar medications. *See* Moorjani Aff. ¶¶ 4-5.

> FN12. *See* Bellamy Dep. II at 43:21-24 (where Bellamy admits that some of his symptoms resumed even after using the testosterone patch). *See also* Am. Compl., Statement of Facts ¶ 7 ("[T]his treatment [, Androderm,] still has not proven to be effective in keeping my hormone levels elevated, even after the dosages were increased, and my levels rise high at times then suddenly drops real low.").

**3. Bellamy's Letters to Wright**

Following the surgery, Bellamy wrote to Wright on three pertinent occasions. In the first letter, Bellamy provided background into his ailments and asked Wright to provide him with a hormone treatment (Androgel) which had been provided at a previous facility.[FN13] The second letter asked Wright to force Dr. Gennovese at the Shawangunk facility to provide him with Ensure-a nutritional supplement which had been provided at a previous facility. [FN14] Bellamy's third letter to Wright concerned several matters. [FN15] In particular, Bellamy claimed, *first,* that a female officer entered his cell and retrieved his HIV medication, *second,* that an officer eavesdropped on a medical consultation with his doctor, and, *third,* that he went four days without HIV medication, five days without Cortisol treatment, and six days without testosterone treatment, all while undergoing a mental health evaluation.[FN16]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN13. *See* Defendants' Rule 56.1 Statement of Facts ¶ 9. *See also* 7/5/05 Grievance Letter from Bellamy to Wright, Ex. D to 3/30/09 Declaration of Julinda Dawkins, counsel to defendants ("Dawkins Decl.").

FN14. *See* Defendants' Rule 56.1 Statement of Facts ¶ 10. *See also* 1/22/07 Grievance Letter from Bellamy to Wright, Ex. E to Dawkins Decl.

FN15. *See* Defendants' Rule 56.1 Statement of Facts ¶ 11. *See also* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Deck

FN16. *See* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Decl.

Wright's office routinely receives hundreds of letters each year, addressed to him personally from inmates throughout the DOCS system and from individuals writing on behalf of inmates.[FN17] These letters are screened by staff, who then forward them to the appropriate division or bureau within the DOCS with an instruction to respond or with a notation indicating the appropriate action.[FN18] Wright never sees the actual letters or their responses.[FN19] Inmate letters concerning medical care-such as Bellamy's-are forwarded to the Regional Health Services Administrator or the Regional Medical Director, as appropriate, that oversees the facility housing the inmate. [FN20] The concerns are then investigated and addressed by the regional staff.[FN21]

FN17. *See* Defendants' Rule 56.1 Statement of Facts ¶ 12.

FN18. *See id.*

FN19. *See id.* ¶ 13.

FN20. *See id.* ¶ 14.

FN21. *See id.*

**\*2** All three of Bellamy's letters received responses. Holly A. Collet, the Facility Health Services Administrator at Elmira Correctional Facility, responded to Bellamy's July 5, 2005 letter.[FN22] Pedro Diaz, the Regional Health Services Administrator at Shawangunk Correctional Facility, responded to Bellamy's January 22, 2007 letter.[FN23] Pedro Diaz, also the Regional Health Services Administrator at Sing Sing Correctional Facility, responded to Bellamy's June 5, 2007 letter.[FN24] Wright and Bellamy have never met each other, nor have they had any other personal contact.[FN25] Bellamy admits that he has no evidence that Wright was involved in the responses to any of the three letters.[FN26]

FN22. *See id.* ¶ 15.

FN23. *See id.*

FN24. *See id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN25. *See id.* ¶ 16. *See also* 3/27/09 Affidavit of Dr. Lester N. Wright ("Wright Aff."), Ex. G to Dawkins Decl., ¶ 9; Bellamy Dep. II at 20:23-25.

FN26. *See* Bellamy Dep. II at 26:17-20.

**4. Bellamy's Claims**[FN27]

FN27. In addition to the claims listed here, Bellamy originally charged both the DOCS and Wright with violations of the Americans with Disabilities Act of 1990 (the "ADA") and the Rehabilitation Act of 1973 (the "RHA"). *See* Am. Compl., Legal Claims ¶ 15. However, Bellamy later conceded that "Plaintiff['s] Americans With Disabilities Act and Rehabilitation [Act] fails because those statutes are not applicable here at this junction." Plaintiff's Reply to Defendants' Summary Judgment ("Bellamy's Reply") at 7. This Court interprets Bellamy's Reply as a withdrawal of his ADA and RHA claims against the remaining defendants.

Bellamy admits that he has no evidence that Wright denied him testosterone replacement treatment.[FN28] Nonetheless, Bellamy claims that Wright "was responsible for denying plaintiff's testosterone treatment on different occasions" and "was also made aware of plaintiff's complaints, but failed to abate further injury to the plaintiff." [FN29] Bellamy charges the DOCS because he was in its custody when his claims arose.[FN30] Bellamy specifically alleges that Wright-acting under color of state law-displayed "deliberate indifference to plaintiff's serious medical needs and violated plaintiff's rights and constituted cruel and unusual punishment under the Eight [h] Amendment of the United States Constitution." [FN31] A similar claim is lodged against the DOCS.[FN32] Bellamy also seeks a preliminary and permanent injunction against

the DOCS to provide the medical treatment he requests and to comply with various New York State laws.[FN33] Finally, Bellamy seeks compensatory and punitive damages.[FN34]

FN28. *See* Bellamy Dep. II at 33:14 to 34:15 (Question: "Do you have any kind of evidence that Dr. Wright denied you testosterone treatment?" Answer: "Directly, no.").

FN29. *See* Am. Compl., Defendants ¶ 6.

FN30. *See id.* Many of the claims that allegedly occurred under DOCS supervision have since been dismissed.

FN31. *See id.,* Legal Claims ¶ 13. Bellamy brings his claims pursuant to section 1983 of Title 42 of the United States Code ("section 1983").

FN32. *See id.,* Legal Claims ¶ 14 (repeating the same claim but omitting the phrase that the DOCS "violate[d] plaintiff's rights").

FN33. *See id.,* Legal Claims ¶ 18. Bellamy's original Complaint only requested injunctive relief against the DOCS. However, he later asked for injunctive relief against Wright. *See* Bellamy's Reply at 1. Because Bellamy is proceeding pro se, the *factual* allegations in his Reply Memoranda are treated as if they were raised in his Complaints. *See* *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim). However, it would be improper to allow a plaintiff, even one proceeding pro se, to add a defendant to a claim he had raised more than a year earlier. Thus, Bellamy's claim for injunctive relief against Wright is dismissed. *See Polanco v. City of New York Dep't of Corr.,* No. 01 Civ. 759, 2002 WL 272401, at *3 (S.D.N.Y. Feb. 26, 2002) ("It is well established that a plaintiff may not amend his pleading through papers offered in opposition to a motion to dismiss ... Plaintiff is bound by the allegations of his Amended Complaint.") (citations omitted).

FN34. *See* Am. Compl., Legal Claims ¶¶ 19-21.

**B. Procedural History**

Bellamy's first Complaint was filed on March 2, 2007, and an Amended Complaint followed on July 16, 2007. On August 5, 2008, this Court granted summary judgment to defendants Dr. Janis and Mount Vernon. The DOCS had not been properly served at that point, but it was subsequently served on August 7, 2008. Dr. J. Pereli was dismissed as a defendant on January 15, 2009, for lack of timely service of process.

**III. LEGAL STANDARD**

**A. Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [FN35] An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " [FN36] A fact is material when it " 'might affect the outcome of the suit under the governing law.' " [FN37] "It is the movant's burden to show that no genuine factual dispute exists." [FN38]

FN35. Fed.R.Civ.P. 56(c).

FN36. *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

FN37. *Ricci v. DeStefano,* 530 F.3d 88, 109 (2d Cir.2008) (quoting *Anderson,* 477 U.S. at 248).

FN38. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. [FN39] "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " [FN40] To do so, the non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' " [FN41] and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' " [FN42] However, " 'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " [FN43]

FN39. Fed.R.Civ.P. 56(c).

FN40. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). *Accord* *In re September 11 Litig.,* No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug.15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

FN41. *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

FN42. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

FN43. *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson,* 477 U.S. at 248-49).

*3 In determining whether a genuine issue of material

fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. [FN44] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " [FN45] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law." [FN46]

FN44. *See* *Mathirampuzha v. Potter,* 548 F.3d 70, 74 (2d Cir.2008) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005)).

FN45. *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997)). *Accord* *Anderson,* 477 U.S. at 249.

FN46. *Karpova v. Snow,* 497 F.3d 262, 270 (2d Cir.2007) (citing *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 486-87 (2d Cir.2006)).

Further, where the plaintiff is proceeding pro se, his or her pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers," [FN47] and his or her pleadings must be "interpret[ed] ... to raise the strongest arguments they suggest." [FN48] However, a pro se plaintiff must still meet the usual requirements of summary judgment . [FN49] Thus, a pro se plaintiff's "failure to allege either specific facts or particular laws that have been violated renders [his or] her attempt to oppose defendants' motion [for summary judgment] ineffectual." [FN50]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN47. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). *Accord Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.").

FN48. *Burgos,* 14 F.3d at 790.

FN49. *See Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept.8, 2004). (" 'Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment.' ") (quoting *Cole v. Artuz,* No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct.28, 1999)).

FN50. *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

**B. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act (the "PLRA") mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions.[FN51] Failure to exhaust is an absolute bar to an inmate's action in federal court: "[section] 1997e(a) requires exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to court at all." [FN52] Because the plain language of section 1997e(a) states "no action shall be brought," an inmate must have exhausted his claims at the time of the initial filing, given that "[s]ubsequent exhaustion after suit is filed ... is insufficient." [FN53] Moreover, the exhaustion of administrative remedies must be proper-that is, in compliance with a prison grievance program's deadlines

and other critical procedural rules-in order to suffice.[FN54] The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN55]

FN51. *See* 42 U.S.C. § 1997e(a) (providing that: "No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") ("section 1997"). *See also Porter v. Nussle,* 534 U.S. 516, 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 732, 739 (2001).

FN52. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (quotation marks and citation omitted, emphasis in original).

FN53. *Id.*

FN54. *See Woodford v. Ngo,* 548 U.S. 81, 90-92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

FN55. *Porter,* 534 U.S. at 532.

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. [FN56]

> FN56. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought,' ... does not constitute proper exhaustion." [FN57] "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " [FN58]

> FN57. *Marias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005) and citing *Woodford,* 548 U.S. at 94-95) (finding plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff").

> FN58. *Id.* (quoting *Woodford,* 548 U.S. at 95).

**C. Eleventh Amendment Immunity**

**\*4** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State ..." [FN59] "A state's Eleventh Amendment protection from suit extends to its agencies and departments." [FN60] "This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity." [FN61] To determine whether the action is an official or individual capacity suit, this Court must look behind the designation and determine whether "the State is the real, substantial party in interest." [FN62] State agencies are not immune from suits asking for injunctive relief under the Eleventh Amendment. [FN63]

> FN59. U.S. Const. amend. XI.

> FN60. *Morningside Supermarket Corp. v. New York State Dep't of Health,* 432 F.Supp.2d 334, 338 (S.D.N.Y.2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). *Accord Bryant v. New York State Dep't of Corr. Servs. Albany,* 146 F.Supp.2d 422 (S.D.N.Y.2001) (affirming the dismissal of a section 1983 claim against the DOCS and a correctional facility because Eleventh Amendment immunity abrogated the court's subject matter jurisdiction to hear the claim).

> FN61. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citation omitted).

> FN62. *Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945), *overruled in part by Lapides v. Board of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN63. *See, e.g., Perez v. Westchester County Dep't of Corr.,* No. 05 Civ. 8120, 2007 WL 1288579, at *6-8 (S.D.N.Y. Apr. 30, 2007) (considering, but then denying, injunctive relief against a county's department of corrections).

## D. Section 1983

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." FN64 In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution.FN65 "[N]either a State nor its officials acting in their official capacities are 'persons' under [section] 1983." FN66 Thus, section 1983 "does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivation of rights secured by the United States Constitution." FN67

FN64. *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

FN65. *See Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004) (citation omitted).

FN66. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). *Accord Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005).

FN67. *Bryant,* 146 F.Supp.2d at 425.

Furthermore, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.' " FN68 Thus, "[a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." FN69 In 1995, the Second Circuit held that a supervisory official is personally involved only when that official: (1) participates directly in the alleged constitutional violation; (2) fails to remedy the violation after being informed of the violation through a report or appeal; (3) creates or allows the continuation of a policy or custom under which unconstitutional practices occurred; (4) acts with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibits deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.FN70 However, in 2009, the Supreme Court held, "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual actions,* has violated the Constitution." FN71 The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." FN72 Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." FN73 For example, "[t]he allegation that plaintiff sent defendant[ ] letters complaining of prison conditions is not enough to allege personal involvement." FN74

FN68. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN69. *Ford v. Conway,* No. 03 Civ. 0927S, 2004 WL 1071171, at *4 (W.D.N.Y. Mar.16, 2004).

FN70. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted).

FN71. *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) (emphasis added).

FN72. *Id.* at 1949.

FN73. *Id.*

FN74. *Laureano v. Pataki,* No. 99 Civ. 10667, 2000 WL 1458807, at *4 (S.D.N.Y. Sept.29, 2000) (granting a motion to dismiss on similar facts). *See also Farid v. Goord,* 200 F.Supp.2d 220, 235 (W.D.N.Y.2002) (dismissing claims of personal involvement against supervisory official who merely sent grievances "down the chain of command for investigation").

**E. Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs**

**\*5** The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners.[FN75] The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment."[FN76] Because the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under section 1983.[FN77] "Prison officials have a duty to provide prisoners with the 'reasonably necessary medical care which would be available to him or her ... if not incarcerated.' "[FN78] However, a prison cannot be required to meet the same standard of medical care found in outside hospitals.[FN79]

FN75. U.S. Const. amend. XIII.

FN76. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). *Accord Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind .... In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety ....") (quotations and citations omitted).

FN77. *See Estelle,* 429 U.S. at 105-06.

FN78. *Candeleria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at *7 (S.D.N.Y. Mar.1, 1996) (quoting *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989)). *Accord Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at *8 (S.D.N.Y. Mar. 7, 2002) ("A person who is incarcerated is entitled to receive adequate medical care.").

FN79. *See Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir.1984) ("We have no doubt that the same

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital.").

" 'The deliberate indifference standard embodies both an objective and a subjective prong.' " [FN80] "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." [FN81] "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." [FN82] "[W]hen a prisoner asserts that delay in his treatment constitutes deliberate indifference on the part of a healthcare provider, the Court looks to the severity of the consequences brought about by the alleged delay." [FN83]

FN80. *Morrison v. Mamis,* No. 08 Civ. 4302, 2008 WL 5451639, at *5 (S.D.N.Y. Dec.18, 2008) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)).

FN81. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (quoting *Estelle,* 429 U.S. at 104)).

FN82. *Id.* (citing *Estelle,* 429 U.S. 105-06).

FN83. *Pabon v. Goord,* No. 99 Civ. 5869, 2003 WL 1787268, at *11 (S.D.N.Y. Mar.28, 2003) (citation omitted).

**F. Preliminary and Permanent Injunction**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." [FN84] "A preliminary injunction is an extraordinary remedy never awarded as of right." [FN85] "When the movant seeks a 'mandatory' injunction-that is, as in this case, an injunction that will alter rather than maintain the status quo-[he or] she must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." [FN86] The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that a plaintiff seeking a permanent injunction must show actual success on the merits rather than a likelihood of success on the merits. [FN87]

FN84. *Winter v. Natural Res. Def. Council, Inc.,* --- U.S. ----, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). Accord *Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund,* No. 08 Civ. 5520, 2009 WL 1528513, at *1-2 (S.D.N.Y. June 1, 2009) (discussing *Winter* approvingly). *But see Almontaser v. New York City Dep't of Educ.,* 5 19 F.3d 505, 508 (2d Cir.2008) ("A party seeking a preliminary injunction 'must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor.' ") (citation omitted).

FN85. *Winter,* 129 S.Ct. at 376 (citation omitted).

FN86. *Mitchell v. New York State Dep't of Corr. Servs.,* No. 06 Civ. 6278, 2009 WL 185757, at *2 (W.D.N.Y. Jan. 26, 2009) (quoting *Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir.2008)).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN87. *See Winter,* 129 S.Ct. at 381.

## IV. DISCUSSION

Bellamy asserts an Eighth Amendment deliberate indifference claim against Wright and the DOCS. Defendants respond, first, by asserting Eleventh Amendment immunity for all claims against the DOCS and any claims against Wright in his official capacity. As for the claim against Wright in his individual capacity, defendants argue that he was not personally involved in the alleged harm, nor did he create a policy that contributed to that harm. Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with several New York State laws. Defendants argue that Bellamy will not win on the merits, nor will he suffer irreparable harm. Defendants urge this Court to decline to exercise supplemental jurisdiction over any remaining New York State law claims. Finally, Bellamy seeks compensatory and punitive damages.

### A. Exhaustion of Administrative Remedies

**\*6** This Court determined in a previous opinion that "Bellamy did not fail to exhaust his administrative remedies because he was justified in his belief that no administrative remedy was available to him." FN88 Thus, Bellamy's claims are not barred by the PLRA.

FN88. *Bellamy I,* 2008 WL 3152963, at \*5 (citing *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004)).

### B. Eleventh Amendment Immunity

The Eleventh Amendment immunizes state agencies and state officials acting in their official capacity from suit under section 1983. Accordingly, Bellamy's deliberate indifference claims against both the DOCS and Wright, in his official capacity, are dismissed.

### C. Section 1983 Claim of Deliberate Indifference Against Wright in His Individual Capacity

The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin. Iqbal'* s "active conduct" standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal'* s muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated-situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.

Bellamy's remaining claim alleges that Wright, in his individual capacity, was deliberately indifferent to Bellamy's medical needs. However, Bellamy offers no evidence that any of Wright's actions fall into any of the remaining exceptions that would permit supervisory liability. *First,* Bellamy admits that Wright was not personally involved in the letter responses. Both parties agree that they have never had any form of contact. *Second,* Bellamy offers no evidence that Wright created or contributed to a policy or custom of unconstitutional practices. Bellamy also admitted that he can provide no evidence that Wright was responsible for making any decisions regarding his testosterone medications. FN89 Bellamy's conclusory allegations that Wright must have known about Bellamy's plight is not enough to impute section 1983 liability. FN90

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN89. *See, e.g.,* Bellamy Dep. II at 32:19-21 (Question: "Did Dr. Moorjani say anything that Dr. Wright was involved in the April of 2005 denial?" Answer: "No, he did not.")

FN90. *See Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the pleadings "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official defendant ... that [defendant] created or continued a policy or custom which allowed the violation to occur, or that [defendant] was grossly negligent in managing the subordinates who caused the unlawful condition").

Finally, Bellamy offers no evidence that Wright demonstrated deliberate indifference to Bellamy's serious medical needs. Bellamy does not contend that Wright unnecessarily and wantonly inflicted any pain-indeed Bellamy conceded that Wright was not involved with the alleged denials of treatment. Accordingly, Bellamy's deliberate indifference claim against Wright in his individual capacity is dismissed.

**D. Preliminary and Permanent Injunction**

Bellamy asks this Court to order the DOCS-through an injunction-to provide him with adequate medical care and to comply with New York State laws. This request is denied.

**\*7** *First,* Bellamy has not alleged that he is suffering irreparable harm. Instead, he has alleged a number of unrelated and sporadic problems that can be expected in the normal course of incarceration, especially when transferring from facility to facility. It cannot be inferred from his pleadings, his testimony or his letters to Wright that he has consistently been denied any form of treatment. Indeed, each of his three letters address completely different topics without re-addressing prior issues. Bellamy concedes that the disruption of his medication only occurred on a very limited or isolated basis. FN91

FN91. *See* Bellamy Dep. II at 56-57, 75-76 (demonstrating that, over the course of three-years, Bellamy was denied treatment for one three-week period, for one allegedly three-month period-while he was transferring facilities-and a few alleged short-term periods, although those dates are unspecified).

*Second,* Bellamy cannot show a clear or substantial likelihood of success on the merits. Bellamy does not offer evidence that either defendant was deliberately indifferent to his serious medical needs. FN92 For the objective prong, Bellamy offers no evidence that any deprivation of medication was sufficiently serious. Headaches and fatigue do not rise to the level of seriousness necessary to warrant a preliminary injunction-especially when Bellamy admits that he still suffers similar side-effects while receiving the requested treatment. FN93 For the subjective prong, Bellamy does not offer any evidence that any DOCS employee acted with the requisite state of mind to be deliberately indifferent to his serious medical needs.

FN92. While the DOCS itself is immune from section 1983 liability, the following analysis surrounds the DOCS and its employees generally.

FN93. Further, the defendants' affidavits question many of Bellamy's medical

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

propositions. *See, e.g.,* Moorjani Aff. ¶ 4 (claiming that Bellamy exhibited signs of hypogonadism and many of its symptoms, including weight loss, headaches, and fatigue, prior to the surgery).

This Court need not address the balance of equities nor the public interest factors because Bellamy has not shown irreparable harm or a substantial likelihood of success on the merits. Accordingly, Bellamy's request for both a preliminary and permanent injunction is denied.

**E. Supplemental Jurisdiction**

Bellamy asks this Court to compel the DOCS-through an injunction-to comply with New York State Public Health Laws.[FN94] To the extent that there are any remaining state law claims, this Court declines to exercise supplemental jurisdiction over those claims.[FN95]

**FN94.** *See* Am. Compl., Prayer for Relief ¶ 18.

**FN95.** *See Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims."). *See also Kshel Realty Corp. v. City of New York,* No. 01 Civ. 9039, 2006 WL 2506389, at *13 (S.D.N.Y. Aug.30 2006) ("[T]he Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of on 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.' ") (quoting *Walker v. Time Life Films, Inc.,* 784

F.2d 44, 53 (2d Cir.1986)).

**V. CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this motion (Docket # 64) and this case.

SO ORDERED:

S.D.N.Y.,2009.

Bellamy v. Mount Vernon Hosp.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

**H**

United States District Court,

S.D. New York.

Matthew D'OLIMPIO and Michael Kaplan, Plaintiffs,

v.

Louis CRISAFI, in his individual capacity, Brendan Vallely, in his individual capacity, Thomas D'Amicantonio, in his individual capacity, James Giglio, in his individual capacity, Michael Moffett, in his individual capacity, Paul Nadel, in his individual capacity, Jennifer Treacy, in her individual capacity, Kenneth Post, in his individual capacity, and Timothy Dewey, in his individual capacity, Defendants.

Louis Crisafi, Counterclaim-Plaintiff,

v.

Michael Kaplan, Counterclaim-Defendant.

Nos. 09 Civ. 7283(JSR), 09 Civ. 9952(JSR).

June 15, 2010.

**Background:** Arrestee and former narcotics enforcement investigator brought action against another investigator and other narcotics enforcement officials, alleging malicious prosecution, false arrest, unlawful detention, and other constitutional violations against arrestee, and First Amendment retaliation against investigator. Defendant investigator counterclaimed, alleging defamation by plaintiff investigator. Defendants moved to dismiss for failure to state a claim.

**Holdings:** The District Court, Jed S. Rakoff, J., held that:

(1) allegations were sufficient to state a claim of supervisory liability against officials;

(2) law enforcement officers lacked even arguable probable cause to make arrest;

(3) investigator's statements were not protected by First Amendment; and

(4) plaintiff investigator was not liable for defamation.

Motions denied in part and granted in part.

West Headnotes

**[1] Civil Rights 78 ⟊ 1358**

78 Civil Rights

   78III Federal Remedies in General

      78k1353 Liability of Public Officials

         78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases

Arrestee was not required to show discriminatory

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

purpose on the part of law enforcement officers in order to establish the personal involvement needed to support the officers' liability on his § 1983 claim alleging that his search, arrest, and prosecution violated the Fourth Amendment. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 ☞ 1395(6)**

78 Civil Rights

78III Federal Remedies in General

78k1392 Pleading

78k1395 Particular Causes of Action

78k1395(4) Criminal Law Enforcement; Police and Prosecutors

78k1395(6) k. Arrest, search, and detention. Most Cited Cases

Allegations against law enforcement officials were sufficient to state a claim under § 1983 that officials failed to supervise narcotics enforcement investigators; complaint incorporated by reference an investigatory report that described various acts of misconduct by investigator that took place prior to arrestee's arrest, and concluded that there was a lack of appropriate supervision by officials, and arrestee alleged that another investigator complained to official in writing regarding investigator's misconduct prior to arrestee's arrest. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[3] Arrest 35 ☞ 63.4(2)**

35 Arrest

35II On Criminal Charges

35k63 Officers and Assistants, Arrest Without Warrant

35k63.4 Probable or Reasonable Cause

35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. U.S.C.A. Const.Amend. 4.

**[4] Civil Rights 78 ☞ 1376(6)**

78 Civil Rights

78III Federal Remedies in General

78k1372 Privilege or Immunity; Good Faith and Probable Cause

78k1376 Government Agencies and Officers

78k1376(6) k. Sheriffs, police, and other peace officers. Most Cited Cases

In the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show arguable probable cause. U.S.C.A. Const.Amend. 4.

**[5] Civil Rights 78 ☞ 1358**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

            78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

Arrestee's allegations were sufficient to state a § 1983 supervisory liability claim against law enforcement officials, arising out of officials' creation of policy allowing narcotics enforcement investigators to initiate criminal charges based on a phone conversation or faxed affidavit, where arrestee alleged that his arrest for possession of a narcotic and criminal impersonation to obtain prescriptions was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of a prescription within a week, which prompted a narcotics enforcement official to call arrestee's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of arrestee's doctor. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

[6] Arrest 35 ☞ 63.4(8)

35 Arrest

    35II On Criminal Charges

        35k63 Officers and Assistants, Arrest Without Warrant

            35k63.4 Probable or Reasonable Cause

                35k63.4(7) Information from Others

                    35k63.4(8) k. Reliability of informer. Most Cited Cases

Law enforcement officers lacked even arguable probable cause to arrest arrestee for possession of a narcotic and impersonation of a physician based solely on unauthenticated report by physician's staff denying knowledge of arrestee's prescription. U.S.C.A. Const.Amend. 4.

[7] Constitutional Law 92 ☞ 1941

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press

        92XVIII(P) Public Employees and Officials

            92k1941 k. Discipline or reprimand. Most Cited Cases

A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee spoke as a citizen on a matter of public concern; otherwise, the employee's speech is outside the scope of the First Amendment. U.S.C.A. Const.Amend. 1.

[8] Constitutional Law 92 ☞ 1955

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press

        92XVIII(P) Public Employees and Officials

            92k1955 k. Police and other public safety officials. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

**Municipal Corporations 268 🔑 185(1)**

268 Municipal Corporations

    268V Officers, Agents, and Employees

        268V(B) Municipal Departments and Officers Thereof

            268k179 Police

                268k185 Suspension and Removal of Policemen

                    268k185(1) k. Grounds for removal or suspension. Most Cited Cases

Law enforcement officer's complaints to supervisor about fellow officer's behavior, his workplace incident reports, and his complaint to the inspector general, was speech falling within officer's official duties, and thus was not protected under the First Amendment, as required to support employee's retaliation claim; statements were made privately though channels available through officer's employment and were made in a manner that would not be available to a non-public employee citizen, and subject of statements was that other officer was not performing his job properly. U.S.C.A. Const.Amend. 1.

**[9] Libel and Slander 237 🔑 28**

237 Libel and Slander

    237I Words and Acts Actionable, and Liability Therefor

        237k26 Repetition

            237k28 k. By others in general. Most Cited Cases

It was simply implausible that narcotics investigator in any legally relevant sense caused the republication of his statements in an investigatory report or newspaper article regarding actions of a fellow investigator, as required to state a claim of defamation under New York law.

**[10] Libel and Slander 237 🔑 28**

237 Libel and Slander

    237I Words and Acts Actionable, and Liability Therefor

        237k26 Repetition

            237k28 k. By others in general. Most Cited Cases

Under New York law, a plaintiff may not recover damages from the original author for slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication.

*342 James Brian Lebow, Sr., New York, NY, for Plaintiffs.

Christine Alexandria Rodriguez, Christine A. Rodriguez, Law Office, Ivan B. Rubin, Peter Sangjin Hyun, New York State Office of the Attorney General, New York, NY, for Defendants.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*MEMORANDUM ORDER*

JED S. RAKOFF, District Judge.

On August 18, 2009, Plaintiff Matthew D'Olimpio brought this action (docket-numbered 09 Civ. 7283) against defendants Louis Crisafi, Brendan Vallely, Thomas D'Amicantonio, James Giglio, Michael Moffett, and Paul Nadel for malicious prosecution, false arrest, unlawful detention, and various other violations of the Constitution and 42 U.S.C. §§ 1983 and 1988. An amended complaint filed on October 29, 2009 joined Michael Kaplan as a plaintiff and added a claim against defendants Nadel, Jennifer Treacy, Kenneth Post, and Timothy Dewey for unconstitutionally retaliating against Kaplan based on his reports of misconduct committed by defendant Crisafi, a fellow investigator employed by the New York State Department of Health's Bureau of Narcotics Enforcement, Metropolitan Area Regional Office ("BNE-MARO"), in violation of the First and Fourteenth Amendments and § 1983.

On December 18, 2009, defendants Giglio, Moffett, and Nadel moved to dismiss all of D'Olimpio's claims against them, and defendants Crisafi, Vallely, and D'Amicantonio moved to dismiss D'Olimpio's malicious prosecution claim. That same day, defendants Nadel, Treacy, Post, and Dewey moved to dismiss Kaplan's claims against them. Meanwhile, on December 3, 2009, Crisafi had filed what was styled as a complaint against Kaplan (docket-numbered 09 Civ. 9952) alleging that Kaplan defamed him through publication of the reports of Crisafi's misconduct discussed in Kaplan's complaint. On the parties' consent, the Court converted Crisafi's complaint into a compulsory counterclaim in the action docket-numbered 09 Civ. 7283 and consolidated the two cases. *See* Transcript, 1/14/10, *Crisafi v. Kaplan,* No. 09 **\*343** Civ. 9952. On January 22, 2010, Kaplan moved to dismiss that counterclaim.

By Order dated March 1, 2010 (the "March 1 Order"), the Court granted the motion of Nadel, Treacy, Post, and Dewey to dismiss Kaplan's retaliation claim; granted Kaplan's motion to dismiss Crisafi's defamation counterclaim; and denied all other motions to dismiss.[FN1] The Order also promised that a Memorandum would issue in due course stating the reasons for these rulings. With apologies to counsel for the extended delay, the Court here provides that Memorandum.

> FN1. Although the Order did not explicitly so state, all the dismissals were with prejudice (which, as it happens, is also the default position when an order does not state whether a dismissal is or is not with prejudice).

The Court turns first to the motions of defendants Crisafi, Vallely, and D'Amicantonio to dismiss D'Olimpio's malicious prosecution claim, as set forth in the First Amended Complaint ("FAC") filed on October 29, 2009.[FN2] The relevant allegations are as follows:

> FN2. The first five causes of action in the FAC are D'Olimpio's claims. The sixth cause of action is Kaplan's claim.

Sometime before November 16, 2007, D'Olimpio, a resident of Brooklyn, was prescribed Vicodin by his doctor. FAC ¶ 17. He called that prescription into his pharmacy and obtained the Vicodin. *Id.* ¶ 18. D'Olimpio's pharmacy contacted the BNE-MARO after it had not received a hard copy of the prescription from D'Olimpio's doctor within seven days. *Id.* ¶ 19. A MARO official called D'Olimpio's doctor's office and spoke to an unknown individual there, who either stated by phone that he was not aware of D'Olimpio's Vicodin prescription or provided a faxed affidavit purportedly signed by the doctor to that effect. *Id.* ¶ 20. Based on these occurrences, and without any further investigation, MARO investigator Crisafi began planning Crisafi's arrest. *Id.* ¶ 21.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

On or about November 16, 2007, D'Olimpio was exiting his doctor's office in Brooklyn and walking toward his car when Crisafi and defendants Vallely and D'Amicantonio, also MARO investigators, showed D'Olimpio their badges and asked to speak with him. *Id.* ¶¶ 4, 27-28. They asked D'Olimpio his name, where he was coming from, what he was doing at the doctor's office, and whether the car was his. *Id.* ¶ 29. D'Olimpio replied it was his wife's car. *Id.* ¶ 30. Crisafi asked D'Olimpio if they could search him for weapons; D'Olimpio consented to be frisked, but not to a full search. *Id.* ¶¶ 31-32. Crisafi then frisked D'Olimpio, reached into his pockets, and took out his car keys. *Id.* ¶ 33. Crisafi asked D'Olimpio whether he would consent to a search of the car; D'Olimpio refused, but Crisafi nonetheless carried out the search. *Id.* ¶¶ 34-36. During the search, Crisafi found a bag containing a bottle marked for Klonopin but containing both Vicodin and Klonopin pills, all of which were lawfully prescribed to Crisafi and which he carried in one bottle for convenience. *Id.* ¶¶ 37-38. Upon finding the bottle and discovering that there were two types of pills inside, Crisafi handcuffed D'Olimpio and moved him into the police car, without making any effort to find out whether the drugs were legally prescribed. *Id.* ¶¶ 39-40.

While D'Olimpio was being driven to the police precinct and again when he was being escorted to a bathroom prior to questioning, D'Olimpio requested an attorney, but these requests were denied. *Id.* ¶¶ 41-44. Before questioning began, D'Olimpio asked Crisafi to call an ambulance so that he could take the Klonopin that he needed; Crisafi told D'Olimpio to call his wife and ask her to come to the precinct with his medication. *Id.* ¶¶ 46-47. When *344 D'Olimpio's wife arrived, D'Olimpio was brought into a different room, and his wife was given his possessions. *Id.* ¶ 48. Crisafi then offered D'Olimpio a blue pill, which he took, but D'Olimpio now believes that pill was not a Klonopin pill, as he experienced side effects of confusion and drowsiness after taking it, which he had never felt previously when taking Klonopin. *Id.* ¶ 50. Crisafi began to interrogate D'Olimpio, and at one point

threatened to rescind his father's physician license. *Id.* ¶ 51. D'Olimpio at that point again requested an attorney, and Crisafi again denied his request. *Id.* ¶¶ 52-53.

During the interrogation, Crisafi asked D'Olimpio to confess to charges of criminal possession of a controlled substance for possessing the Vicodin and to charges of criminal impersonation for allegedly calling pharmacies and using false information to obtain prescriptions. D'Olimpio, under the influence of the pill, signed a one-page confession presented to him by Crisafi. *Id.* ¶ 54. At Crisafi's request, Vallely signed a form falsely indicating that he had seen Crisafi inform D'Olimpio of his *Miranda* rights. *Id.* ¶ 55. D'Olimpio's forged signature was also added to this "*Miranda* sheet." *Id.* ¶ 56. Crisafi, perhaps with the assistance of Vallely or D'Amicantonio, also wrote a four-page confession and forged D'Olimpio's signature and initials on it. *Id.* ¶ 57. Furthermore, Crisafi, possibly with the assistance of Vallely and D'Amicantonio, drafted an affidavit falsely attesting that D'Olimpio illegally possessed Vicodin and that he impersonated a doctor to obtain his prescriptions. *Id.* ¶ 58.

D'Olimpio was then taken to the Manhattan Detention Center, where he was held for 24 hours prior to being arraigned. *Id.* ¶¶ 59-60. Based on the four-page confession and the affidavit, he was arraigned on the criminal possession and impersonation charges and then released on his own recognizance. *Id.* ¶¶ 61-62. According to the Complaint, D'Olimpio appeared in court about seven times before the charges against him were finally dropped on September 4, 2008. *Id.* ¶ 76.

On the basis of these allegations, D'Olimpio's third cause of action claims that Crisafi, Vallely, and D'Amicantonio maliciously prosecuted D'Olimpio by initiating the criminal charges.[FN3] These defendants moved to dismiss this malicious prosecution claim, primarily on the basis that the charges against D'Olimpio remained pending against him as of the time of their motion, as

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

demonstrated by a Court Action Sheet of the Criminal Court, New York County. Decl. of Ivan Rubin, 12/22/09, Ex. 1. Because the favorable termination of the prosecution is a necessary element of a malicious prosecution claim under § 1983, *Green v. Mattingly,* 585 F.3d 97, 103 (2d Cir.2009), the pendency of criminal charges would be fatal to this cause of action.

> FN3. In the first, fourth, and fifth causes of action in the FAC, D'Olimpio respectively alleges that Crisafi, Vallely, and D'Amicantonio violated various constitutional rights, falsely arrested him, and unlawfully detained him. No motions to dismiss were filed with respect to these claims.

In his opposition to the motions to dismiss, D'Olimpio asserted that the Assistant District Attorney prosecuting D'Olimpio's criminal case had committed to move orally to dismiss that case at the next court hearing, which was scheduled for February 2, 2010. Based on that representation, this Court granted leave for D'Olimpio to file a Second Amended Complaint ("SAC") following that hearing. The Second Amended Complaint, filed on February 18, 2010, did indeed include the representation that the criminal charges were dismissed on February 2, 2010. SAC **345 ¶ 110. Since D'Olimpio had now sufficiently alleged the favorable termination of the criminal charges against him, the March 1 Order therefore denied the motions to dismiss D'Olimpio's malicious prosecution claim.[FN4]

> FN4. Defendants also asserted that the malicious prosecution claim should be dismissed because D'Olimpio's allegations failed to demonstrate the element of malice-*i.e.,* that there was "some deliberate act punctuated with awareness of 'conscious falsity' " with respect to the institution of criminal proceedings. *Bradley v. Vill. of Greenwood Lake,* 376 F.Supp.2d 528,

534-35 (S.D.N.Y.2005). But D'Olimpio's allegations regarding the false affidavits and confessions were clearly more than sufficient to plead malice.

Defendants Giglio, Moffett, and Nadel moved to dismiss D'Olimpio's second cause of action, which charged them with various constitutional violations based on their supervisory authority over Crisafi and their involvement with an alleged policy leading to D'Olimpio's false arrest. In this regard, the FAC contains the following allegations with respect to these defendants: At the time of the events alleged, James Giglio was the director of the BNE, and worked in the BNE's office in Troy, New York. *Id.* ¶ 5. Michael Moffett was the BNE's Section Chief with responsibility over BNE investigators, and also worked in the Troy office. *Id.* ¶ 6. Paul Nadel was the BNE's Program Director for the MARO, and worked in the same Manhattan office as Crisafi, Vallely, and D'Amicantonio. *Id.* ¶ 7. All three of these defendants had supervisory authority over Crisafi, Vallely, D'Amicantonio, and Kaplan. *Id.* ¶¶ 5-7.

The FAC further alleges that at the time of Crisafi's arrest, MARO followed the following protocol in order to determine whether a narcotics prescription was legitimate: First, when a patient called in a prescription to a pharmacy, the pharmacy would expect to receive a hard copy of the prescription from the patient's doctor within a week. Second, pharmacies were instructed to contact the MARO if they failed to receive a hard copy by the end of the seven-day period. Third, when the MARO was contacted by a pharmacy because the pharmacy did not receive a hard copy, a MARO officer would call the doctor's office and would either speak with the doctor to inquire whether the prescription was legitimate or would ask the doctor to fax an affidavit stating that the prescription was legitimate. *Id.* ¶ 11. With respect to this last step, MARO had a practice of confirming complaints from doctors by telephone and fax without taking any other steps to verify the doctors' identities. *Id.* ¶ 12.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

The FAC also includes the following allegations regarding the failure of Giglio, Moffett, and Nadel to supervise Crisafi: On March 22, 2007, the *New York Times* published an article detailing the abuse of parking placards by government officials. This article included a photograph of a car belonging to Crisafi. *Id.* ¶ 13. Shortly after the publication of that article, the New York State Inspector General's Office began an investigation of Crisafi, which unearthed evidence of other misconduct. *Id.* ¶ 14. Sometime before November 16, 2007, plaintiff Kaplan, a MARO investigator, sent Nadel a written complaint informing him that Crisafi was violating suspects' Fifth Amendment rights. *Id.* ¶ 15. Nadel took no action in response to this complaint. *Id.* ¶ 16. Kaplan followed up with a series of other complaints, including a report to the Inspector General, which are discussed more fully below in the context of Kaplan's retaliation claim. The Inspector General's investigation culminated in a report issued on December 8, 2008, written by Inspector General Joseph Fisch (the "Fisch Report"), which found that Crisafi committed numerous abuses, including many of those alleged by Kaplan, some of **\*346** which were assisted by Vallely and D'Amicantonio. The Fisch Report also found that Giglio and Moffett failed to supervise Crisafi and the MARO office, and noted the fact that Nadel, who was responsible for approving law enforcement operations, was a licensed pharmacist with no previous law enforcement experience. *Id.* ¶¶ 78-79.

Based on the above allegations, Crisafi in his second cause of action asserted § 1983 claims against Giglio, Moffett, and Nadel arising from (1) their creation of a policy allowing MARO personnel to initiate criminal charges based on a phone conversation or faxed affidavit without confirmation of the doctor's identity or that the alleged signature on the affidavit was authentic (the "Policy"); (2) their failure to supervise Crisafi and the MARO; (3) their allowing Nadel, a pharmacist with no prior law enforcement experience, to be the MARO Program Director; and (4) their deliberate indifference to D'Olimpio's rights. *Id.* ¶¶ 122-25.

Defendants attack these claims on several grounds. First, they assert that these claims are based on a broad theory of "supervisory liability" that has been discredited by the Supreme Court in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Prior to *Iqbal,* well-established Second Circuit law provided five bases for showing that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a § 1983 claim. A plaintiff could plead personal involvement by showing any of the following:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Defendants argue that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* therefore rendering D'Olimpio's reliance on some of the *Colon* categories unwarranted.

By way of background, the plaintiff in *Iqbal* brought a " *Bivens* " action against several high-ranking federal officials, including the Attorney General and the Director of the Federal Bureau of Investigation, based on allegations that following the September 11 attacks, the FBI "arrested and detained thousands of Arab and Muslim men" substantially on the basis of their race, religion, or national origin, and that as a result plaintiff was unlawfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

subjected to harsh confinement conditions substantially on these discriminatory bases. 129 S.Ct. at 1951. The Supreme Court, however, held, *inter alia,* that the complaint failed to state a claim for intentional discrimination with respect to the Attorney General or FBI Director, and, as part of that discussion, observed that neither *Bivens* itself (*i.e., Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)) nor § 1983 imposes supervisory liability simply on the basis of *respondeat superior;* rather, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948; *see also id.* at 1949 ("[T]he term 'supervisory liability' is a misnomer.... [E]ach Government official ... is only liable for his or her own misconduct."). The Court went on to note that the required showing of personal involvement "will vary with the **\*347** constitutional provision at issue"; as the plaintiff's claim in *Iqbal* was for "invidious discrimination" in violation of the First Amendment and Equal Protection Clause, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 1948. Accordingly, the Court rejected the plaintiff's theory that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 1949.

[1] The defendants here note that certain courts in this District have read these passages of *Iqbal* to mean that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ... [t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated." *Bellamy v. Mount Vernon Hosp.,* 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims continue to impose the exact types of supervisory liability that *Iqbal* eliminated." *Bellamy v. Mount Vernon Hosp.,* 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* 2009 WL 3321011, at *15 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim Iqbal eliminated."). This Court respectfully disagrees. As *Iqbal* noted, the degree of personal involvement varies depending on the

constitutional provision at issue; whereas invidious discrimination claims require a showing of discriminatory purpose, there is no analogous requirement applicable to D'Olimpio's allegations regarding his search, arrest, and prosecution. *See, e.g., Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). *Colon's* bases for liability are not founded on a theory of *respondeat superior,* but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. 58 F.3d at 873 (internal quotation marks omitted). Thus, the five *Colon* categories for personal liability of supervisors may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

[2] Apart from this argument based on *Iqbal,* Giglio and Moffett assert that D'Olimpio's claims against them should be dismissed insofar as they allege a failure to supervise the MARO investigators. They maintain that D'Olimpio's allegations in this regard are too conclusory to state a claim. The Court disagrees. The FAC incorporates by reference the Fisch Report, which summarizes an investigation beginning in March 2007, describes various acts of misconduct by Crisafi that took place prior to D'Olimpio's arrest, contains a section headed "Lack of Supervision of Crisafi and MARO," and indeed concludes that there was a "lack of appropriate supervision by [Crisafi's] supervisors at MARO and at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

BNE's headquarters in Troy," where Giglio and Moffett were in charge. Fisch Report, 12/8/08, at 4, 16-17, *available at http:// www. ig. state. ny. us/ *348 pd fs/Investigationöf% 20Employee% 20Misconduct% 20at% 20the% 20DOH% 20Bureau% 20of% 20Narcotics% 20Enforcement.pdf* (cited in FAC ¶ 78). These findings by the Inspector General strongly suggest that defendants Giglio and Moffett "fail[ed] to act on information indicating unconstitutional acts were occurring," or were "gross[ly] negligen[t] in failing to supervise ... subordinates who commit ... wrongful acts," or were otherwise deliberately indifferent to suspects' rights, and also demonstrate "an affirmative causal link between the supervisor's inaction and [plaintiff's] injury." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002). For the foregoing reasons, the March 1 Order held that the claims against Giglio and Moffett in this respect cannot be dismissed.

Nadel also argued that the claims against him for his failure to supervise Crisafi must be dismissed because there were no specific allegations of Nadel's personal involvement. The FAC does allege, however, that Kaplan complained to Nadel in writing of Crisafi's misconduct prior to D'Olimpio's arrest. FAC ¶ 15. The Fisch Report, although it does not dwell on Nadel's actions, cites Nadel's lack of prior law enforcement experience and describes complaints by MARO investigators that the lack of a Program Director with law enforcement experience allowed Crisafi "to attain an inappropriate degree of power within the office." Fisch Report at 1, 16. Because the Court, in ruling on a motion to dismiss, must "take all facts and draw all inferences in the light most favorable" to the plaintiff, *Gross v. Rell,* 585 F.3d 72, 75 n. 1 (2d Cir.2009), and because, as noted, the FAC incorporates by reference the allegations of the Fisch Report, the Fisch Report's conclusion that there was a general failure to supervise Crisafi must be taken for these purposes to apply to Nadel, Crisafi's immediate supervisor.[FN5] Thus, the March 1 Order denied the motion to dismiss the claim alleging Nadel's failure to supervise.

FN5. Defendants' reply memorandum asserted that contrary to what was pleaded in the FAC, Crisafi was a Senior Investigator at the time of D'Olimpio's arrest and thus did not report to Nadel at that time. In support of this, it cited to the Fisch Report, which mentions that Crisafi was temporarily promoted between 2006 and March 2008. Fisch Report at 16. The Report does not, however, state that Crisafi ceased reporting to Nadel during this period. The FAC alleges that Nadel, as MARO Program Director, had supervisory authority over all MARO investigators. FAC ¶ 7. In light of the allegations in the FAC, and taking all inferences in favor of D'Olimpio, the Court cannot conclude that Nadel lacked supervisory authority over Crisafi during this period. In any event, it is undisputed that Nadel supervised Vallely and D'Amicantonio, who are also alleged to have violated D'Olimpio's constitutional rights.

With respect to those aspects of plaintiff D'Olimpio's second cause of action that relate to the alleged "Policy," that Policy allegedly permitted BNE investigators to rely on unverified telephone communications with, or faxed affidavits from, doctors' offices to satisfy the requirement of probable cause to arrest suspects or initiate criminal charges. While defendants appear to concede that Giglio, Moffett, and Nadel were sufficiently involved with the formation and operation of this Policy to satisfy the personal involvement requirement of § 1983, they argue that the alleged Policy is not unconstitutional, or at the very least, that the doctrine of qualified immunity should bar further proceedings with respect to these allegations.

[3][4] "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is *349 committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). The probable cause determination is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

based on the "totality of the circumstances," and does not readily lend itself to being reduced to a "neat set of legal rules." *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir.2002) (internal quotation marks omitted). Furthermore, "in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *Id.* (internal quotation mark omitted). The Supreme Court has held that tips from informants can provide probable cause to arrest, but only if either the informant or the information in his/her tips has been shown to be reliable or has been sufficiently corroborated. *See Illinois v. Gates,* 462 U.S. 213, 242, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[E]ven in making a warrantless arrest[,] an officer 'may rely upon information received through an informant, rather than upon his direct observations, *so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.*' " (emphasis added)); *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (anonymous call to police reporting that person was carrying a gun lacked indicia of reliability sufficient to satisfy "reasonable suspicion" standard with respect to a police officer's stop-and-frisk search, even though that standard requires a lesser showing than probable cause to arrest); *see also United States v. Elmore,* 482 F.3d 172, 179 (2d Cir.2007) ("Even a tip from a completely anonymous informant-though it will seldom demonstrate basis of knowledge and the veracity of an anonymous informant is largely unknowable-can form the basis of reasonable suspicion or probable cause *if it is sufficiently corroborated.*" (emphasis added) (citation omitted)); *Oliveira v. Mayer,* 23 F.3d 642, 647 (2d Cir.1994) ("Information about criminal activity provided by a single complainant can establish probable cause *when that information is sufficiently reliable and corroborated.*" (emphasis added)).

[5] Defendants argue that the Policy provides BNE officers with probable cause (either on the merits or sufficient to entitle them to qualified immunity) because the information provided by the doctors' offices is sufficiently reliable to support a reasonable belief that a crime has been committed. For this proposition, the defendants rely primarily on two out-of-circuit cases,

*United States v. Fooladi,* 703 F.2d 180 (5th Cir.1983), and *Edwards v. Cabrera,* 58 F.3d 290 (7th Cir.1995). While these cases do support the proposition that it may be error to discount information provided by disinterested informants absent reason to doubt these informants' veracity, even when their names are not known to the law enforcement officer, these cases do not stand for the proposition that such information alone suffices to establish probable cause. Rather, in *Fooladi,* the probable cause determination was not based solely on information provided by a representative of a glass manufacturer, which the Fifth Circuit held that the trial court had erroneously disregarded. Instead, the arrest was based not only on the employee's tip that the manufacturer had shipped glassware to a purported business address that was in fact the arrestee's personal address, but also on, among other things, the law enforcement agent's personal observation that the arrestee's residence emanated an odor characteristic of methamphetamine manufacturing and that the arrestee left the premises "holding his gloved hands away from his body as if a chemical were on them." 703 F.2d at 181-84. Similarly, in *Edwards,* the Seventh Circuit found that probable cause existed not just because of a tip from a bus **\*350** driver, relayed through a dispatcher, that the driver thought he saw several men participate in a drug transaction in a bus station, but also based on the police officer's own personal observations of several men, including the arrestee and his brother, who matched the driver's description standing together outside the bus station; the officer's personal observation that the arrestee's brother was so nervous that he appeared to have urinated on himself; and the officer's subsequent consent search of the brother's garment bag, which yielded a plastic bag appearing to contain marijuana. 58 F.3d at 292.

These cases are thus consistent with the law in this Circuit, as articulated in *Caldarola v. Calabrese,* 298 F.3d 156 (2d Cir.2002). The plaintiff in *Caldarola,* a New York corrections officer challenged his arrest on charges that he was unlawfully collecting job injury benefits even though he was no longer a New York resident and thus was not qualified to receive such benefits. The arresting officer determined there was probable cause to believe the plaintiff had moved from New York to Connecticut based

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

on an investigative file containing reports from two private investigation firms that had been hired by the officer's supervisors. The reports themselves contained, among other things, summaries of investigators' personal interviews with the plaintiff's New York neighbors, surveillance tapes showing the plaintiff emerging from a home in Connecticut and dropping his children off at school, a deed and mortgage for a Connecticut home in the plaintiff's name indicating that it was his primary residence, and work attendance records indicating that the plaintiff had a Connecticut telephone number. The Second Circuit held that it was reasonable for the arresting officer to conclude that these private investigative firms hired by his supervisors were reliable and that the investigators' reports provided information corroborating their conclusions. *Id.* at 163-68. Thus, accepting *arguendo* defendants' assertion that *Caldarola* stands for the proposition that information gathered by private investigators can support probable cause even in the absence of personal knowledge by the arresting officer, the decision certainly does not suggest that an unadorned, unverified phone call or fax can, by itself, without further meaningful corroboration, satisfy probable cause or support qualified immunity.

[6] Returning to the allegations in the FAC, D'Olimpio has asserted that, consistent with the Policy, his arrest was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of the prescription within a week, which prompted a MARO official to call D'Olimpio's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of the doctor. None of the above-cited cases suggests that this information originating from an unidentifiable person in a doctor's office can even come close to satisfying probable cause to arrest, absent corroboration or other indicia of reliability. Unlike *Caldarola,* here there is no underlying data providing support for the informant's conclusion. There is no indication that the identity of the informant here could ever be determined. *Cf. J.L.,* 529 U.S. at 270, 120 S.Ct. 1375 ("Unlike a tip from a known informant whose

reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' " (citation omitted)). There is no suggestion that the MARO investigators had any reason to rely on this particular doctor's office; to the contrary, there are numerous **\*351** reasons why a doctor or her staff might inadvertently provide inaccurate information, especially given that the relevant information is not affirmatively provided by a tipper, but rather can be elicited by the investigator from whoever happens to pick up the phone in the doctor's office. Moreover, if the doctor herself were involved in wrongdoing with respect to the prescription of narcotics, she would have an incentive to affirmatively mislead the investigators. In sum, while a report from a doctor or her staff denying knowledge of the prescription might be a reasonable basis for further investigation, it is patently deficient as the sole ground for an arrest.

For the foregoing reasons, under the facts alleged and the clearly established law cited herein, defendants lacked even arguable probable cause to arrest D'Olimpio. Because the circumstances of this arrest were consistent with the Policy (as alleged), and because defendants do not dispute that Giglio, Moffett, and Nadel had personal involvement with the establishment and enforcement of this Policy, the March 1 Order declined to dismiss the second cause of action with respect to these allegations.

The Court turns next to those portions of the FAC that assert claims by plaintiff Kaplan, all of which the defendants moved to dismiss. Kaplan's claim of retaliation for expressing his First Amendment rights (the sixth cause of action in the FAC) is based on the following allegations: Kaplan (as noted) is a MARO investigator. FAC ¶ 3. During at least some of the times covered by the FAC, Crisafi was Kaplan's supervisor. *Id.* ¶ 64. As described above, Kaplan complained to Nadel about Crisafi prior to November 16, 2007, but Nadel took no action. *Id.* ¶¶ 15-16. On or about November 17, 2007, Kaplan again went to Nadel and raised concerns about

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Crisafi: in particular, he stated that Crisafi took prescription narcotics while on duty; that Crisafi would experience facial tics and "zone out"; that Crisafi accidentally discharged his weapon while on duty; that Crisafi lied about his previous job experience; that Crisafi had investigators perform "ill-conceived" and dangerous arrests and searches; that Crisafi was violating suspects' *Miranda* rights; that Crisafi, without authorization, put sirens and lights on his car; and that Crisafi was working outside jobs during work hours. *Id.* ¶ 63. Despite the fact that Kaplan told Nadel that he was afraid of Crisafi and Nadel assured Kaplan that the conversation would be kept confidential, Nadel reported this conversation to Crisafi. *Id.* ¶¶ 63-64. Thereafter, on or about November 20, 2007, Crisafi threatened Kaplan by walking up behind him and saying, "Bang bang, you're dead." *Id.* ¶ 65. At around that same time, Kaplan filed a Workplace Incident Report with the Department of Health's Bureau of Employee Relations detailing these threats and reporting Crisafi's other misconduct, of which he had previously complained to Nadel. *Id.* ¶ 66. In response, Crisafi sabotaged Kaplan's work product on several occasions and began to spread rumors about him, including rumors that Kaplan appeared tired and slept while at the office. *Id.* ¶¶ 67-68. Kaplan then called the Inspector General to report these concerns about Crisafi, and the Inspector General then widened his ongoing investigation of Crisafi to address these issues. *Id.* ¶¶ 69-70. Because, however, the Inspector General's investigation led to interviews with all the MARO inspectors except for Kaplan, Crisafi and Nadel were able to infer that Kaplan was the whistleblower. *Id.* ¶ 71.

Kaplan, after spraining his ankle while on duty, went on workers' compensation leave on or about February 27, 2008. *Id.* ¶ 72. A bullet was shot at Kaplan's house on April 17, 2008, and on April 25, 2008, his house was vandalized. *Id.* ¶¶ 73-74. **\*352** On August 12, 2008, after Kaplan was notified that Employee Relations never received his first Workplace Incident Report, Kaplan resubmitted it. *Id.* ¶ 75.

After publication of the Fisch Report, Giglio resigned

as the director of the BNE. *Id.* ¶ 81. In December 2008, defendant Jennifer Treacy was appointed Deputy Director of the New York State Department of Health, with supervisory authority over the BNE and the MARO. *Id.* ¶ 82. The Inspector General attempted to persuade Kaplan to return to work, as Crisafi was on leave and would face discipline for his conduct. *Id.* ¶ 83. Kaplan agreed to return to work and received a physician's evaluation that he was fit to return. *Id.* ¶¶ 84-86. Nonetheless, Kaplan was required to undergo three additional physical examinations; after reviewing these, the relevant administrator concluded that Kaplan was fit to return, provided the he be closely monitored, specifically for falling asleep at work. *Id.* ¶¶ 87-90. He was scheduled to return to work on April 10, 2009. *Id.* ¶ 91. The FAC alleges that Treacy, who was romantically involved with Giglio, was upset about Giglio's resignation and blamed Kaplan for causing it; therefore, she ordered the acting director of the BNE not to allow Kaplan to return. *Id.* ¶¶ 92-93. On April 9, 2009, Kaplan was told not to return because of a lack of staff, and on April 23, the Department of Health sent him a letter informing him that he was terminated for failing to complete a study to confirm he did not have a sleep disorder. *Id.* ¶¶ 94-95. Kaplan filed a grievance and, after a hearing, was allowed to return to work. *Id.* ¶ 96.

In May 2009, defendant Kenneth Post was appointed as director of the BNE, and defendant Timothy Dewey was appointed as BNE Section Chief. *Id.* ¶¶ 97-98. In June 2009, Kaplan returned to work, and was informed that he would only be given a temporary assignment and would not perform fieldwork. *Id.* ¶ 99. After his reinstatement, Kaplan was denied access to a state car and was not given a badge, gun, or firearms training; he was confined to desk duties and menial document review. *Id.* ¶¶ 100-101. On July 14, 2009, Kaplan met with Dewey to complain about his treatment. *Id.* ¶ 102. D'Olimpio filed his original complaint in the instant action on August 18, 2009. In September 2009, Stephanie Jubic of Employee Relations confiscated the computers of Crisafi, Vallely, D'Amicantonio, and Kaplan-Kaplan believes Jubic downloaded his emails to find grounds to terminate him. *Id.* ¶ 105. On October 8, 2009, Kaplan was placed on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

administrative leave and told not to contact anyone at the BNE. *Id.* ¶ 108. On October 16, Jubic mailed Kaplan a letter stating that he would be interrogated on October 27 and would possibly face discipline. *Id.* ¶ 109. Also on October 16, Kaplan had a grievance hearing to discuss being denied his proper job responsibilities. At this hearing, Post stated that as BNE director, it was in his discretion to decide what duties Kaplan should have. *Id.* ¶ 110.

Based on these facts, Kaplan alleges in that defendants Treacy, Post, Dewey, and Nadel retaliated against him with respect to speech that was protected by the First Amendment. These defendants have moved to dismiss Kaplan's claim on several grounds, including that Kaplan's speech was made pursuant to his official duties and hence is not protected by the First Amendment.

[7] A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee "spoke as a citizen on a matter of public concern"; otherwise, the employee's speech is outside the scope of the First Amendment. *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (internal quotation *353 mark omitted). In *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951. Though not without reluctance, the Court concludes that this "official duties" exception, as recently elaborated on by the Second Circuit in *Weintraub v. Board of Education,* 593 F.3d 196 (2d Cir.2010), is fatal to Kaplan's retaliation claim.

*Weintraub* made clear that for purposes of determining whether a public employee's speech is protected, a public employee's "official duties" are to be

construed broadly. The plaintiff in *Weintraub* was a public school teacher, and the allegedly protected speech consisted of a grievance he filed with his union challenging a school administrator's decision not to discipline a disruptive student. Quoting *Garcetti,* the Court of Appeals stated that the inquiry into whether a public employee speaks pursuant his official duties is "a practical one," and that the employee's duties should not be interpreted narrowly. 593 F.3d at 202 (internal quotation marks omitted). Thus, *Weintraub* held:

[U]nder the First Amendment, speech can be "pursuant to" a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer. In particular, we conclude that Weintraub's grievance was "pursuant to" his official duties because it was "part-and-parcel of his concerns" about his ability to "properly execute his duties," as a public school teacher-namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning.... Weintraub's speech challenging the school administration's decision to not discipline a student in his class was a "means to fulfill," and "undertaken in the course of performing," his primary employment responsibility of teaching.

*Id.* at 203 (citations omitted). The court went on to note that its conclusion was supported "by the fact that [Weintraub's] speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue." *Id.* Whereas actions like writing a letter to a newspaper or informally discussing politics with co-workers are equally available to government employees and ordinary citizens, "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens." *Id.* at 203-04.

[8] Here, the speech that Kaplan claims is protected falls within Kaplan's official duties as defined by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*Weintraub.* In the FAC, Kaplan alleges that the retaliation he allegedly suffered was in response to the following statements: (1) his complaints to Nadel about Crisafi's behavior; (2) his Workplace Incident Reports; and (3) his complaint to the Inspector General. With the possible exception of the latter, each of these statements, as Kaplan concedes, was "made privately though channels available through his employment, and was "made in a manner that would not be available to a non-public employee citizen." Kaplan Supp. Mem., 2/5/10, at 5. Moreover, the common theme of all these statements was that Crisafi was violating suspects' rights and was not performing his job properly, and by implication that Crisafi was interfering with Kaplan's ability to perform his own duties. It is clear that Kaplan's duties as a MARO officer included ensuring that investigations and arrests of narcotics abuses are lawfully conducted. *See, e.g.,* Fisch Report at 2-3 (describing policies and training manuals **354** applicable to BNE investigators). All of Kaplan's relevant speech was therefore, either directly or indirectly, " 'part-and-parcel of his concerns' about his ability to 'properly execute his duties' " as a BNE investigator. *Weintraub,* 593 F.3d at 203. Just as the speech in *Weintraub* was in furtherance of the teacher's duty to maintain classroom discipline, Kaplan's speech here, which related to ensuring the "safety of citizens" and the "constitutional rights of suspects," Kaplan Supp. Mem. at 5, was made in furtherance of his law enforcement duties as an investigator endowed with the power to arrest. *Cf. Carter v. Inc. Vill. of Ocean Beach,* 693 F.Supp.2d 203, 211 (E.D.N.Y.2010) ( "All of plaintiffs' complaints to their superiors ... related to their concerns about their ability to properly execute their duties as police officers, as they expressed concern [that various acts] affected their ability to perform their job assignments safely and that they were told not to issue summonses to certain individuals and businesses.... Plaintiffs' speech in challenging ... defendants' alleged cover-ups of officer misconduct ... was undertaken in the course of performing one of their core employment responsibilities of enforcing the law and, thus, was speech made pursuant to their official duties."). Accordingly, Kaplan's allegations cannot support a First Amendment retaliation claim.

In addition, the speech contained in Kaplan's Workplace Incident Reports and his complaint to the Inspector General were unprotected by the First Amendment because these statements were required by law. *See* N.Y. Labor Law § 27-b(6)(a) ("Any employee ... who believes that a serious violation of a workplace violence protection program exists or that an imminent danger exists shall bring such matter to the attention of a supervisor in the form of a written notice."); N.Y. Exec. Law § 55(1) ("Every state officer or employee in a covered agency shall report promptly to the state inspector general any information concerning corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment .... The knowing failure of any officer or employee to so report shall be cause for removal from office or employment or other appropriate penalty.").[FN6] Speech made pursuant to a public employee's legal obligations is not made "as a citizen."[FN7]

FN6. It is these statutory obligations, as well as *Weintraub's* broad definition of speech made in the course of official duties, that distinguish Kaplan's speech from that of the plaintiff in *Freitag v. Ayers,* 468 F.3d 528 (9th Cir.2006). The plaintiff in *Freitag,* a California correctional officer, claimed she was retaliated against after reporting to the California Inspector General that she and other prison guards were being sexually harassed. Although the Ninth Circuit held that the plaintiff "acted as a citizen" in complaining to the Inspector General and in writing letters to a state senator regarding this harassment, the court's holding was based on the fact that "[i]t was certainly not part of [plaintiff's] official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly." *Id.* at 545. Under New York law, however, such complaints *are* within the official duties of BNE investigators.

FN7. Because Kaplan's speech was made

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

pursuant to his official duties and thus is not constitutionally protected, the Court need not reach other required elements of a First Amendment retaliation claim, including whether his speech addressed matters of "public concern," *see Sousa, 578 F.3d at 170*, and whether the complaint sufficiently alleges a causal connection between the protected speech and the retaliatory acts, *see Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir.2001)*.

For the foregoing reasons, the March 1 Order denied the sixth cause of action in the FAC, and, as the Court now clarifies, the dismissal was with prejudice because it rests on a legal ground that cannot be **\*355** cured by repleading. *Cf. Oliver Schs., Inc. v. Foley, 930 F.2d 248, 252-53 (2d Cir.1991)*. The Court notes, however, that the dismissal of Kaplan's First Amendment claim brought pursuant to § 1983 does not alter Kaplan's opportunity under applicable New York law to seek protection from the retaliatory acts he alleges. *See N.Y. Labor Law § 27-b*(6)(e) (prohibiting retaliation based on an employee's filing of a report of workplace violence); *N.Y. Exec. Law. § 55*(1) (providing that employees who report "improper governmental action" to the Inspector General "shall not be subject to dismissal, discipline or other adverse personnel action").

[9] The Court comes finally to Crisafi's counterclaim for defamation, which insinuates that the aforementioned Workplace Incident Reports filed by Kaplan, Kaplan's complaint to the Inspector General, and even Kaplan's allegations in the FAC are defamatory. Crisafi subsequently conceded, however, that the only potentially actionable statements not protected by privilege or barred by the statute of limitations are those that were allegedly republished on December 8, 2008 by the Inspector General and the *New York Times*. Crisafi Mem. Opp. Kaplan's Mot. to Dismiss, 2/5/10, at 4-5. In this respect, the counterclaim, which was filed on December 3, 2009, alleges the following: Kaplan filed Workplace Incident Reports on or about November 20, 2007 and August 12,

2008 reporting various misconduct by Crisafi, and made a complaint to the Inspector General to the same effect on or about November 20, 2007. Crisafi Compl. ¶¶ 15, 17, 20, Exs. C-E. Crisafi alleges, based on information and belief, that Kaplan's report to the Inspector General "prompted an investigation" focused on Crisafi and relating to Kaplan's complaints. *Id.* ¶ 19. Also upon information and belief, Crisafi alleges that a copy of the Fisch Report was provided to Kaplan in advance of its public release. *Id.* ¶ 35. This report was also provided to the *New York Times*, which described this report in an article published on December 8, 2008. *Id.* ¶ 36 & Ex. F. Upon information and belief, Crisafi alleges that Kaplan gave the Fisch Report to the *New York Times*. *Id.* ¶ 37. The Fisch Report was published on the *New York Times's* and Inspector General's websites, where it remains accessible. *Id.* ¶¶ 39-40. Crisafi alleges that the contents of the *New York Times* article and the Fisch Report reflect false and defamatory statements made by Kaplan, and have caused Crisafi to be vilified and his reputation to suffer. *Id.* ¶¶ 16, 18, 21, 23-33, 41-43. Accordingly, Crisafi asserted two causes of action alleging that Kaplan defamed him. Kaplan then moved to dismiss these counterclaims on the basis that Kaplan is not responsible for the republication of his allegedly defamatory statements by the *New York Times* or the Inspector General.

[10] Under New York law, a plaintiff "may not recover damages from the original author for ... slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 59 (2d Cir.2002)*. Crisafi argues that a more lenient standard applies, permitting liability based on Kaplan's mere knowledge or reasonable expectation that his allegedly defamatory statements would be republished. *See, e.g., Campo v. Paar, 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963)*. The Court need not resolve which standard applies: Crisafi's counterclaim is deficient under either test because it fails to "state a claim to relief that is plausible on its face." *Iqbal, 129 S.Ct. at 1949* (internal quotation marks omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Even accepting as true Crisafi's non-conclusory factual allegations, including **\*356** those made only on information and belief, it is simply implausible that Kaplan in any legally relevant sense caused the republication of his statements in the Fisch Report or *New York Times* article. Crisafi alleges that Kaplan's complaint prompted the Inspector General investigation, but this allegation is contradicted by the Fisch Report itself, which indicates that the investigation began after the *New York Times* published an article in March 22, 2007 describing abuses of government-issued parking placards. Fisch Report at 3-4. In any event, even if Kaplan's complaint served to expand the scope the investigation, and included allegations consistent with what the Fisch Report eventually concluded, the Report clearly did more than merely parrot Kaplan's charges. The Report, in a section headed "Methodology," states that the investigation was based on, among other things, interviews with Crisafi himself, other BNE employees, Giglio, and Moffett, as well as other police officers and district attorneys who had interacted with Crisafi. *Id.* at 4. Indeed, the Inspector General is required by statute to "investigate," not merely repeat, allegations of malfeasance. [N.Y. Exec. Law § 53](). And even if, as alleged, Kaplan acted to bring the Report to the attention of the *New York Times,* the *New York Times* article, which consists entirely of a summary of the Fisch Report, reflects Kaplan's allegations only to the extent that such charges were ratified by the Report itself. *See* Crisafi Compl., Ex. F.

For these reasons, the Court concluded that there is no basis for holding Kaplan liable for the republication of his allegedly defamatory statements, even if he intended that his allegations be republished in this manner and gave the *New York Times* a copy of the Fisch Report. "The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication." *[Van-Go Transp. Co. v. N.Y. City Bd. of Educ.,]() 971 F.Supp. 90, 102 (E.D.N.Y.1997)* (internal quotation marks omitted). Here,

the duty of the Inspector General to investigate complaints prior to publishing a written report, the fact that the Fisch Report was based on numerous sources beyond Kaplan's allegations, and the fact that the *New York Times* article merely summarized the Fisch Report together sever any causal link that might exist between Kaplan's actions and the December 8, 2008 republications. Thus, the March 1 Order dismissed Crisafi's counterclaim with prejudice.[FN8]

> FN8. This result is not inconsistent with *[Campo v. Paar,]() 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963),* which declared that "[a]nyone giving a statement to a representative of a newspaper authorizing or intending its publication is responsible for any damage caused by the publication." This broad pronouncement was made in the context of a narrower holding that the defendant, Jack Paar, could be held responsible for the *New York Post's* publication of his statement, made by him to a reporter during an interview, that the plaintiff "lacked certain qualities which would fit him to be a performer desirable to [Paar's] program." *[Id.]() at 365, 239 N.Y.S.2d 494.* The causal link between Kaplan's statements and the findings of the Fisch Report, which were subsequently summarized by the *New York Times,* is obviously much more attenuated than the relationship in *[Campo]()* between Paar's statement to the newspaper reporter during an interview and the reporter's publication of that statement.

For the foregoing reasons, the Court hereby confirms its decisions to dismiss the sixth cause of action (*i.e.,* all of Kaplan's claims) and to dismiss both of Crisafi's counterclaims, all with prejudice, and to otherwise deny the motions to dismiss. The Clerk of the Court is directed to close **\*357** the entries numbered 33, 34, 35, 42, and 47 on the docket of case number 09 Civ. 7283 and to close case number 09 Civ. 9952.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)


S.D.N.Y.,2010.

D'Olimpio v. Crisafi

718 F.Supp.2d 340


END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

**c**

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Gultela QASEM, Plaintiff,

v.

Luis A. TORO; Superintendent of Taconic Correctional Facility Delores Thornton; Deputy Superintendent for Security William Rogers; John Does 1-10, Defendants.

No. 09 Civ. 8361(SHS).

Aug. 10, 2010.

**Background:** Inmate brought a § 1983 suit against corrections officials regarding injuries suffered by the inmate at the hands of a corrections officer alleged to have sexually assaulted the inmate. Superintendent and deputy superintendent for security moved to dismiss claims that they were deliberately indifferent to the inmate's personal safety.

**Holdings:** The District Court, Sidney H. Stein, J., held that:

(1) inmate stated a claim against the movants for Eighth and Fourteenth Amendment violations, and

(2) movants were not entitled to qualified immunity.

Motion denied.

West Headnotes

**[1] Civil Rights 78 ⚷ 1358**

78 Civil Rights

   78III Federal Remedies in General

      78k1353 Liability of Public Officials

         78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases

**Constitutional Law 92 ⚷ 4825**

92 Constitutional Law

   92XXVII Due Process

      92XXVII(H) Criminal Law

         92XXVII(H)11 Imprisonment and Incidents Thereof

            92k4825 k. Use of Force; Protection from Violence. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

**Prisons 310**          **234**

310 Prisons

  310II Prisoners and Inmates

    310II(E) Place or Mode of Confinement

      310k234 k. Duty to Protect; Protective Confinement. Most Cited Cases

**Sentencing and Punishment 350H**          **1537**

350H Sentencing and Punishment

  350HVII Cruel and Unusual Punishment in General

    350HVII(H) Conditions of Confinement

      350Hk1537 k. Protection from Violence. Most Cited Cases

Inmate's allegations against superintendent and deputy superintendent for security in a § 1983 suit, claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, stated a claim for Eighth and Fourteenth Amendment violations; complaint alleged that the officials were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with another official, the investigation and response to complaints of staff misconduct. U.S.C.A. Const.Amends. 8, 14; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78**          **1335**

78 Civil Rights

  78III Federal Remedies in General

    78k1334 Persons Liable in General

      78k1335 k. In General. Most Cited Cases

Degree of personal involvement required to overcome a motion to dismiss a § 1983 claim for failure to state a claim varies depending on the constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Civil Rights 78**          **1355**

78 Civil Rights

  78III Federal Remedies in General

    78k1353 Liability of Public Officials

      78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases

Categories set forth in case law as supporting personal liability of supervisors under § 1983 apply as long as they are consistent the requirements applicable to the particular constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983.

**[4] Sentencing and Punishment 350H**          **1532**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

      350HVII(H) Conditions of Confinement

         350Hk1532 k. In General. Most Cited Cases

Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. U.S.C.A. Const.Amend. 8.

**[5] Sentencing and Punishment 350H    1533**

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

      350HVII(H) Conditions of Confinement

         350Hk1533 k. Deliberate Indifference in General. Most Cited Cases

Official acts with the requisite deliberate indifference for an Eighth Amendment violation when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. U.S.C.A. Const.Amend. 8.

**[6] Civil Rights 78    1376(7)**

78 Civil Rights

   78III Federal Remedies in General

      78k1372 Privilege or Immunity; Good Faith and Probable Cause

         78k1376 Government Agencies and Officers

            78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

Superintendent and deputy superintendent for security were not entitled to qualified immunity in an inmate's § 1983 suit claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable, if not unintelligible, decisions made with respect to the inmate during the course of an investigation. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78    1376(2)**

78 Civil Rights

   78III Federal Remedies in General

      78k1372 Privilege or Immunity; Good Faith and Probable Cause

         78k1376 Government Agencies and Officers

            78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

Individual defendants are shielded from liability for civil damages under § 1983 if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

Karen K. Won, Cooley Godward Kronish LLP, William O'Brien, Kronish, Lieb, Weiner & Hellman L.L.P., New York, NY, for Plaintiff.

Thomas Patrick McCloskey, Aliazzo, McCloskey & Gonzalez, LLP, Ozone Park, NY, Julia Hyun-Joo Lee, New York State Department of Law, New York, NY, for Defendants.

*OPINION & ORDER*

SIDNEY H. STEIN, District Judge.

**\*1** Plaintiff Gultela Qasem brings this action pursuant to 42 U.S.C. § 1983 against defendants Luis Toro, Delores Thornton, William Rogers, and John Does 1-10 in their individual capacities. The lawsuit arises from injuries allegedly suffered by Qasem at the hands of Corrections Officer Luis Toro while Qasem was an inmate under the custody of the New York State Department of Correctional Services ("DOCS") at Taconic Correctional Facility. The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) direct and repeated acts of sexual assault by Toro; (2) Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Defendants Thornton and Rogers have now moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for relief.

## I. BACKGROUND

The following facts are taken from the complaint and presumed to be true for the purposes of this motion.

### A. *Parties*

Plaintiff Gultela Qasem is currently an inmate at the Bedford Hills Correctional Facility. At the time of the acts alleged in the complaint, plaintiff was an inmate at the Taconic Correctional Facility. (Compl. ¶¶ 5, 21.) Defendant Toro-not a party to the present motion-is a DOCS Corrections Officer. At the time of the acts alleged in the complaint, defendant Delores Thornton was the Superintendent of Taconic and defendant Rogers was the Deputy Superintendent for Security of Taconic. (*Id.* ¶¶ 1, 8-9.)

### B. *This Action*

Qasem alleges defendants violated her Eighth and Fourteenth Amendment rights under the United States Constitution as they arise out of a repeated pattern of sexual assault and rape committed against her by Toro.

While an inmate at Taconic, Qasem was assigned to work in Building 93 from approximately February 2007 to November 2007, and for most of that time, she also lived there. (*Id.* ¶¶ 21-22.) Qasem alleges that, on or around March 27, 2007, Toro entered her cell during the afternoon "count time" [FN1] and sexually assaulted her by fondling her breasts, vaginal area, and buttocks while also exposing his penis and forcing Qasem to perform oral sex on him. (*Id.* ¶ 23.) Plaintiff alleges that later that evening Toro ordered her to the officers' station where he raped her. (*Id.* ¶ 24.) Toro then told Qasem that he would write up a disciplinary action against her if she told anyone what he had done to her. (*Id.* ¶ 24.)

Qasem alleges that a pattern of sexual assault emerged over the next eight months. Toro allegedly assaulted and raped Qasem in her cell on numerous occasions during the night count time, in the officers' station, in the shower area, and in the recreation room. (*Id.* ¶¶ 25-26.) Throughout these eight months, Qasem alleges that Toro

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

repeatedly threatened to kill her and her family if she reported his actions. As a result, she did not report Toro's conduct. (*Id.* ¶ 27.) Plaintiff alleges, however, that other corrections staff facilitated Toro's repeated sexual abuse by condoning Toro or plaintiff being in unauthorized areas and allowing Toro into plaintiff's housing area when he was not assigned there. (*Id.* ¶ 28.)

**\*2** Although Qasem did not file a report against Toro based on his conduct, others did, and on July 2, 2007, the DOCS Officer of Inspector General ("IG") commenced an investigation into Toro's actions. (*Id.* ¶¶ 31-33.) When interviewed by an IG representative, Qasem denied the allegations because of the prior threats that Toro had made; despite her denials, plaintiff was reassigned to a different building the day after her interview. (*Id.* ¶¶ 33-34.) As the IG continued its investigation, in August 2007 Qasem was transferred back to building 93, which was the building where Toro worked at that time. Plaintiff contends that by causing her to be transferred back to Toro's building, defendants Thornton and Rogers were deliberately indifferent to her safety and allowed Toro to have continued unfettered access to her, which enabled him to continue raping and sexually abusing her. (*Id.* ¶ 38.) Plaintiff alleges that once she returned to building 93 in August 2007, Toro resumed his sexual assaults, including but not limited to raping and sodomizing her. (*Id.* ¶ 40.)

During this same time period, plaintiff was transferred in and out of the "keeplock" area in building 93. (*Id.* ¶¶ 39-47.) While she was in keeplock, at least one corrections officer delivered a message from Toro to her, while other corrections staff condoned and disregarded the alleged continuing assaults by Toro. (*Id.* ¶¶ 47-48.) In addition to physical, mental, and emotional injuries she suffered from the repeated rapes and sexual abuse, Qasem alleges that in October 2007 she was diagnosed with genital herpes, a sexually transmitted disease, which she believes was transmitted to her by Toro. (*Id.* ¶¶ 61-63.)

Plaintiff alleges that sometime in November 2007, Toro became aware of the IG investigation and started harassing her by asking her what questions the IG representative had asked her and what her responses were. (*Id.* ¶ 45.) Qasem contends that on November 26, 2007, after she was once again raped by Toro, she told him that she was going to report his conduct, and Toro became violent with her-twisting her arm and wrist. (*Id.* ¶ 50.) The next day, plaintiff was transferred out of Taconic and into Bedford. (*Id.* ¶ 51.)

Plaintiff alleges that Thornton and Rogers were deliberately indifferent to her safety and well-being and that despite ample evidence of the assaults, they permitted Toro to have repeated access to her instead of removing either her or Toro from building 93. (*Id.* ¶¶ 55-60.) Plaintiff maintains that Thornton and Rogers were responsible for the inadequate polices and practices that allowed her to be repeatedly raped and assaulted over a number of months, despite the fact that other corrections officers were aware of Toro's misconduct. (*Id.*)

## II. DISCUSSION

A. *Rule 12(b)(6) Standard*

On a motion to dismiss a claim for relief pursuant to Rule 12(b)(6) a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006). A complaint will be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal, 129 S.Ct. at 1949* (quoting *Twombly, 550 U.S. at 556, 127 S.Ct. 1955).*

B. *Supervisory Liability Post-Iqbal*

**\*3** [1] The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) the direct and repeated acts of sexual assault by Toro; (2) defendant Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Thornton and Rogers respond to the claims against them on several grounds.

First, they assert that Qasem's claims are based on a broad theory of "supervisory liability" that has been discredited by the U.S. Supreme Court in *Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).* Prior to *Iqbal,* well-established Second Circuit law provided five bases for alleging that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a section 1983 claim. A plaintiff could plead personal involvement by showing any of the following five courses of conduct:

(1) the defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were

occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Sanders v. N.Y. City Dep't of Corr.,* 07 Civ. 3390, 2009 WL 222161, at \*5, 2009 U.S. Dist. LEXIS 7709, at \*17-18 (S.D.N.Y. Jan. 30, 2009). Defendants contend that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* thereby rendering Qasem's reliance on *Colon* categories unwarranted.

The Second Circuit has not yet addressed how *Iqbal* affects the five categories of conduct that give rise to supervisory liability under *Colon.* As explained in detail in *D'Olimpio v. Crisafi,* No. 09 Civ. 7283, ---F.Supp.2d ----, ---- - ----, 2010 WL 2428128, at \*4-6, 2010 U.S. Dist. LEXIS 59563, at \*14-18 (S.D.N.Y. June 15, 2010), in the wake of *Iqbal,* certain courts in this district have found that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster," and that "[t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated," because only the first and third categories allege personal involvement sufficiently to permit supervisory liability to be imposed after *Iqbal. Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2009 WL 1835939, at \*1-2, 2009 U.S. Dist. LEXIS 54141, at \*6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.");* *Joseph v. Fischer,* No. 08 Civ. 2824, 2009 WL 3321011, at \*15, 2009 U.S. Dist. LEXIS 96952, at \*42-43 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim *Iqbal* eliminated."). This Court, as did the Court in *D'Olimpio,* disagrees with this narrow interpretation of *Iqbal.*

**\*4** [2] As *Iqbal* noted, the degree of personal involvement required to overcome a Rule 12(b)(6) motion varies depending on the constitutional provision alleged to

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

have been violated. Invidious discrimination claims require a showing of discriminatory purpose, but there is no analogous requirement applicable to Qasem's allegations of repeated sexual assaults. *See Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) (citing *Chao v. Ballista,* 630 F.Supp.2d 170, 178 n. 2 (D.Mass.2009)); *see also D'Olimpio,* --- F.Supp.2d at ----, 2010 WL 2428128, at *5, 2010 U.S. Dist. LEXIS 59563, at *16. *Colon's* bases for liability are not founded on a theory of respondeat superior, but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. *Id.* at ----, *5, 2010 U.S. Dist. LEXIS 59563 at *17 (quoting *Colon,* 58 F.3d at 873).

[3] Thus, the five *Colon* categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *Id.*; *see also Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

Plaintiff's allegations and inferences, if proven, would entitle her to relief under the Fourteenth Amendment and Eighth Amendments. *See Breithaupt v. Abram,* 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) (sustaining substantive due process claims where state action shocks the conscience); *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the

Eighth Amendment.") (quoting *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

C. *Colon Categories*

Second and apart from their argument based on *Iqbal,* Thornton and Rogers assert that plaintiff has adequately alleged neither (1) that they were deliberately indifferent to her rights by failing to act on information that unconstitutional acts were occurring nor (2) that they were responsible for creating or maintaining policies or practices that failed to prevent Qasem from being repeatedly raped and assaulted.

[4][5] The Court finds that plaintiff has alleged sufficient facts that Thornton-the Superintendent of the DOCS facility where plaintiff resided-and Rogers-the Deputy Superintendent for Security at that same facility-were deliberately indifferent to her health and safety and that they were responsible for creating or maintaining policies and practices that failed to prevent plaintiff from being raped and assaulted. The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996). "An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

*5 Specifically, the complaint alleges that defendants were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with the IG, the investigation and response to complaints of staff misconduct. Despite an investigation and what plaintiff alleges as substantial evidence of Toro's misconduct known to a variety of individuals (*id.* ¶ 56),

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

defendants Thornton and Rogers allowed plaintiff to be housed in the building where Toro worked (*id.* ¶ 58); they failed to remove him from guarding Qasem (*id.* ¶ 57); they failed to reassign Qasem to another building (*id.*); they allowed Qasem to be transferred back to the building where Toro worked (*id.* ¶ 58); and they did not increase supervision of Toro despite their knowledge of allegations of Toro's assaults and the IG's investigation of him (*id.* ¶ 59). The complaint also alleges that a number of acts occurred under defendants' supervision that were violations of DOCS rules and regulations (*id.* ¶¶ 28, 47), and that defendants Thornton and Rogers allowed those practices to take place.

Although discovery may ultimately reveal that defendants Thornton and Rogers made every reasonable effort to prevent the alleged sexual abuse, Qasem has alleged sufficient facts to allow the Court "to draw the reasonable inference" that the defendants "are liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949.

D. *Qualified Immunity*

[6] Third, Thornton and Rogers claim that qualified immunity requires dismissal of this litigation as to them. So far as the Court can ascertain, defendants contend that they are entitled to immunity principally because Qasem herself initially denied the sexual relationship when asked about it by prison security officers. In their view, her denials by themselves operate as a "reasonable" basis for the decision to place plaintiff back into the building where Toro had unfettered access to her.

[7] Individual defendants are " 'shielded from liability for civil damages' " under 42 U.S.C. § 1983 if " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d

396 (1982)); *accord Gilles v. Repicky,* 511 F.3d 239, 243 (2d Cir.2007). "A right is clearly established if (1) the law is defined with Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (quoting *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)).

This Court cannot find the defendants immune from suit on this record. It is well established that the sexual exploitation of prisoners by prison guards amounts to a constitutional violation. *See Schwenk v. Hartford,* 204 F.3d 1187, 1197 (9th Cir.2000) ("In the simplest and most absolute terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established ... and no reasonable prison guard could possibly have believed otherwise."); *Daskalea v. District of Columbia,* 227 F.3d 433, 440, 343 U.S.App.D.C. 261 (D.C.Cir.2000) (affirming prisoner's Eighth Amendment claim after prison guards sexually assaulted her); *Berryhill v. Schriro,* 137 F.3d 1073, 1076 (8th Cir.1998); *Barney v. Pulsipher,* 143 F.3d 1299, 1310 (10th Cir.1998) ("Clearly plaintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment."). *Cf. Farmer v. Brennan,* 511 U.S. 825, 833-34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' ") (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable-if not unintelligible-decisions made with respect to plaintiff during the course of the IG's investigation, the Court cannot say at this stage of the litigation that Thornton and Rogers are entitled to qualified immunity for their alleged actions.

**III. CONCLUSION**

*6 Because plaintiff has alleged enough facts to raise

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

a plausible claim to relief against the supervisory officials Thornton and Rogers and they are not entitled to qualified immunity on the basis of the record at this stage of the litigation, the motion by Thornton and Rogers to dismiss the complaint is denied.

> FN1. Count time is time during which all activity stops and essentially all inmates are locked into their cells, and corrections staff verify that no inmates are missing. (Compl. ¶ 23 n. 1.)

S.D.N.Y.,2010.

Qasem v. Toro

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31002803 (N.D.N.Y.)

(Cite as: 2002 WL 31002803 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Julio GIANO, Plaintiff,

v.

Donald SELSKY, Director of S.H.U.; Daniel Senkowski, Superintendent; William Costello, Deputy of Security; Joseph Wood, Correctional Captain; David Armitage, Correctional Sergeant, Defendants.

No. 91-CV-166.

Sept. 5, 2002.

State prisoner brought § 1983 action against prison officials alleging his due process rights were violated when he was placed in administrative segregation. The District Court, Lawrence E. Kahn, J., 37 F.Supp.2d 162, granted summary judgment to the defendants, and prisoner appealed. The Court of Appeals, Oakes, Senior Circuit Judge, 238 F.3d 223, vacated and remanded. On remand, defendants moved for summary judgment. The District Court held that prisoner who was afforded initial segregation hearing and periodic review of his confinement received all process that he was due under Due Process Clause.

Granted.

West Headnotes

[1] Constitutional Law 92 ☞ 4826

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)11 Imprisonment and Incidents Thereof
                92k4826 k. Segregation. Most Cited Cases
    (Formerly 92k272(2))

Prisons 310 ☞ 281

310 Prisons
    310II Prisoners and Inmates
        310II(H) Proceedings
            310k279 Requisites, Course, and Conduct of Proceedings
                310k281 k. Particular Issues and Applications. Most Cited Cases
    (Formerly 310k13(7.1))

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31002803 (N.D.N.Y.)

(Cite as: 2002 WL 31002803 (N.D.N.Y.))

State prisoner who was afforded initial segregation hearing and received copy of administrative segregation recommendation before his transfer to administrative segregation received all process that he was due under Due Process Clause, despite his claim that he did not represent security threat; prisoner was given opportunity to present his views regarding his transfer to administrative segregation, and was afforded opportunity to call witnesses and present evidence in opposition to recommendation. U.S.C.A. Const.Amend. 14.

[2] Constitutional Law 92 🗝 4826

92 Constitutional Law

92XXVII Due Process

92XXVII(H) Criminal Law

92XXVII(H)11 Imprisonment and Incidents Thereof

92k4826 k. Segregation. Most Cited Cases

(Formerly 92k272(2))

Prisons 310 🗝 275

310 Prisons

310II Prisoners and Inmates

310II(H) Proceedings

310k271 Nature and Necessity of Proceedings; Right to Notice and Hearing

310k275 k. Placement and Classification.

Most Cited Cases

(Formerly 310k13(10))

Prisons 310 🗝 281

310 Prisons

310II Prisoners and Inmates

310II(H) Proceedings

310k279 Requisites, Course, and Conduct of Proceedings

310k281 k. Particular Issues and Applications. Most Cited Cases

(Formerly 310k13(10))

State prisoner who was afforded periodic review of his confinement in administrative segregation received all process that he was due under Due Process Clause, despite his claim that reviews were nothing more than pro forma exercise; prisoner was initially held in administrative segregation upon his arrival at facility based on fact that he was unknown to staff, had history of prior escape attempts and was familiar with facility, but he was released after only 92 days after staff had evaluated his behavior. U.S.C.A. Const.Amend. 14.

*MEMORANDUM DECISION AND ORDER*

KAHN, J.

**\*1** Plaintiff pro se, Julio Giano ("Plaintiff" or "Giano"), brings this action pursuant to 42 U.S.C. § 1983 (1994) alleging that Defendants violated his right to due process by wrongfully placing him in administrative

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31002803 (N.D.N.Y.)

(Cite as: 2002 WL 31002803 (N.D.N.Y.))

segregation while he was an inmate at Clinton Correctional Facility ("Clinton"), a maximum security prison in the New York State Correctional Services system. Specifically, Plaintiff avers that the initial decision to place him in administrative segregation and subsequent decisions to continue his placement therein were made under false pretenses.

This Court granted summary judgment to Defendants, holding that Giano's ninety-two days of administrative confinement at Clinton did not constitute an "atypical and significant hardship" sufficient to create a liberty interest. On appeal to the Second Circuit Court of Appeals, Giano argued that his prior 670 day administrative segregation at the Attica Correctional Facility ("Attica") should have been considered along with his ninety-two days administrative segregation at Clinton. The Court of Appeals found that Giano's "commutative confinement at Attica and Clinton implicated a liberty interest" and remanded the case to this Court for a determination of whether procedural due process was provided to Giano with respect to his administrative segregation at Clinton. For the following reasons, this Court holds that Defendants' motion for summary judgment is GRANTED and Plaintiff's cross-motion for summary judgment is DENIED.

## I. BACKGROUND

Plaintiff first entered the New York State corrections system in August 1985. Prior to this date, Plaintiff attempted to escape from the Nassau County courthouse. During the attempted escape, several court officers were severely injured. Plaintiff first entered Clinton sometime after August 1985, but on July 28, 1986, Plaintiff was transferred from Clinton to Sing Sing Correctional Facility ("Sing Sing") in Ossining, New York. On December 9, 1986, Plaintiff and two other inmates escaped from Sing Sing. Plaintiff was captured soon thereafter and sentenced to five (5) years in the Special Housing Unit ("SHU") [FN1] at Sing Sing. On December 23, 1987, after spending approximately one year in the SHU at Sing Sing, Plaintiff

was transferred to Shawangunk Correctional Facility ("Shawangunk") in Wallkill, New York. Plaintiff spent approximately one more year in Shawangunk's SHU and was then released to the general prison population based on his good behavior.

FN1. Special Housing Units are 'single occupancy cells grouped so as to provide separation from the general population." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b)

On September 12, 1988, an unknown inmate stabbed Plaintiff in the back resulting in a serious injury to Plaintiff's right shoulder. Because of this incident, and Plaintiff's refusal to voluntarily enter protective custody, Plaintiff was placed in Shawangunk's involuntary protective custody ("IPC") unit. Plaintiff spent twenty-nine (29) days in IPC and was then transferred to Attica on October 10, 1988. Upon his arrival at Attica, Plaintiff was placed in administrative segregation because: (1) he had been stabbed by an unknown inmate and (2) his escape record. On August 10, 1990, after six hundred seventy (670) days in administrative segregation at Attica, Plaintiff was transferred back to Clinton.

*2 On August 13, 1990, Giano was served with a recommendation that he be placed in administrative segregation. That recommendation, written by defendant David Armitage ("Armitage"), a sergeant in the New York Department of Correctional Services ("DOCS"), stated the following:

Due to the administration's concern regarding Inmate Giano's transfer to Clinton from Attica Correctional Facility, where he was in administrative segregation status, it has been requested that status be retained at this facility. Inmate Giano is serving time for six (6) felonies, the longest term involving 25 to Life for

Not Reported in F.Supp.2d, 2002 WL 31002803 (N.D.N.Y.)

(Cite as: 2002 WL 31002803 (N.D.N.Y.))

Murder 2 and the most recent Escape 1, concerning an escape on 12/9/86, from Sing Sing Correctional Facility. Due to this information, Escape from a Max A Facility, it is requested that Giano be placed in Administrative Segregation as he presents a possible threat to the safety and security of the facility.

Defs.' Mem. Summ. J., Ex. N. This recommendation was followed by an Administrative Segregation Admission hearing on August 17, 1990.[FN2] At the conclusion of the hearing, the hearing officer, defendant Joseph Wood ("Wood"), upheld Armitage's recommendation to place Plaintiff in administrative segregation based on the following:

> [FN2.] Prior to the hearing, Giano was provided with an inmate assistant. (Exhibit A, Transcript of Administrative Segregation Custody Hearing, pp. 15-16). During the hearing, Giano was afforded the right to speak on his own behalf and question the witness he called. (See generally, Exhibit A).

(1) the recommendation written by Sergeant Armitage where it stated that inmate Giano escaped from a maximum security facility on December 9, 1986; (2) Plaintiff's verbal testimony confirming the fact that he escaped from Sing Sing on December 9, 1986; (3) Sergeant Armitage's verbal testimony concerning his review of plaintiff's records which confirmed that Giano was successful in an organized escape from Sing Sing and was also involved in a near successful escape from custody (Nassau County courthouse) which involved serious injury to others; (4) Giano's familiarity with the Clinton Correctional Facility.

Defs.' Mem. Summ. J., Statement of Material Facts at ¶ 16; see also id., Ex. A. at 59. On September 11, 1990, Defendant Donald Selsky ("Selsky"), Director of Special Housing/Inmate Disciplinary Program, affirmed

Defendant Wood's findings. (Exhibit Q).

On October 22, 1990, Plaintiff claims his counselor told him that Defendant Daniel Senkowski ("Senkowski") would release him from administrative segregation only if Giano signed a form consenting to being admitted into protective custody. Plaintiff claims he refused the offer because Senkowski would not put it into writing. On October 24, however, Plaintiff accepted Senkowski's offer because he felt his living "conditions would be much better" in Protective Custody rather than in administrative segregation. Approximately one week later, Plaintiff contends that Defendant William Costello ("Costello") and another individual met with him and told him that he would be released from administrative segregation if he signed a waiver releasing Clinton from potential liability for any harm that Plaintiff might incur upon his return to the general population.

**\*3** Plaintiff signed the waiver but was not immediately released into the general population. Instead, on November 5, 1990, Plaintiff was placed in the Protective Custody unit. On November 6, 1990, Defendant Armitage asked Plaintiff to sign a second waiver similar to the first so that he could be released to the general population. Plaintiff signed the form, but was then told by Defendant Armitage approximately one hour later that he would not be released to the general population until he signed a consent to protective custody. Plaintiff refused to sign the consent and was thereafter taken back to administrative segregation. On November 8, 1990, Plaintiff contends that Defendants Senkowski, Costello, and McCormick came to his cell and told him that he would remain in administrative segregation until he consented to protective custody. Plaintiff claims that he eventually signed the consent form because he feared spending the remainder of his sentence in administrative segregation.

On November 9, 1990, Plaintiff was admitted into

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31002803 (N.D.N.Y.)

(Cite as: 2002 WL 31002803 (N.D.N.Y.))

Clinton's Protective Custody unit. The reason given for Plaintiff's placement was that Plaintiff's "records indicate [he was] stabbed by an unknown inmate at another New York Correctional Facility. It is not known if that inmate is at this facility. For your own safety it is recommended you be placed on Protective custody status." Defs.' Mem. Summ. J. Ex. U. Plaintiff's status in Protective Custody was reviewed periodically and it was determined that his continued placement therein was warranted because the circumstances justifying his initial placement had not changed. Giano remained in Protective Custody until December 13, 1990. Between administrative segregation and protective custody, Plaintiff spent one-hundred and twenty-five (125) days in SHU.

Giano alleges that his "due process right to a fair hearing before he was admitted to segregation was violated in that the hearing was nothing more than a pretext." Pl.'s Pre-trial Mem. at 2, Docket No. 69. He further contends that his "due process right to meaningful review of his continued confinement in segregation was violated in that the reviews were not done in a meaningful time and in a meaningful manner." *Id.* Defendants seek summary judgment on the following six (6) grounds: (1) Giano has failed to show that his period of confinement imposed an atypical and significant hardship; (2) the procedures Defendants followed afforded Giano all the process he was due; (3) Defendants have qualified immunity; (4) the evidence was sufficient to sustain the decision to place and maintain Giano in segregated confinement; (5) Giano is precluded from bringing this action because, if he is successful, such a holding would undermine the validity of the underlying conviction; and (6) a Section 1983 action cannot be maintained against Defendant Coughlin because he was not personally involved in the actions or decisions giving rise to this lawsuit.[FN3]

FN3. The Court previously limited its discussion to Defendants' first defense, finding it dispositive. As the Second Circuit has found that Giano possessed a liberty interest, the Court now discusses Defendants remaining defenses.

## II. DISCUSSION

A. Summary Judgment Standard of Review

**\*4** The standard for summary judgment is well-established. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is genuinely disputed only if, based on that fact, a reasonable jury could find in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).* On a motion for summary judgment, all evidence must be viewed and all inferences must be drawn in a light most favorable to the nonmoving party. *See City of Yonkers v. Otis Elevator Co., 844 F.2d 42, 45 (2d Cir.1988).*

The party seeking summary judgment bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).* Upon the movant's satisfying that burden, the onus then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson, 477 U.S. at 250.* The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986),* but "must set forth specific facts showing that there is a genuine issue of fact for trial." *First Nat'l Bank of Az. v. Cities Serv. Co., 391 U.S. 253, 288, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31002803 (N.D.N.Y.)

(Cite as: 2002 WL 31002803 (N.D.N.Y.))

**B. Due Process**

The Due Process Clause of the Fourteenth Amendment provides that no "State [shall] deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. Though countervailing considerations of security, discipline, and order alter the jurisprudence somewhat in the context of prisoners' rights, *see, e.g., Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), "a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime." *Id.* Accordingly, to present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process. *See Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

**1. Liberty Interest**

In determining whether a liberty interest exists, the Court of Appeals held that Giano's periods of confinement at Clinton and Attica must be considered in the aggregate. *See Giano v. Selsky,* 238 F.3d 223, 226 (2d Cir.2001) (stating that separate SHU sentences " 'should be aggregated for purposes of the *Sandin* inquiry' when they constitute a sustained period of confinement"). The Second Circuit determined that Giano's segregation at Clinton was simply a continuance of his segregation at Attica. The two periods of confinement were based on the same administrative rationale and the conditions of Giano's confinement were essentially the same at both facilities. As the Second Circuit reasoned, "under these circumstances, Giano's two sentences of administrative segregation must be considered cumulatively for purposes of the *Sandin* analysis." *Giano,* 238 F.3d at 226. When viewed in the aggregate, the Second Circuit held that the length of time Giano was held in administrative segregation created a liberty interest implicating due process concerns. *Id.* The Court must now address the second prong of the due process analysis to determine whether the process afforded Giano with respect to his segregation at Clinton [FN4] satisfies the minimum requirements of the Due Process Clause.

FN4. In 1989, Giano filed a separate § 1983 action in the Western District of New York, challenging his administrative segregation at Attica. In that action, Giano was found to have suffered an atypical and significant hardship and was awarded $19,400 in damages. *See Giano v. Kelly,* No. 89-CV-727(C), 2000 WL 876855 (W.D.N.Y. May 16, 2000).

**2. Sufficiency of Process and Deprivation**

**\*5** There are two issues of due process before the Court regarding Giano's administrative segregation at Clinton. First, whether Giano received the process due during the initial segregation hearing conducted on August 17, 1990; and second, whether Giano received the process due during the subsequent status reviews of the administrative segregation decision. If Giano establishes a due process violation on either of these claims he must then show that he would have been released from administrative segregation had there been a meaningful review at either the initial hearing or at the periodic reviews. *See Patterson v. Coughlin,* 905 F.2d 564, 568 (2d Cir.1990) (citing *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

As to the initial administrative segregation hearing, Giano claims (1) that "no evidence [was] presented that plaintiff represented a continuing and imminent security threat" and (2) "the hearing officer [relied] upon information which was not made known to plaintiff 24 hours before the commencement of the hearing." Complaint at p. 8, ¶ 12.

Giano also claims that his due process rights were violated because prison officials provided inadequate periodic review of his administrative segregation status.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31002803 (N.D.N.Y.)

(Cite as: 2002 WL 31002803 (N.D.N.Y.))

Specifically, Giano argues that his due process rights were violated because: (1) he "had never been told exactly how he should change his behavior in order to satisfy defendants that his presence into general population does not pose a threat to his own safety or the safety and security of others or the facility," Complaint at p. 10, ¶ 24; and (2) that he was not "advised of the timing and results of the periodic review, the identification of the reviewers, or informed of the reasons for their [prisoners in administrative segregation] retention on administrative segregation status or the type of specific behavior that supports their continued confinement and segregation" (Complaint at p. 10, ¶ 25); and (3) the periodic reviews were "done in a cursory, perfunctory manner without any serious consideration of his actual recent behavior of the possibility that he could successfully program in the general population at Clinton or another facility. (Complaint at p. 10, ¶ 26).

a. Initial Administrative Segregation Hearing at Clinton

In connection with Giano's initial transfer to administrative segregation at Clinton, "the Due Process Clause requires only an informal nonadversary review of evidence ... in order to confine an inmate feared to be a threat to institutional security to administrative segregation." *Hewitt v. Helms,* 459 U.S. 460, 474, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). "Officials must conduct 'an informal, nonadversary evidentiary review' of the information in support of the prisoner's administrative confinement, and the 'proceeding must occur within a reasonable time following an inmate's transfer.' " *Soto v. Walker,* 44 F.3d 169, 171 (2d Cir.1995) (quoting *Hewitt,* 459 U.S. at 476 & n. 8). The inmate confined for administrative reasons is entitled to only minimal process-"some notice of the charges against him and an opportunity to present his view to the prison official charged with deciding whether to transfer him to administrative segregation." *Gomez v. Coughlin,* 685 F.Supp. 1291, 1297 (S.D.N.Y.1988) (quoting *Hewitt,* 459 U.S. at 476).

*6 [1] The facts presented by Giano in his complaint indicate that he received all process that was due to him regarding the initial segregation hearing. Plaintiff was provided with a copy of the administrative segregation recommendation on August 13, 1990, thus satisfying the notice requirement. (Exhibit N).

Giano was also given an opportunity to present his views regarding his transfer to administrative segregation. An administrative segregation hearing was also conducted. The hearing commenced on August 17, 1990, with defendant Wood serving as hearing officer. At the hearing, the segregation recommendation was read to Giano (Exhibit A, p. 3) and a description of his rights given. (Exhibit A, p. 1). Giano was also given the opportunity to call witnesses and present evidence in opposition to Armitage's recommendation that Giano remain in administrative segregation. After the hearing, defendant Wood concluded that Giano should remain in administrative segregation because he presented a risk to the safety and security of the facility. The decision was based largely on Sergeant Armitage's written report and testimony from Giano. Giano was also informed that his administrative segregation status would be reviewed every seven days for the first six weeks and then every thirty days thereafter. Giano appealed the determination to defendant Selsky, the Commissioner's designee, who affirmed the hearing officer's determination. (Exhibit Q).

Giano claims that he did not represent a security threat, however, substantial evidence exists for prison officials to conclude otherwise. The Supreme Court has noted in *Rhodes v. Chapman,* 452 U.S. 337, 349 n. 14, 101 S.Ct. 2392, 69 L.Ed.2d 59, (1981), that "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." In this case, defendants argue that Giano posed a threat due to his past escape attempts, from Sing Sing Correctional Facility, and from the Nassau County Court where his guards were seriously injured, and his familiarity with Clinton Correctional Facility. This is clearly enough evidence to conclude that Giano is a security risk.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31002803 (N.D.N.Y.)

(Cite as: 2002 WL 31002803 (N.D.N.Y.))

Giano's second due process claim as to the initial hearing is that "the hearing officer [relied] upon information which was not made known to plaintiff 24 hours before the commencement of the hearing." (Complaint at p. 8, ¶ 12). Other than this claim, Giano offers the Court no further facts or allegations to substantiate this claim. Giano does not dispute that he received a copy of the administrative segregation recommendation four days before the commencement of the hearing. Giano offers only a bald conclusory statement which is not enough to sustain his claim. Giano's due process claims surrounding the initial administrative segregation hearing at Clinton, are denied in their entirety.

b. Periodic Review of Administrative Segregation Status

In addition to the initial administrative segregation hearing, the regulations also provide that:

**7** Inmates assigned to administrative segregation status shall have such status reviewed every seven days for the first two months, and every 30 days thereafter, by a three-member committee consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff. The results of such review shall be forwarded, in writing, to the superintendent for final determination.

7 N.Y. Comp.Codes R. & Regs. tit. 7 § 301.4(d); see also Hewitt, 459 U.S. at 477 n. 9 (1983)(holding that "administrative segregation may not be used as a pretext for indefinite confinement" and that "prison officials must engage in some form of periodic review of the confinement of such inmates"). The periodic review can be informal and non-adversarial. These reviews do not require the presence of the accused and do not require the reviewer to "always consider new information, since the

original reasons for placing the inmate in [administrative segregation] may continue to be compelling." Giano v. Kelly, 2000 WL 876855 *17 (W.D.N.Y.2000). However, if new relevant evidence becomes available following initial review of the inmate's administrative segregation, the decision-maker is obligated to consider that evidence during the periodic reviews. The inmate is entitled to notice of the reason for his confinement and an opportunity to respond to that reason. Hewitt, 459 U.S. at 477. If the reasons for his confinement do not change, however, the inmate need not be informed each time his confinement is reviewed. If the reasons for administrative segregation do change, the inmate should be informed of the new reasons and given an opportunity to respond.

[2] Giano claims that the periodic reviews were nothing more than a pro forma exercise, in which no meaningful review actually took place. The fact that Giano was held in administrative segregation at Clinton for only 92 days contravenes this assertion. At the initial hearing, it was determined that Giano should be placed in administrative segregation based, in part, on his prior escape attempts and his familiarity with Clinton. Given these facts, it is reasonable for the prison officials to initially place Giano in administrative segregation. For all practical purposes, when Giano arrived at Clinton in August 1990, he was a new inmate with whom the staff at Clinton were unfamiliar. Being new to Clinton, the officials acted properly in placing Giano in administrative segregation in order to monitor and evaluate his behavior. Once placed in administrative segregation, Giano's status was periodically reviewed in accordance with the Department of Corrections regulations. The fact that Giano was released from administrative segregation after only 92 days lends credence to the fact that meaningful review took place. Just as it would be irresponsible for the Clinton officials to perfunctorily continue Giano's administrative segregating status, it would be equally irresponsible to release an inmate from administrative segregating without meaningful review of the individual.

**8** Giano's remaining argument incorrectly concludes

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31002803 (N.D.N.Y.)

(Cite as: 2002 WL 31002803 (N.D.N.Y.))

that since his due process rights were violated at Attica, then they must be violated at Clinton. Giano bases this conclusion on the Second Circuit's finding that the administrative segregation at Clinton was merely a continuation of his administrative segregation status at Attica. This finding by the Second Circuit was in regards to whether a liberty interest was at stake, not whether he was afforded sufficient process. The process afforded Giano at Attica is not relevant to the determination by the Court that Giano was afforded sufficient process at the periodic review of his administrative segregation status at Clinton. The favorable decision Giano received for his Attica confinement does not in any way entitle him to collateral estoppel with respect to the due process issue at Clinton. Collateral estoppel, which precludes relitigating issues that were actually litigated and decided in a prior action with the defendant, is not applicable to the inquiry into the sufficiency of process afforded Giano at Clinton. Giano's due process claims surrounding the periodic review of his administrative segregation status at Clinton are denied in their entirety.

CONCLUSION

For the reasons stated above, it is hereby:

ORDERED, that Defendants' motion for summary judgment is GRANTED and Plaintiff's cross-motion for summary judgment is DENIED; and it is further

ORDERED, that the Clerk of the Court shall serve copies of this Order by regular mail upon the parties to this action.

IT IS SO ORDERED.

N.D.N.Y.,2002.

Giano v. Selsky

Not Reported in F.Supp.2d, 2002 WL 31002803 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 1185723 (D.Conn.)

(Cite as: 2005 WL 1185723 (D.Conn.))

**C**

Only the Westlaw citation is currently available.

United States District Court,

D. Connecticut.

Jermaine JONES Plaintiff,

v.

WATERBURY POLICE DEPARTMENT, et al.,
Defendants.

No. 3:04CV2137MRK.

May 12, 2005.

Jermaine Jones, Suffield, CT, pro se.

*RULING AND ORDER*

KRAVITZ, J.

**\*1** *Pro se* plaintiff, Jermaine Jones, is confined at the MacDougall-Walker Correctional Institution in Suffield, Connecticut. He brings this civil rights action challenging the circumstances surrounding his arrest. For the reasons that follow, the complaint [doc. # 1] is DISMISSED WITHOUT PREJUDICE.

I.

Mr. Jones has met the requirements of 28 U.S.C. § 1915(a) and has been granted leave to proceed *in forma pauperis* in this action. Pursuant to 28 U.S.C. § 1915(e)(2)(B), "the court shall dismiss the case at any time if the court determines that ... the action ... is frivolous or malicious; ... fails to state a claim on which relief may be granted; or ... seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i)-(iii). *See Cruz v. Gomez,* 202 F.3d 593, 596 (2d Cir.2000) (dismissal of a complaint by a district court under any of the three enumerated sections in 28 U.S.C. § 1915(e)(2)(B) is mandatory rather than discretionary).

"When an *in forma pauperis* plaintiff raises a cognizable claim, his complaint may not be dismissed sua sponte for frivolousness under § 1915(e)(2)(B)(i) even if the complaint fails to flesh out all the required details." *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998) (quotations and citations omitted). In reviewing the complaint, the court "accept[s] as true all factual allegations in the complaint" and draws inferences from these allegations in the light most favorable to the plaintiff. *Cruz,* 202 F.3d at 596. Dismissal of the complaint under 28 U.S.C.1915(e)(2)(B), is only appropriate if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Id.* at 597 (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In addition, "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim," the court should permit "a *pro se* plaintiff who is proceeding *in forma pauperis*" to file an amended complaint that states a claim upon which relief may be granted. *Gomez v. USAA Federal Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1185723 (D.Conn.)

(Cite as: 2005 WL 1185723 (D.Conn.))

## II.

Mr. Jones's complaint alleges a violation of his constitutional rights pursuant to 42 U.S.C. § 1983. In order to state a claim for relief under § 1983, Mr. Jones must satisfy a two-part test. First, he must allege facts demonstrating that defendant acted under color of state law. Second, he must allege facts demonstrating that he has been deprived of a constitutionally or federally protected right. *See* Lugar v. Edmondson Oil Co., 457 U.S. 922, 930, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Mr. Jones alleges that on the morning of June 27, 2001, defendants Scott Stevenson, Detective Balnis, Lucinda Lopes and Detective Kennelly executed an arrest warrant against him charging him with assault, as well as a search warrant for his residence. *See* Compl. [doc. # 1] at 3-4. Defendants allegedly handcuffed Mr. Jones to a daybed for approximately two hours during the search. *See id.* Mr. Jones further alleges that Defendants failed to advise him, both at the time of his arrest and when he was subsequently interrogated at the police station, that he had a right to remain silent and did not tell him that he was suspected of committing another crime. *See id.* While these allegations ordinarily might state a claim pursuant to § 1983, Mr. Jones's claim fails for the reasons stated below.

**\*2** The first named defendant is the Waterbury Police Department. Although a municipality is subject to suit pursuant to 42 U.S.C. § 1983, *see* Monell v. Dep't of Social Services, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a municipal police department is not. It is a sub-unit or agency of the municipal government through which the municipality fulfills its policing function. *See* Nicholson v. Lenczewski, 356 F.Supp.2d 157, 164 (D.Conn.2005) (collecting cases). Because a municipal police department is not an independent legal entity, it is not subject to suit under § 1983. *See id.* Accordingly, all claims against the Waterbury Police Department are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(i).

In addition, Mr. Jones's claims against all other defendants appear to be barred by the three-year statute of limitations for § 1983 claims. *See* Lounsbury v. Jeffries, 25 F.3d 131, 134 (2d Cir.1994) (holding that, in Connecticut, the general three-year personal injury statute of limitations set forth in Connecticut General Statutes § 52-577 is the appropriate limitations period for civil rights actions asserted under 42 U.S.C. § 1983). When considering a case filed by a prisoner, courts consider a complaint to have been filed as of the date the inmate gives the complaint to prison officials to be mailed to the court. *See* Fernandez v. Artuz, 402 F.3d 111, 114 n. 2 (2d Cir.2005) ("the Second Circuit has consistently applied the [prisoner] mailbox rule to papers filed by state prisoners initiating" § 1983 actions). The incidents giving rise to this action occurred on June 27, 2001. *See* Compl. [doc. # 1] at 3. Thus, Mr. Jones had until June 27, 2004, to file his complaint. On the record before the Court, Mr. Jones did not sign his complaint until December 8, 2004, over five months after the limitations period expired, and could not have given it to prison officials for mailing before that date. *See* Compl. [doc. # 1] at 7. Accordingly, if Mr. Jones's claim is merely that Defendants failed to inform him of his rights, that claim would be time-barred.

However, construing Mr. Jones's complaint liberally, as the Court must, it is possible that Mr. Jones is seeking damages for a conviction based on information improperly obtained without informing him of his rights. Although such a claim would not be time-barred, it would nonetheless be premature. In the seminal case of Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Supreme Court explained that:

[I]n order to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a [section] 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1185723 (D.Conn.)

(Cite as: 2005 WL 1185723 (D.Conn.))

court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

**\*3** *Heck,* 512 U.S. at 486-87 (footnote omitted). Because Mr. Jones has alleged no facts suggesting that his conviction has been invalidated, he cannot maintain a § 1983 action based on a wrongful conviction. Therefore, the Court dismisses Mr. Jones's claims against the twelve police officer defendants named in Mr. Jones's complaint, without prejudice to renewal.

Accordingly, the Court concludes that Mr. Jones has not stated any viable claim under § 1983 against any defendant named in his complaint. If Mr. Jones can allege facts to overcome the deficiencies identified in this ruling, he may file an amended complaint against any or all of the defendants he has named, except for the Waterbury Police Department which is not subject to suit under § 1983 as explained above.

In doing so, Mr. Jones should bear in mind that Rule 8 of the *Federal Rules of Civil Procedure* provides that a complaint shall contain, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The purpose of this rule is to give defendants fair notice of the claim being asserted to enable them to file a responsive answer, prepare an adequate defense, and determine whether the claim is barred under the doctrine of res judicata. *See Rodriguez v. Dep't of Homeland Security,* No. 3:03CV718(MRK), 2005 WL 465415, at *1 (D.Conn. Feb.7, 2005) (citing *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988)). Therefore, should Mr. Jones choose to file an amended complaint, he must allege specific facts supporting his claims with respect to *each defendant* that he names in his complaint.

IV.

In conclusion, all claims against defendant Waterbury Police Department are DISMISSED pursuant to 28 U.S.C. § 1915(e)(2)(B)(i). The claims against the remaining defendants are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). Any amended complaint shall be filed on or before June 12, 2005. The Clerk is directed to close the file. If Mr. Jones files an amended complaint within the time specified, the Clerk shall reopen this case. If Mr. Jones does not file an amended complaint on or before June 12, 2005, his entire lawsuit will be dismissed by the Court with prejudice.

IT IS SO ORDERED.

D.Conn.,2005.

Jones v. Waterbury Police Dept.

Not Reported in F.Supp.2d, 2005 WL 1185723 (D.Conn.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

**H**

Only the Westlaw citation is currently available.

United States District Court,

D. Connecticut.

Andrew N. MATTHEWS, Plaintiff,

v.

STATE OF CONNECTICUT, Department of Public
Safety, Leonard C. Boyle, Defendants.

No. 3:10cv325 (MRK).

Oct. 8, 2010.

Jacques J. Parenteau, Katalin A. Demitrus, Madsen,
Prestley & Parenteau, LLC-NL, New London, CT, Kera L.
Paoff, Madsen, Prestley & Parenteau, LLC, Hartford, CT,
for Plaintiff.

John P. Shea, Jr., Zachary David Schurin, Sullivan,
Schoen, Campane & Connon, LLC, Hartford, CT, for
Defendants.

### RULING AND ORDER

MARK R. KRAVITZ, District Judge.

**\*1** In this case, Connecticut State Police Sergeant
Andrew N. Matthews alleges that his employer unlawfully
retaliated against him for speaking out against a variety of
misconduct by his fellow officers and against his
employer's attempts to cover up that misconduct.
Defendants are the State of Connecticut; Mr. Matthews'
employer, the Department of Public Safety; and Leonard
C. Boyle, the Department's former Commissioner. Pending
before the Court is Defendants' Renewed Motion to
Dismiss [doc. # 33] for failure to state a claim upon which
relief can be granted pursuant to Rule 12(b)(6) of the
Federal Rules of Civil Procedure. For the reasons set forth
below, Defendants' Motion to Dismiss [doc. # 33] is
GRANTED.

### I.

As it must, the Court accepts the factual allegations in
Mr. Matthews' Second Amended Complaint [doc. # 29] as
true, and draws all reasonable inferences in Mr. Matthews'
favor. *See Holmes v. Grubman,* 568 F.3d 329, 335 (2d
Cir.2009). Mr. Matthews joined the Department of Public
Safety in January 1998. In July 2004, he was promoted to
Sergeant and transferred to the Internal Affairs Division.
While Mr. Matthews was a member of the Internal Affairs
Division, he learned that Department management had a
practice of covering up a variety of misconduct by state
police officers, including alcohol abuse, drunk driving,
sexual abuse, and domestic violence. Mr. Matthews
complained about the misconduct and the cover-ups to
others in the Department.

Mr. Matthews first complained to the Connecticut
Attorney General's Office about the misconduct and
cover-ups in June 2005. Mr. Boyle, who was at that time
the Department's Commissioner, knew that Mr. Matthews
contacted the Attorney General's Office. On June 16,
2005, Mr. Boyle authorized a meeting to request that Mr.
Matthews allow the Department to handle his complaint

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

internally. Mr. Matthews refused and sent a letter to Mr. Boyle informing him that he intended to file a formal retaliation complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO").

On July 7, 2005, Mr. Boyle authorized Mr. Matthews' transfer from the Internal Affairs Division to the newly-created Risk Management Unit. Although the Risk Management Unit was located in the Department's Professional Standards building in Meriden, Mr. Boyle assigned Mr. Matthews to remain in a cubicle at the Department's Middletown Headquarters. Mr. Boyle later changed the Department's table of organization to make it appear that Mr. Matthews' transfer to the Risk Management Unit was non-disciplinary.

Mr. Matthews contacted the Attorney General's Office for a second time in August 2005, and on August 22, 2005, he filed a grievance with his union about his transfer to the Risk Management Unit. On September 7, 2005, Mr. Boyle authorized the Department to issue a negative Personnel Evaluation Report regarding Mr. Matthews' performance as a member of the Internal Affairs Division. Mr. Matthews received the lowest performance rating of all the members of the Internal Affairs Division, which was not consistent with his other performance ratings. For example, on September 8, 2005, Mr. Matthews received a "Superior" rating for his performance as a member of the Risk Management Unit.

*2 On September 21, 2005, an officer acting under Mr. Boyle's authority held a meeting with Mr. Matthews. The officer told Mr. Matthews that he "would do anything to prevent something from smearing the image of the agency." On September 23, 2005, Mr. Boyle's Chief of Staff held a meeting with Mr. Matthews to discuss his complaints about the Department. When Mr. Matthews returned to his desk, he found a handwritten note on his desk that read: "CANCER." Mr. Matthews reported the incident to his superiors, and Mr. Boyle opened an

Internal Affairs investigation. However, the Internal Affairs Division lost the note and never completed the investigation. Mr. Matthews requested that Mr. Boyle open a criminal investigation, but Mr. Boyle failed to do so. Mr. Matthews began to fear for his physical safety and voluntarily elected to work out of the Department's Meriden building-where the other members of the Risk Management Unit were located-rather than out of the Middletown Headquarters.

Beginning in October 2005, the Department called in the New York State Police to conduct an independent investigation of the Internal Affairs Division. The New York State Police investigation lasted for approximately one year. In mid-October 2005, after the New York State Police investigation was under way, Mr. Matthews again contacted the Attorney General's Office to complain about the "CANCER" note and the Department's failure to sufficiently investigate the note.

In March 2006, an Internal Affairs officer designated Mr. Matthews as the target of an Internal Affairs investigation. Mr. Boyle assigned the officer who filed the complaint against Mr. Matthews to investigate the allegations against him. When Mr. Matthews requested that the Department provide him with a copy of the complaint against him before his interview with the investigator, Mr. Boyle refused to do so.

As a member of the Risk Management, it was Mr. Matthews' duty to review other officers' use of force reports. In April 2006, Mr. Matthews made a complaint within the Department about another officer's improper use of force report and about the Department's failure to investigate that report. Mr. Matthews held a meeting with a superior officer regarding his complaint on April 26, 2006. At the meeting, the officer informed Mr. Matthews that Mr. Boyle had decided to move the Risk Management Unit from the Meriden building back to the Middletown Headquarters. The officer also informed Mr. Matthews

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

that Mr. Boyle had decided that the Risk Management Unit would no longer be responsible for reviewing use of force reports.

On May 24, 2006, Mr. Matthews wrote a letter to Mr. Boyle complaining that he did not want to return to the Middletown Headquarters because he considered it a hostile work environment. On May 26, 2006, Mr. Matthews filed a grievance with his union regarding the transfer. Nevertheless, Mr. Matthews returned to the Middletown Headquarters as ordered on June 6, 2006. In May or June 2006, around the time of Mr. Matthews' return, Mr. Boyle permanently locked the door to the "Commissioner's Suite." The Suite housed Mr. Boyle's office as well as mailboxes for other officers, including Mr. Matthews. The Suite had previously been routinely left open for all officers to access. After May or June 2006, it was only accessible via keycard, and Mr. Matthews was not provided with a keycard to access the Suite.

**\*3** On June 15, 2006, Mr. Matthews filed a retaliation complaint with the CHRO. On June 22, 2006, he wrote the Attorney General's Office requesting protection from the Department's management, including Mr. Boyle. He also filed a retaliation complaint with the Attorney General's Office. During the Attorney General's investigation of the complaint, Mr. Boyle requested that the Department's internal legal advisor be permitted to sit in on witness interviews. The Attorney General's Office granted Mr. Boyle's request.

On November 21, 2006, Mr. Matthews' union wrote to Mr. Boyle requesting that Mr. Matthews be reassigned to a different work location outside the Middletown Headquarters. Mr. Boyle approved the request. However, Mr. Boyle did not immediately provide Mr. Matthews with an alternative workspace. Starting in November 2006, rather than work from the Middletown Headquarters, Mr. Boyle began working out of his police cruiser.

On December 4, 2006, the New York State Police issued a report based on its investigation of the Internal Affairs Division. The report concluded that the Internal Affairs Division had a pattern and practice of tolerating unethical and unlawful acts by Department officers and managers. On December 7, 2006, Mr. Matthews again wrote to the Attorney General's Office requesting protection from further retaliation. On January 12, 2007, Mr. Matthews' union wrote to Mr. Boyle to request that in light of the report, Mr. Matthews should not be transferred back to the Middletown Headquarters.

In February 2007, Mr. Matthews' union wrote to Mr. Boyle requesting that Mr. Matthews be placed on paid leave pending the completion of the Attorney General's investigation. On February 7, 2007, Mr. Boyle denied the request for paid leave. However, Mr. Boyle approved a transfer of Mr. Matthews out of the Middletown Headquarters and into Department office space in Hartford. The Hartford office space was being used at the time to conduct criminal interviews stemming from the New York State Police investigation into the Internal Affairs Division.

On February 20, 2007, Mr. Matthews' union wrote to Mr. Boyle requesting that Mr. Matthews be assigned to office space at the Department's Meriden building until the criminal interviews at the Hartford office space were completed. On February 26, 2007, Mr. Boyle approved that request. Mr. Matthews was assigned to work from a mailroom that also housed a soda machine. Mr. Matthews was not allowed to use any of the common areas in the building, including the lunch room. On February 28, 2007, Mr. Boyle met with a superior officer and complained that the mailroom was not a sufficiently secure location for his work. Sometime in early 2007, Mr. Boyle referred Mr. Matthews to the Department's Employee Assistance Program for psychological counseling. Mr. Boyle left the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

Department on March 1, 2007 to begin federal government service.

Mr. Matthews filed his Complaint [doc. # 1] against the State of Connecticut, the Connecticut Department of Public Safety, and Mr. Boyle in the Connecticut Superior Court on February 4, 2010.[FN1] The complaint asserted a claim against the State of Connecticut and the Connecticut Department of Public Safety under Connecticut General Statutes § 31-59q. It also asserted a First Amendment retaliation claim against Mr. Boyle under 42 U.S.C. § 1983. Defendants filed a Notice of Removal [doc. # 1] in this Court on March 4, 2010. Defendants were able to remove the case to federal court because of Mr. Matthews' federal law claim against Mr. Boyle.

FN1. Mr. Matthews filed a complaint against other defendants premised on essentially the same set of facts nearly three years earlier. *See Matthews v. Blumenthal*, No. 3:07cv739 (WWE) (D. Conn. filed May 9, 2007).

*4 Defendants filed their first Motion to Dismiss [doc. # 15] for failure to state a claim pursuant to Rule 12(b)(6) on May 13, 2010. The Court denied that motion without prejudice to renewal because Mr. Matthews requested leave to file an amended complaint. *See* Order [doc. # 22] dated May 25, 2010. Mr. Matthews filed his Amended Complaint [doc. # 25] on June 21, 2010. The Amended Complaint asserted the same claims as the original Complaint, but included a number of additional factual allegations. On July 8, 2010, the parties filed a Consent Motion [doc. # 27] to permit Mr. Matthews to amend his complaint a second time to make minor corrections to some of those additional factual allegations. The Court granted the motion, *see* Order [doc. # 28] dated July 8, 2010, and Mr. Matthews filed his Second Amended Complaint [doc. # 29] the same day.

Defendants filed their renewed Motion to Dismiss [doc. # 33] on July 14, 2010. In support of the motion, Defendants argue in support of their motion that the Eleventh Amendment bars Mr. Matthews' § 1983 claim insofar as it seeks damages against Mr. Boyle in his official capacity, and that the Second Amended Complaint fails to state a First Amendment retaliation claim against Mr. Boyle. Mr. Matthews filed an Opposition to the Motion to Dismiss [doc. # 34] on August 4, 2010. Defendants filed a Reply to Mr. Matthews' Opposition [doc. # 40] on August 30, 2010.

## II.

The standard of review this Court must apply on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is a familiar one. In reviewing a complaint for failure to state a claim, the Court must "accept [ ] all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Holmes*, 568 F.3d at 335. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The "plausible grounds" requirement "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's claim for relief. *Twombly*, 550 U.S. at 556; *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120-21 (2d Cir.2010) ("[W]e reject [the] contention that *Twombly* and *Iqbal* require the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible.").

## III.

The only federal law claim in Mr. Matthews' Second Amended Complaint is his First Amendment retaliation claim against Mr. Boyle under § 1983. In opposition to the pending motion, Mr. Matthews concedes that he does not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

seek damages against Mr. Matthews in his official capacity. Nevertheless, the Court notes that the Eleventh Amendment prohibits Mr. Matthews from seeking damages from Mr. Boyle in his official capacity.

**\*5** The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Absent waiver by a State or valid abrogation by Congress, the Eleventh Amendment bars any damage action against a State in federal court. See Kentucky v. Graham, 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). It also bars suits against state officials when they are sued for damages in their individual capacities. See id. Section 1983 does not abrogate Eleventh Amendment immunity. See Quern v. Jordan, 440 U.S. 332, 342, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). The Court is therefore precluded from awarding Mr. Matthews any damages against Mr. Boyle in his official capacity.

**IV.**

In support of their motion to dismiss, Defendants argue that the statute of limitations bars Mr. Matthews' First Amendment retaliation claim against Mr. Boyle under § 1983 insofar as it seeks damages based on Mr. Boyle's conduct before February 4, 2007. In Connecticut, the statute of limitations applicable to claims under § 1983 is Connecticut's three-year statute of repose for tort claims. See Conn. Gen.Stat. § 52-577; Walter v. Jastremski, 430 F.3d 560, 562 (2d Cir.2005) (applying § 52-577 to a § 1983 claim); Ormiston v. Nelson, 117 F.3d 69, 71 (2d Cir.1997) (holding that § 1983 claims are governed by the state statute of limitations for personal-injury actions); Ruston v. World Wrestling Entm't, No. 3:07cv1650 (MRK), 2008 WL 824217, at \*2 (D.Conn. Mar. 25, 2008) (applying the three year statute of limitations to a § 1983 claim). Both parties agree that § 52-577 is the applicable statute of limitations in this case.

Under § 52-577 of the Connecticut General Statutes, the relevant dates are the date of the defendant's alleged wrongful conduct and the date on which the plaintiff's action was originally filed. See Rosenfield v. Rogin, Nassau, Caplan, Lassman & Hirtle, LLC, 69 Conn.App. 151, 159, 795 A.2d 572 (2002). Mr. Matthews filed his original Complaint in the Superior Court on February 4, 2010. Thus, unless an exception to the ordinary statute of limitations applies here, the Court agrees with Defendants that Mr. Matthews' § 1983 claim is time-barred with respect to any actions before February 4, 2007.

Mr. Matthews argues in opposition to the pending motion that Mr. Boyle's actions as alleged in the Second Amended Complaint constituted a continuing violation of federal law. See Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 713 (2d Cir.1996). The continuing violation doctrine-which was originally developed in the context of Title VII claims-is an "exception to the normal know-or-should-have known accrual date" if there is "evidence of an ongoing ... policy or practice." Id. The continuing violation doctrine applies to ongoing circumstances that combine to form a single violation that "cannot be said to occur on any particular day." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114-15, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); cf. OBG Technical Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp., 503 F.Supp.2d 490, 510-11 (D.Conn.2007) (discussing the analogous continuing course of conduct doctrine). Discrete incidents that are not part of an ongoing policy or practice are not continuing violations. See Washington v. Cnty. of Rockland, 373 F.3d 310, 317 (2d Cir.2004).

**\*6** If the continuing violation doctrine applies to Mr. Matthews' First Amendment retaliation claim under § 1983, that claim is not time-barred with respect to any of his factual allegations so long as he can allege one act in furtherance of the continuing violation that occurred

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

within the three-year limitations period. *See Harris v. City of New York,* 186 F.3d 243, 248 (2d Cir.1999). Neither the Supreme Court nor the Second Circuit has had occasion to consider whether the continuing violation doctrine can be applied to a First Amendment relation claim brought under § 1983. However, the Second Circuit recently held that the continuing violation doctrine can apply to an Eighth Amendment deliberate indifference claim brought under § 1983. *See Shomo v. City of New York,* 579 F.3d 176, 181-82 (2d Cir.2009). The Court sees no reason why the continuing violation doctrine would apply to an Eighth Amendment deliberate indifference claim under § 1983, but not to other constitutional claims under § 1983, including First Amendment retaliation claims.

Assuming, however, that the continuing violation doctrine can be applied to First Amendment retaliation claims under § 1983, the Court concludes that Mr. Matthews has not alleged a continuing First Amendment violation here. Instead, Mr. Matthews has alleged numerous *discrete* First Amendment violations by Mr. Boyle. *See Washington,* 373 F.3d at 318. In a First Amendment retaliation claim, the federal law violation is an adverse employment action causally related to the employment's exercise of his right to free speech. *See Morris v. Lindau,* 196 F.3d 102, 110-11 (2d Cir.1999). In the First Amendment retaliation context, an adverse employment action is any action that might well dissuade a reasonable worker from exercising his right to free speech. *See Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 227 (2d Cir.2006). According to the Second Amended Complaint, before February 4, 2007, Mr. Boyle:(1) forcibly transferred Mr. Matthews from the Internal Affairs Division to the Risk Management Unit, a different unit with significantly different work responsibilities; (2) issued an untruthful negative report about Mr. Matthews' performance as a member of the Internal Affairs Division; (3) failed to investigate a threatening note to Mr. Matthews apparently sent by another officer in the Department; (4) initiated an Internal Affairs investigation of Mr. Matthews; (5) forced Mr. Matthews to return to the Middletown Headquarters even though he had left it based on fears for his safety; (6) excluded Mr. Matthews from a common space at the Middletown headquarters used by

other officers; and (7) ordered Mr. Matthews transferred out of the Middletown headquarters without providing him with any alternative workspace. Any one of those seven allegations could have formed the basis for a timely retaliation claim under § 1983 against Mr. Boyle, but Mr. Matthews sat on his rights.

Mr. Matthews failure to file a timely retaliation claim under § 1983 based on any one of those alleged discrete retaliatory actions is particularly surprising in light of the fact that Mr. Matthews first threatened to file retaliation claims against Mr. Boyle and others as early as June 2005, and that he actually filed retaliation claims with both the CHRO and the Attorney General's Office in June 2006. Mr. Matthews' inaction is even more surprising in light of the fact that he filed timely § 1983 claims in federal court against a number of *other* individuals based on essentially the same set of facts in 2007, nearly three years before he filed this action. *See Matthews v. Blumenthal,* No. 3:07cv739 (WWE) (D. Conn. filed May 9, 2007).

**\*7** The Court is not at all persuaded by Mr. Matthews' repeated invocation of the phrase "pattern and practice" in opposition to the pending motion. *See, e.g.,* Pl.'s Opp. to Mot. to Dismiss [doc. # 34] at 17. The Second Circuit rejected the precise argument that Mr. Matthews makes here in *Washington v. County of Rockland,* where it held that a "series of separate acts [cannot] be characterized as an ongoing policy ... sufficient to toll the applicable statute of limitation." 373 F.3d at 318. The Court therefore concludes that Mr. Boyle is time-barred from seeking damages from Mr. Boyle based on any acts that occurred before February 4, 2007.

## V.

Mr. Matthews' Second Amended Complaint alleges only four acts by Mr. Boyle after February 4, 2007. After February 4, 2007, Mr. Boyle: (1) denied Mr. Matthews' union's request to place him on paid leave; (2) approved a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

request to transfer Mr. Matthews out of the Middletown Headquarters; (3) approved a request to transfer Mr. Matthews to the Department's Meriden building; and (4) referred Mr. Matthews to the Department's Employee Assistance Program for psychological counseling.[FN2] Although Mr. Matthews' Second Amended Complaint refers to a number of other events that occurred after February 4, 2007-namely, that Mr. Matthews was required to work out of an unsecured mailroom and excluded from common areas at the Meriden building-Mr. Matthews nowhere alleges that Mr. Boyle had personal knowledge of those events or was in any fashion personally responsible for those events. *See Richardson v. Goord, 347 F.3d 431 (2d Cir.2003)* (recognizing that supervisor liability in a § 1983 action depends on a showing of personal responsibility). The Court concludes that Mr. Matthews cannot seek to hold Mr. Boyle responsible for those events without alleging that he played some personal role in those events. *See Iqbal, 129 S.Ct. at 1952.*

> FN2. Mr. Matthews' Second Amended Complaint alleges that the referral occurred sometime in early 2007. Construing that allegation in the light most favorable to Mr. Matthews, the Court assumes that it occurred after, rather than before, February 4, 2007.

The Court also concludes that as a matter of law, none of Mr. Boyle's alleged conduct after February 4, 2007 could support Mr. Matthews' § 1983 claim. To prevail on a First Amendment retaliation claim under § 1983, a plaintiff must show: (1) that he spoke on a matter of public concern; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between his speech and the adverse employment action. *See Singh v. New York, 524 F.3d 361 (2d Cir.2008).* As discussed above, an adverse employment action is any action that might dissuade a reasonable worker from exercising his right to free speech. *See Kaytor, 609 F.3d at 555.* The Court assumes without deciding that Mr. Matthews spoke on matters of public concern.[FN3] However, none of Mr. Boyle's alleged actions after February 4, 2007 constituted

an adverse employment action.

> FN3. The Court notes that Mr. Matthews almost certainly did not engage in constitutionally protected speech when he made his initial complaints about officer misconduct and conduct to his superiors in the Department. *See Garcetti v. Ceballos, 547 U.S. 410, 426, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)* ("We reject ... the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties."). However, because Mr. Matthews later made retaliation allegations to the Attorney General's Office and the CHRO, the Court concludes that *Garcetti* does not necessarily control the outcome here.

Mr. Boyle's first alleged action-denying the union's request to have Mr. Matthews placed on paid leave-was not an adverse employment action. Neither the Supreme Court nor the Second Circuit has ever had occasion to consider whether an employer's *denial* of a request for paid leave can constitute an adverse employment action in the First Amendment retaliation context. The argument is somewhat unusual. In this Court's experience, it is more typical for employees to argue that *requiring* an employee to take paid leave constitutes an adverse employment action. *See, e.g., Krukenkamp v. State Univ. of N.Y. at Stony Brook, No. 09-4933-cv, 2010 WL 3894970, at * 1 (2d Cir. Oct.6, 2010).*

**8** The Court nevertheless concludes that Mr. Boyle's denial of the union's request did not constitute an adverse employment action for three reasons. First, in an unpublished summary order, the Second Circuit has held that denial of a request for a leave of absence does not constitute an adverse employment action in the equal protection context. *See Williams v. N.Y. City Housing Auth., 335 Fed. App'x 108, 110 (2d Cir.2009).* Although the phrase "adverse employment action" has a somewhat

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

different meaning in that context-specifically, "a materially adverse change in the terms and conditions of ... employment," *Galabya v. N.Y. City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2010)-the Court still finds the Second Circuit's conclusion instructive. Second, at least one other district court within the Second Circuit has rejected the argument that denial of a request for leave can constitute an adverse employment action in the First Amendment retaliation context. *See Casale v. Reo,* 522 F.Supp.2d 420, 427 (N.D.N.Y.2007) ("[N]o reasonable jury could find that refusing to recommend a third consecutive year of leave would dissuade a reasonable employee from engaging in protected speech."). Third, even assuming there are situations in which an employee might, for example, be entitled under a contract to take leave at will-and in which an employer *could* be forced to face a Hobson's choice between granting a request for leave and facing civil liability for retaliation-Mr. Matthews does not allege that he was entitled to take leave at will.

Mr. Boyle's next two alleged actions-approving the union's request to transfer Mr. Matthews out of the Middletown Headquarters, and, after Mr. Matthews' union objected to the Hartford location, approving the union's request for a transfer to the Meriden office-were actually actions taken for Mr. Matthew' *benefit.* Those actions were taken only at the request of Mr. Matthews' union. The Court finds it inconceivable that an employer's decision to grant an employee a benefit at the employee's own request could ever dissuade a reasonable worker from exercising his First Amendment rights. *See Kaytor,* 609 F.3d at 555.

Mr. Matthews' fourth alleged action-referring Mr. Matthews to the Department's Employee Assistance Program for psychological counseling-also did not constitute an adverse employment action. Although no Supreme Court or Second Circuit precedent is directly on point, the Court believes that no reasonable jury could conclude that a supervisor's mere referral of an employee to an internal counseling service would dissuade a reasonable worker from exercising his right to free speech.

*See id.; cf. Breaux v. City of Garland,* 205 F.3d 150 (5th Cir.2000) (holding that requiring an employee to undergo a single psychological exam was not an adverse employment action in the First Amendment retaliation context). The result could conceivably be different if Mr. Boyle had forced Mr. Matthews to undergo psychological treatment, or had publicized his decision to refer Mr. Matthews for psychological counseling to others in the Department. However, Mr. Matthews makes no such allegations in his Second Amended Complaint.

### VI.

**\*9** In sum, the Court concludes that the Eleventh Amendment bars Mr. Matthews from seeking damages against Mr. Boyle in his official capacity; that Mr. Matthews' claim against Mr. Boyle is time-barred insofar as it seeks damages based on acts that occurred before February 4, 2007; and that none of Mr. Boyle's alleged conduct after February 4, 2007 amounted to an adverse employment action. Because the only federal law claim in Mr. Matthews' Second Amended Complaint fails as a matter of law, the Court declines to exercise supplemental jurisdiction over Mr. Matthews' state law claim against the State of Connecticut and the Connecticut Department of Public Safety. *See Castellano v. Board of Trustees of Police Officers' Variable Supplements Fund,* 937 F.2d 752, 758-59 (2d Cir.1991). Mr. Matthews may pursue that claim in state court if he wishes to do so.

Defendants' Motion to Dismiss [doc. # 33] is therefore GRANTED. **The Clerk of the Court is directed to enter judgment for Mr. Boyle on the § 1983 claim and to close this file.**

IT IS SO ORDERED.

D.Conn.,2010.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

Matthews v. Connecticut, Dept. of Public Safety

Slip Copy, 2010 WL 3984645 (D.Conn.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.