15–3673
*Proctor v. LeClaire, et al.*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————

August Term 2016

(Argued: September 21, 2016      Decided: January 24, 2017)

Docket No. 15-3673

PATRICK PROCTOR,

*Plaintiff-Appellant*,

v.

LUCIEN J. LECLAIRE, JR., former Deputy Commissioner,
Department of Corrections and Community Supervision,
BRIAN FISCHER, former Commissioner, Department of
Corrections and Community Supervision, ANTHONY J.
ANNUCCI, Acting Commissioner, Department of
Corrections and Community Supervision, JOSEPH
BELLNIER, Deputy Commissioner, Department of
Corrections and Community Supervision,

*Defendants-Appellees*.[*]

———————

[*] The Clerk of Court is respectfully directed to amend the official
caption in this case as it appears above.

CERTIFIED COPY ISSUED ON 01/24/2017

––––––––––––

Before:

    KATZMANN, *Chief Judge*, WESLEY and HALL, *Circuit Judges*.

    Appeal from an order of the United States District Court for the Northern District of New York (Sharpe, *J.*), granting summary judgment for Defendants-Appellees. Plaintiff-Appellant Patrick Proctor, an inmate who has been held in solitary confinement for over two decades and is currently under Administrative Segregation, filed this 42 U.S.C. § 1983 claim for deprivations of procedural and substantive due process. We conclude that triable issues of fact remain as to whether Proctor was denied the meaningful periodic reviews of his Administrative Segregation that procedural due process requires. We also conclude that the District Court erred in granting summary judgment *sua sponte* without adequate notice on Proctor's substantive due process claim. **VACATED** and **REMANDED**.

––––––––––––

      ELLIOT HARVEY SCHATMEIER (Timothy Gilman, *on the brief*), Kirkland & Ellis LLP, New York, NY, *for Plaintiff-Appellant*.

      BRIAN D. GINSBERG, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Andrea Oser, Deputy Solicitor General, *on the brief*), for Eric T. Schneiderman, Attorney General of the State of New York, Albany, NY, *for Defendants-Appellees.*

––––––––––––

WESLEY, *Circuit Judge*:

Plaintiff-Appellant Patrick Proctor is an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), serving a sentence of thirty-two-and-one-half years to life for second-degree murder, robbery, and attempted escape. He is confined in the Special Housing Unit (the "SHU"), or, as it is better known, solitary confinement, where he has spent the last twenty-two years. Proctor spent his first nine years in the SHU under Disciplinary Segregation and the last thirteen years and counting under Administrative Segregation. Defendants-Appellees are current and former DOCCS administrators: Lucien J. LeClaire, Jr., a former Deputy Commissioner of DOCCS; Brian Fischer, a former Commissioner of DOCCS; Anthony J. Annucci, the current Acting Commissioner of DOCCS; and Joseph Bellnier, the current Deputy Commissioner of DOCCS (collectively, "Defendants").

Proctor brings this action under 42 U.S.C. § 1983, alleging that his continuous confinement in the SHU under Administrative Segregation violates his Fourteenth Amendment rights to procedural and substantive due process of law. The District Court (Sharpe, *J.*) granted Defendants' motion for summary judgment on Proctor's procedural due process claim, holding that no reasonable juror could conclude that Proctor was denied meaningful periodic reviews of his Administrative Segregation commitment. The District Court also awarded summary judgment to Defendants *sua sponte* on Proctor's substantive due process claim.

We conclude that the record presents triable issues of fact regarding Proctor's procedural due process claim and that the District Court violated Federal Rule of Civil Procedure 56(f) in awarding summary judgment *sua sponte* on Proctor's substantive

due process claim. The judgment of the District Court is VACATED and the case is REMANDED for further proceedings.

## BACKGROUND

### I

### A

In the DOCCS system, there are two relevant reasons for prison administrators to send an inmate to the SHU—Disciplinary Segregation and Administrative Segregation ("Ad Seg"). Disciplinary Segregation, as its name suggests, is designed to discipline an inmate found guilty of a "Tier III" violation, the most serious of three infraction levels in the DOCCS system. N.Y. COMP. CODES R. & REGS. tit. 7, §§ 270.2, 270.3(a)(3), 301.2. A Disciplinary Segregation term lasts "for a designated period of time as specified by the hearing officer." *Id.* § 301.2(a). Once that time elapses, the statute does not empower DOCCS to punish the inmate doubly for the same infraction by imposing further Disciplinary Segregation. *See id.*

Ad Seg serves a different purpose. As relevant here, Ad Seg removes an inmate from the general population when he "pose[s] a threat to the safety and security of the [prison] facility." *Id.* § 301.4(b). Given the importance of that purpose, Ad Seg is flexible and accords DOCCS officials substantial discretion in deciding whether to impose an Ad Seg term. Ad Seg terms are open-ended and do not require that DOCCS predetermine when it will release an inmate—"[a]t any time when deemed appropriate [by DOCCS], an inmate may be evaluated and recommended for return to general population." *Id.* § 301.4(e)

There is, however, a constitutional ceiling on that flexibility: To ensure that a state prison facility does not use Ad Seg as a pretext to commit an inmate to the SHU indefinitely, the

Due Process Clause of the Fourteenth Amendment mandates that prison officials periodically review whether an inmate continues to pose a threat to the facility. *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983), *abrogated in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).  New York effectuates that mandate by providing an inmate with an initial hearing within fourteen days of his confinement in Ad Seg, *see* N.Y. COMP. CODES R. & REGS. tit. 7, §§ 254.6, 301.4(a), and with reviews conducted pursuant to section 301.4(d) of the DOCCS regulatory code ("section 301.4(d) reviews") every sixty days until he is returned to the general population, *see id.* § 301.4(d).

Section 301.4(d) review, as it manifests itself in this case, is a three-step process.[1] First, a committee commonly referred to as the "Facility Committee," consisting of "a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff," convenes to review the inmate's institutional record. *Id.* § 301.4(d)(1). The Facility Committee prepares and submits to the superintendent of the prison a report outlining "(i) reasons why the inmate was initially determined to be appropriate for [Ad Seg]; (ii) information on the inmate's subsequent behavior and attitude; and (iii) any other factors that [the committee] believe[s] may favor retaining the inmate in or releasing the inmate from [Ad Seg]" and recommending whether to continue the inmate's SHU term. *Id.*

Second, the superintendent forwards the Facility Committee's report and any written response that the inmate

---

[1] In other cases, section 301.4(d) review is streamlined into a process where officials from the prison facility, including the superintendent, review an inmate's case and render a final decision without the input of the DOCCS headquarters. *Id.* § 301.4(d)(2).

submits to a "Central Office Committee" located at DOCCS headquarters in Albany, New York, for "Central Office Review." The Central Office Committee, "consisting of a representative from the office of facility operations, a member of [the DOCCS] inspector general's staff, and an attorney from the office of counsel," reviews the Facility Committee's report, develops its own recommendation whether the inmate continues to pose a safety threat to the facility, and forwards the paperwork to the deputy commissioner of DOCCS. *Id.* § 301.4(d)(3).

Third, the deputy commissioner reviews the two committees' recommendations, as well as the inmate's written statement when applicable, and decides whether to continue the inmate in Ad Seg. *Id.* Once the deputy commissioner makes a final decision, he or she notifies the superintendent of the inmate's prison facility, who provides written notice to the inmate of the decision and its "reason(s)," and a statement notifying the inmate of his right to submit a written statement in the next section 301.4(d) review. *Id.* § 301.4(d)(4).

## B

Proctor is currently held under Ad Seg in the SHU at the Upstate Correctional Facility. He is serving a state prison term of thirty-two-and-one-half years to life for second-degree murder and attempted escape and is first eligible for parole in 2024. Proctor previously served two other terms in state prison for convictions of, *inter alia*, burglary, robbery, and assault.

Proctor's early years in prison (in the 1980s and early 1990s) were marked by violence and dangerous defiance of the law. Proctor stabbed an inmate. He "absconded from a job search from the Edgecombe Correctional Facility." *Proctor v. Kelly*, No. 9:05-cv-0692, 2008 WL 5243925, at *14 (N.D.N.Y. Dec. 16, 2008) ("*Proctor I*") (Suddaby, J.) (internal quotation marks

omitted). He attempted to escape from a police vehicle by unlocking his handcuffs and kicking a window. *See id* at *16. He professed a desire to be "more famous than Willie Bosket," a notorious prisoner in DOCCS. *Id.* at *14. And he used a prison telephone to solicit (unsuccessfully) another person to firebomb a residence. *Id.* at *16.

Proctor's defiance reached its apex in November 1994, when he and three inmate-accomplices executed an elaborate escape from Shawangunk Correctional Facility, a maximum security facility.[2] DOCCS officials apprehended Proctor after he had been at large for about five hours. Disciplinary proceedings against Proctor for his escape resulted in a sentence of ten years of Disciplinary Segregation in the SHU.

Proctor's behavior in the SHU under Disciplinary Segregation varied. For the first three years of his SHU term, he continued his defiance. Proctor managed to remove his handcuffs without permission while in his cell. *See Proctor I*, 2008 WL 5243925, at *14. He threw feces at DOCCS officials. *See id.* at *16. He twice set fire to his cell. *Id.* at *14, *16. He concealed a razor in his rectum. *Id.* He stabbed another inmate. *Id.* And he received disciplinary reports for "disorderly conduct, fighting, harassment, movement violations, refusing direct orders, and violent conduct." *Id.* at *14. Later in his time in Disciplinary Segregation, however, Proctor's behavior improved considerably. Defendants recount in their brief in this Court that "[b]ecause [Proctor] . . . had periods of good behavior while in [the] SHU, over time, DOCCS gradually reduced his

---

[2] One DOCCS official described Shawangunk as "a maxi max" facility that "shouldn't be escapable from." J.A. 929.

[Disciplinary Segregation] penalty to nine years and one month." Appellees' Br. 10.

On the day he was scheduled to be released from Disciplinary Segregation, DOCCS served Proctor with an "[Ad Seg] Recommendation" and retained him in the SHU. *Proctor I*, 2008 WL 5243925, at *10. DOCCS held a hearing shortly thereafter to determine if Proctor was appropriate for Ad Seg. *See id.* at *15. The hearing officer found that Proctor posed a threat to the prison facility based on Proctor's criminal history and misbehavior, including his 1994 escape and his early behavior in Disciplinary Segregation. *See id.* at *10. As a result, as soon as Proctor's Disciplinary Segregation ended, DOCCS retained him in the SHU under Ad Seg, where he has spent the last thirteen years and remains today.[3]

Proctor's behavioral record in Ad Seg has not been spotless. In the first few years, Proctor received "minimal" disciplinary reports for possession of contraband, lewd exposure, and "unhygienic acts, littering and harassment." J.A. 334, 348. In the last decade, he has committed two unhygienic acts and possessed one unidentified weapon. At times, he can be argumentative with his fellow Ad Seg inmates.

But in the main, Proctor's behavior has remained positive. He has gone long stretches—including one period of almost four years—without any disciplinary reports. *See* J.A. 320–34

---

[3] Although SHU conditions under Ad Seg and under Disciplinary Segregation are similar, DOCCS's affords Ad Seg inmates a few additional privileges, such as access to playing cards, headphones, up to ten pieces of reading material, ten additional personal photos, stamps, and a small bottle of skin cream. *See* N.Y. COMP. CODES R. & REGS. tit. 7, § 303.2.

(fourteen months without a disciplinary report), 342–91 (almost four years without a disciplinary report), 395–424 (twenty months without a disciplinary report), 429–55 (twenty months without a disciplinary report). Particularly in the last eight years, DOCCS has observed that Proctor has made "an extensive effort to minimize his disciplinary violations." J.A. 374. He received just one disciplinary report between December 2011 and the close of the record in this case. DOCCS considered Proctor's attitude "positive," "co[-]operat[ive]," and "much improved." J.A. 419, 506.

Defendants have without fail conducted a section 301.4(d) review for Proctor every sixty days he has been in Ad Seg. Each time, the Upstate Corrections Facility Committee (made up of a rotating panel of Upstate Corrections officials) convenes to review Proctor's institutional record and make a recommendation. That committee forwards Proctor's paperwork to the Central Office Committee (comprising a rotating panel of officials from DOCCS headquarters), which in turn reviews Proctor's case and any written statement Proctor submits. The Central Office Committee then issues a recommendation, which to this point invariably has been that Proctor should remain confined in Ad Seg, and forwards the paperwork to the deputy commissioner of DOCCS.  The deputy commissioner reviews the Facility and Central Office Committees' reports and adopts their recommendations. Finally, the Upstate Corrections Facility superintendent notifies Proctor of the deputy commissioner's decision in a summary report.

## II

The procedural history in this case involves multiple lawsuits and a prior appeal, mostly addressing procedural issues unrelated to our decision today. Much of that history is described in detail in *Proctor v. LeClaire*, 715 F.3d 402, 406–11 (2d Cir. 2013) ("*Proctor III*"). Here, we briefly summarize the prior history and lay out the present dispute.

Proctor brought his first *pro se* challenge to his Ad Seg commitment in 2005. *Proctor I*, 2008 WL 5243925. He brought a § 1983 claim alleging, *inter alia*, that various DOCCS officials, including then-Deputy Commissioner LeClaire, deprived him of procedural and substantive due process by confining him in Ad Seg as soon as his Disciplinary Segregation ended, and violated the Eighth Amendment by forcing him to live in inhumane conditions in the SHU. *Id.* at *1. In a brief at the summary-judgment stage, Proctor also claimed for the first time that defendants denied him due process by failing to conduct a single meaningful section 301.4(d) review to date. *Id.* at *1 & n.1.The district court granted summary judgment for the defendants. *Id.* at *1. Proctor's appeal in this Court was dismissed as frivolous.

In 2009, Proctor instituted his second *pro se* challenge to his Ad Seg commitment, the action which is ultimate source of this appeal. *Proctor v. LeClaire*, No. 9:09-cv-1114, 2011 WL 2976911 (N.D.N.Y. July 21, 2011) ("*Proctor II*") (Sharpe, J.). Again, Proctor brought a § 1983 claim against LeClaire asserting, *inter alia*, that his section 301.4(d) reviews since his initial commitment to Ad Seg were "sham[s], perfunctory[,] and meaningless" and performed as a pretext to confine Proctor in Ad Seg indefinitely. *Id.* at *1. The court understood Proctor to assert that LeClaire had deprived him of due process. *See id.* at *3–4; *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (requiring that courts interpret *pro se* litigants' papers "liberally 'to raise the strongest arguments

they suggest' " (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). On LeClaire's motion, the District Court dismissed Proctor's action on res judicata and collateral estoppel grounds. *Proctor II*, 2011 WL 2976911, at *3–4. This time, Proctor timely appealed and was appointed counsel.  *Proctor III*, 715 F.3d at 411. We reversed without expressing a view on the merits of Proctor's claim, vacated the dismissal, and remanded for further proceedings. *Id.* at 411–17.

On remand, Proctor, still aided by counsel, filed an amended complaint, the pleading in play in this appeal. That complaint added former Commissioner Fischer in his personal capacity and Acting Commissioner Annucci and Deputy Commissioner Bellnier in their personal and official capacities as defendants to this action. Proctor alleges that Defendants denied him procedural due process because none of the section 301.4(d) reviews while he was confined in Ad Seg has been "meaningful." J.A. 67. Proctor supports his claim by arguing that, *inter alia*, Defendants "justified [his] continued confinement in Ad Seg by citing decades-old incidents, such as the 1994 escape, for which [he] already served his disciplinary sentence," J.A. 68; that Defendants "used [his] consistent good behavior over the past several years against [him] as further justification to continue his confinement in Ad Seg," J.A. 69 (emphasis omitted); and that many of Proctor's reviews have consisted of "mere copying and pasting of language from one review to the next," J.A. 71. Proctor concludes that "Defendants have used . . . sham reviews of [his] [Ad Seg] as a pretext to indefinitely confine [him] in the SHU." J.A. 76.

Proctor also alleges that his confinement in the SHU for twenty-two uninterrupted years amounts to a deprivation of substantive due process. In light of physical and psychological injuries he claims to suffer, Proctor alleges that Defendants'

failure to undertake meaningful section 301.4(d) reviews "render[s] [his] indefinite confinement arbitrary and oppressive in a constitutional sense." J.A. 77.

Defendants moved for summary judgment on Proctor's procedural due process claim, arguing primarily that Proctor's section 301.4(d) reviews comport with procedural due process.

To defend against Defendants' motion, Proctor deposed witnesses from all three levels of his section 301.4(d) reviews. He began with Christopher DeLutis and Joseph Porcelli, members of Facility Committee panels that reviewed Proctor's Ad Seg commitment. Both witnesses espoused the belief that, by and large, inmates who once posed an escape risk would never be appropriate candidates for release from Ad Seg. DeLutis testified that there is nothing any of the SHU inmates he has reviewed "could do for [him] to . . . believe that they were no longer an escape risk," J.A. 567, and that there is no "behavior that those specific inmates could exhibit that would make [him] change [his] mind about whether or not they were an escape risk," J.A. 568. When asked if there was anything an inmate can ever do to overcome an escape history, DeLutis said, "All I know is . . . in my experience, I never recommended anybody for release." J.A. 572. Porcelli's testimony was similar: He affirmed that he has "never dealt with a prisoner released from [Ad Seg] who has a history of escape." J.A. 780–81. And when asked, "In your experience, once an inmate is placed in [Ad Seg], they're never released to general population?" Porcelli responded, "[Y]es, that's correct." J.A. 770.

The general view expressed by DeLutis and Porcelli did not change in Proctor's case—both indicated that, given his escape attempts, they believed Proctor would never be released from Ad Seg. When asked, "Is there anything that Proctor could ever do to change your opinion about whether or not he should

be released [from Ad Seg]?" DeLutis answered, "No. I believe [Proctor] is right where he belongs." J.A. 585. DeLutis ultimately admitted that Proctor's behavior "plays no role in the decision whether or not to maintain him in [A]d [S]eg" because Proctor "is an escape risk." *Id.* Porcelli again struck a similar tone, stating that "the only thing that Mr. Proctor could do for [Porcelli] to believe he's not an escape risk" is "[g]et old" or "reach the end of his sentence." J.A. 795. Even as Proctor's counsel walked Porcelli through section 301.4(d) review reports demonstrating that Proctor had a positive disciplinary record for over five years, Porcelli stood by his decision to recommend continuation of Proctor's Ad Seg term.  He testified that Proctor "[s]till posed an escape risk" given "the amount of time he ha[s] to do" and that he had "[j]ust an inner feeling that . . . given the opportunity, [Proctor] would try to [escape] again." J.A. 800.

Porcelli raised one more issue of note: As a general matter, Porcelli confirmed that "[Ad Seg] is used for disciplinary reasons." J.A. 797. He identified at least one instance in which Ad Seg "was used in place of discipline" because prison officials did not have enough evidence to "pin [a disciplinary infraction] on an individual that they suspected." J.A. 771. He then admitted that "[Ad Seg] is being used for disciplinary reasons for Mr. Proctor." J.A. 797. *But see* J.A. 931 (Miller: "Ad [S]eg is not to punish [Proctor].").

Proctor next deposed Scott Kelly and Mark Miller, members of Central Office Committee panels that conducted some of Proctor's section 301.4(d) reviews. Both recounted methodical Central Office Review procedures, marked by strong reliance on Facility Committee reports. Kelly stated that he places great weight on the Facility Committee because they are "boots on the ground with the inmate." J.A. 635. Miller similarly stated that the Central Office Committee relies "very heavily" on

the Facility Committee. J.A. 908. Miller testified that he does no preparation for meetings of the Central Office Committee and instead "rel[ies] on what is presented" by the Facility Committee. J.A. 904. Miller testified that he has never disagreed with a recommendation by the Facility Committee.

Proctor's counsel also asked both Kelly and Miller whether, in their experiences, Ad Seg inmates who once posed an escape risk have any hope of being returned to the general population. Kelly identified one instance in which an inmate who had been committed to Ad Seg after escaping from a juvenile facility outside the DOCCS system was later released from the SHU. *See* J.A. 635 ("[That] [t]he initial incident . . . occurred outside the [DOCCS system] was . . . taken into account [when deciding whether to release the inmate from Ad Seg]."). Miller was unable, however, to identify any inmate placed in Ad Seg after escaping a DOCCS facility who had been returned to the general population. *See* J.A. 929.

Lastly, Proctor deposed Bellnier and LeClaire, the two deputy commissioners who conducted the final level of Proctor's section 301.4(d) reviews. Bellnier's recollection of his participation in the section 301.4(d) review process demonstrated significant reliance on both the Facility and Central Office Committees. Bellnier testified that in each section 301.4(d) review form he receives, the portion indicating his final decision has already been completed for him by an unknown member of the Central Office Committee. That is, someone completes the deputy commissioner's portion of the section 301.4(d) review form before Bellnier reviews the Committees' work, and Bellnier merely signs the bottom of the form to indicate his approval. Just as Miller has never disagreed with a recommendation by the Facility Committee, Bellnier testified

that he has never disagreed with a recommendation by the Central Office Committee.

When asked about Proctor in particular, both Bellnier and LeClaire focused on Proctor's decades-old escape history as stand-alone justification for continuing his Ad Seg. LeClaire stated, "I'm not sure any action that [Proctor] could do would counteract his criminal history" because "Proctor's criminal history alone justif[ies] his retention in [Ad Seg]." J.A. 714. That Proctor's escapes and other serious misbehavior occurred in the distant past was not "relevant" to LeClaire's section 301.4(d) reviews. *Id.* Bellnier concurred, testifying that he has "formed" the opinion that Proctor "would be a threat to any facility that he was in in general population." J.A. 488. Bellnier stated that he "ha[s] not been presented with" any type of behavior Proctor could exhibit to get out of Ad Seg and suggested that he would continue to keep Proctor in Ad Seg even if Proctor's behavior remained positive for decades so long as Proctor did not accept responsibility for past actions. J.A. 501; *see* J.A. 503.

Proctor also sought production of the paperwork for each of his section 301.4(d) reviews since his initial Ad Seg commitment in 2003. Many of the section 301.4(d) reports reflect detailed evaluations of the appropriateness of Proctor's continued Ad Seg term; occasionally, the reports contain specific objection-by-objection responses to Proctor's written complaints. The reports also reveal, however, three issues of note: First, six of Proctor's section 301.4(d) reviews, from December 2007 through October 2008, note that Proctor's "[Ad Seg] status has a disciplinary aspect to it." J.A. 368–74; *see* J.A. 364–66. Second, many of the reports are virtually identical to each other, with the exception of a few stray notations. *See, e.g.,* J.A. 318–32 (over one year of virtually identical reports), 342–57 (over one year of virtually identical reports), 360–74 (over one year of virtually

identical reports). And third, the Facility Committee's reasoning in some of the reports is hard to understand: The committee wrote that "[Proctor's] positive behavior and attitude with staff make him a high profile security concern," that Proctor's "superficial[] cooperat[ion] on a day to day basis . . . can not [*sic*] mask his resistance to authority," and that Proctor's good behavior was irrelevant because the SHU "provides little opportunity for infractions." J.A. 360–66, 373, 419. When asked at his deposition to explain what the Facility Committee meant by these notations, Porcelli responded, "That's a little weird, isn't it. . . . I can't explain that." J.A. 810.

In October 2015, the District Court granted Defendants' motion for summary judgment. *Proctor v. LeClaire*, No. 9:09-cv-1114, 2015 WL 5971043 (N.D.N.Y. Oct. 14, 2015) (Sharpe, *J.*) ("*Proctor IV*"). The court held that although Defendants had deprived Proctor of a liberty interest by confining him in Ad Seg for more than 4,000 days, Proctor had received all the process due for that deprivation because Defendants provided Proctor with section 301.4(d) reviews that were, as a matter of law, meaningful. *Id.* at *3–5. The District Court then addressed Proctor's substantive due process challenge, even though Defendants had not moved for summary judgment on that claim. *Id.* at *6. Without acknowledging it was raising summary judgment *sua sponte* and providing the parties with notice, the District Court concluded on its own that "[D]efendants did not exhibit conscious-shocking [*sic*] behavior because they were never made aware of the alleged devastating effects of Proctor's continued placement in Ad Seg." *Id.* As a result, the court held Defendants were entitled to summary judgment on Proctor's substantive due process claim as well. *Id.*

This appeal followed.

16

## DISCUSSION

"[W]e review *de novo* a grant of summary judgment," affirming "only where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Willey*, 801 F.3d at 62 (quoting FED. R. CIV. P. 56(a)). "Summary judgment is inappropriate when the admissible materials in the record ' "make it arguable" ' that the claim has merit." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (quoting *Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)*, 574 F.3d 129, 151 (2d Cir. 2009)). We construe the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Willey*, 801 F.3d at 62. "In reviewing the evidence and the inferences that may reasonably be drawn, [we] 'may not make credibility determinations or weigh the evidence . . . . "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." ' " *Kaytor*, 609 F.3d at 545 (omission in original) (emphases omitted) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).[4]

---

[4] Defendants ask us to apply "a presumption of regularity" that they claim "attaches to the actions of government agencies[,] such as DOCCS," and "public officers," such as Defendants. Appellees' Br. 22–23 (internal quotation marks omitted) (quoting *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001); *United States v. Chemical Found.*, 272 U.S. 1, 14 (1926)). While we afford prison officials "wide-ranging deference in the adoption and execution of policies" designed to promote institutional safety, *Bell v. Wolfish*, 441 U.S. 520, 547 (1979), Defendants cite no case, and we cannot find one, that applies such a presumption in a constitutional challenge to state prison officials' periodic review of Ad Seg. We decline to do so today.

# I

Proctor claims that he was denied procedural due process. To prevail, he must be able to demonstrate (1) that Defendants deprived him of a cognizable interest in "life, liberty, or property," (2) without affording him constitutionally sufficient process. U.S. CONST. amend. XIV, § 1; *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). The District Court held that Proctor's SHU term in excess of 4,000 days gives rise to a cognizable liberty interest. *See Sandin*, 515 U.S. at 484 (holding that an inmate has a cognizable liberty interest in freedom from "restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life"). Because Defendants take no issue with that decision, the sole issue before us on this claim is whether Defendants afforded Proctor sufficient process.

Proctor raises a view of inmate procedural due process this Court has yet to address. While he acknowledges that Defendants have nominally afforded him sufficient process by conducting regular section 301.4(d) reviews, Proctor argues that those reviews have been in substance "hollow," "perfunctory," and meaningless. Appellant's Br. 24. A meaningless section 301.4(d) review, Proctor asserts, is the functional equivalent of no review at all and therefore constitutionally insufficient. Proctor also argues that Defendants have violated the Due Process Clause by using Ad Seg as a means to punish him improperly and as a pretext to confine him in the SHU indefinitely.

Proctor's argument raises two preliminary concerns: First, Proctor's claim cannot serve as an appeal from his section 301.4(d) reviews. Procedural due process does not permit a court to review the substance of Defendants' decision to confine Proctor in Ad Seg. *See Graziano v. Pataki*, 689 F.3d 110, 116 (2d

Cir. 2012) (per curiam). We may not substitute our judgment for Defendants', nor may we rebalance the section 301.4(d) criteria. *See id.* The Due Process Clause permits only an evaluation of whether Defendants' method for coming to their Ad Seg determinations is sufficient. Second, we are mindful of the context in which this case arises and the deference we owe prison officials in carrying out their daily tasks. *See Bell*, 441 U.S. at 547–48. "[O]ne cannot automatically apply procedural rules designed for free citizens in an open society . . . to the very different situation . . . in a state prison." *Wolff*, 418 U.S. at 560. With those observations in mind, we proceed to the merits of Proctor's claim.

## A

In *Hewitt v. Helms*, the Supreme Court described what process is due from prison officials making Ad Seg determinations. 459 U.S. at 474. The Court made clear that Ad Seg is appropriate when necessary to incapacitate an inmate who "represents a security threat" or to "complet[e] . . . an investigation into misconduct charges." *Id.* at 476. So long as prison officials seek to achieve one or both of those goals, they have wide latitude in the procedures they deploy. Before confining an inmate in Ad Seg, prison officials must provide "some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to [Ad Seg]," although not necessarily a full hearing. *Id.*; *accord Taylor v. Rodriguez*, 238 F.3d 188, 192 (2d Cir. 2001). Once that has occurred, prison officials need only conduct "an informal, nonadversary evidentiary review" of whether the confinement is justified. *Hewitt*, 459 U.S. at 476. Their final Ad Seg decision may "turn[] largely on purely

subjective evaluations and on predictions of future behavior." *Id.* at 474 (internal quotation marks omitted).[5]

Once an inmate has been confined in Ad Seg, *Hewitt* mandates that prison officials "engage in some sort of periodic review of the confinement" to verify that the inmate "remains a security risk" throughout his term. *Hewitt*, 459 U.S. at 477 n.9. Periodic Ad Seg reviews are also flexible and may be based on "a wide range of administrative considerations," including but not limited to observations of the inmate in Ad Seg, "general knowledge of prison conditions," misconduct charges, ongoing tensions in the prison, and any ongoing investigations. *Id.* The purpose of these periodic reviews is to ensure that the state's institutional interest justifying the deprivation of the confined inmate's liberty has not grown stale and that prison officials are not using Ad Seg as "a pretext for indefinite confinement of an inmate." *See id.*

It is well established that whenever process is constitutionally due, no matter the context, "[i]t . . . must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *accord Parratt v. Taylor*, 451 U.S. 527, 540 (1981); *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970); *Taylor*, 238 F.3d at 193. Proctor's claim seeks to measure what *Hewitt* requires for meaningful periodic review of Ad Seg. Guiding that analysis are the three *Mathews* factors—the government's

---

[5] When the "sole purpose of confinement is punishment," prison officials must provide more robust procedural protections. *Patterson v. Coughlin*, 761 F.2d 886, 890–91 (2d Cir. 1985) (citing *Wolff*, 418 U.S. at 558); *see also Bolden v. Alston*, 810 F.2d 353, 357 (2d Cir. 1987) ("[T]he level of procedural protection differs according to the purpose of the confinement.").

interest in limited fiscal and administrative burdens, the private interest in freedom from restraint, and "the risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335.

The state's interest in flexible Ad Seg review procedures—maintaining institutional security—is substantial. Institutional safety and security are perhaps a prison facility's most important considerations. *Bell*, 441 U.S. at 546–47 (quoting *Pell v. Procunier*, 417 U.S. 817, 823 (1974)) (citing *Jones v. N.C. Prisoners' Labor Union*, 433 U.S. 119, 129 (1977); *Procunier v. Martinez*, 416 U.S. 396, 412 (1974)). Courts must preserve prison officials' "free[dom] to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape." *Bell*, 441 U.S. at 547. "Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id. But see Covino v. Vt. Dep't of Corr.*, 933 F.2d 128, 130 (2d Cir. 1991) (per curiam) ("At some point . . . the administrative necessity for involuntary lock-up begins to pale.").

However, the private interest implicated by an extended and indefinite stay in Ad Seg is also weighty. *Hewitt* instructs that an inmate in Ad Seg who "was merely transferred from one extremely restricted environment to an even more confined situation" generally does not have a private interest "of great consequence." *See* 459 U.S. at 473. But Helms, the inmate in *Hewitt*, spent less than two months in Ad Seg awaiting his disciplinary hearing. *Id.* at 464–65. Proctor, by contrast, has spent thirteen years in Ad Seg with no release date in sight. Proctor's interest in avoiding an indefinite Ad Seg term is surely

substantial, more so than Helms's interest in avoiding a
temporary Ad Seg term awaiting a hearing. *Compare* N.Y. COMP.
CODES R. & REGS. tit. 7, § 301.3(a)(1) (providing for limited
admission to the SHU "in the case of an inmate who is awaiting
initial appearance before or determination of a disciplinary
hearing" as in the case of Helms), *with id.* § 301.4 (providing for
admission to the SHU under Ad Seg as in this case). We are not
alone in this view. The Third Circuit has similarly concluded
that an inmate who has spent an extended period of time in Ad
Seg and whose term is "potentially limitless" has "a more
significant liberty interest for due process analysis than that
attributed to [Helms]." *Mims v. Shapp*, 744 F.2d 946, 951–52 (3d
Cir. 1984).[6]

In light of those counterbalancing interests, we believe
that meaningful periodic reviews of Ad Seg must at least satisfy
the following criteria:

First, the reviewing prison officials must actually evaluate
whether the inmate's continued Ad Seg confinement is justified.
*See Hewitt*, 459 U.S. at 477 n.9. It is not sufficient for officials to go
through the motions of nominally conducting a review meeting
when they have developed a pre-review conclusion that the
inmate will be confined in Ad Seg no matter what the evidence
shows. Review with a pre-ordained outcome is tantamount to no
review at all.

---

[6] Tellingly, Helms's fifty-one-day Ad Seg term likely would not
require any constitutional process today. *See Wilkinson v. Austin*, 545
U.S. 209, 229 (2005) ("*Sandin* abrogated . . . *Hewitt*'s methodology for
establishing [a] liberty interest . . . ."); *Sealey v. Giltner*, 197 F.3d 578, 589
(2d Cir. 1999) (holding 101-day SHU term ordinarily does not give rise
to a liberty interest after *Sandin*).

Second, the reviewing officials must evaluate whether the justification for Ad Seg exists at the time of the review or will exist in the future, and consider new relevant evidence as it becomes available. It is inherent in *Hewitt*'s use of the term "periodic" that ongoing Ad Seg reviews may not be frozen in time, forever rehashing information addressed at the inmate's initial Ad Seg determination. *Cf. Proctor III*, 715 F.3d at 413 ("[T]he initial authorization for confinement and the subsequent decisions to continue confinement—although plainly involving considerations that overlap—are not . . . the same transaction." (internal quotation marks omitted)). Rather, reviews must take into account prison conditions and inmate behavior as they change over time; those changes may modify the calculus of whether the inmate presents a current threat to the safety of the facility. The periodic Ad Seg review test announced by the *Hewitt* Court is not whether the confined inmate *was* a threat to the facility when he was confined initially; it is whether the inmate "*remains* a security risk" on the date of the periodic review. *See* 459 U.S. at 477 n.9 (emphasis added). This is not to say that prison officials are barred from according significant weight to events that occurred in the past. Neither do we suggest that recent events categorically ought to be more salient in periodic reviews than those that occurred long ago. We conclude merely that prison officials must look to the inmate's present and future behavior and consider new events to some degree to ensure that prison officials do not use past events alone to justify indefinite confinement. *See id.*

Third and finally, the reviewing officials must maintain institutional safety and security (or another valid administrative justification) as their guiding principles throughout an inmate's Ad Seg term. SHU confinement that began for proper Ad Seg purposes may not morph into confinement that persists for

improper purposes. The state is entitled to the procedural flexibility that *Hewitt* allows because of its manifest interest in maintaining safe detention facilities and other similar administrative concerns; "the *Mathews* balancing test tips in favor of the inmate's liberty interest" when a state seeks to impose discipline. *Patterson*, 761 F.2d at 891. The state may not use Ad Seg as a charade in the name of prison security to mask indefinite punishment for past transgressions.

Our resolution of this matter is in accord with the efforts of four of our sister circuits. In *Kelly v. Brewer*, 525 F.2d 394 (8th Cir. 1975), the Eighth Circuit observed that the essential characteristic that distinguishes Ad Seg from Disciplinary Segregation is that Ad Seg "looks to the present and the future" rather than punishing an inmate for the past. *Id.* at 399–400. The court reasoned that periodic Ad Seg decisions therefore must be based on "valid" justifications (such as institutional safety and escape prevention) that are "not only . . . valid at the outset but . . . continue to subsist during the period of the segregation." *Id.* at 400. And to ensure that this mandate is followed, the court held that "where an inmate is held in segregation for a prolonged or indefinite period of time due process requires that his situation be reviewed periodically in a meaningful way and by relevant standards to determine whether he should be retained in segregation or returned to [general] population." *Id.* The Third Circuit followed suit in *Mims v. Shapp*. Recognizing that "[t]he validity of the government's interest in prison safety and security as a basis for restricting the liberty rights of an inmate subsists only as long as the inmate continues to pose a safety or security risk," the court understood the Fourteenth Amendment to require the court to ensure that "periodic review does not become simply a sham." 744 F.2d at 953–54. In *Toevs v. Reid*, 685 F.3d 903 (10th Cir. 2012), the Tenth Circuit agreed,

holding that periodic Ad Seg reviews "must be meaningful" and "cannot be a sham or pretext." *Id.* at 912. And in *Selby v. Caruso*, 734 F.3d 554 (6th Cir. 2013), the Sixth Circuit held that due process requires periodic Ad Seg decisions to be supported by "some evidence." *Id.* at 559 (quoting *Superintendent v. Hill*, 472 U.S. 445, 454 (1985)).[7]

### B

Proctor has raised triable factual questions as to whether his section 301.4(d) reviews have been constitutionally meaningful.

DOCCS officials' own statements raise serious doubts about whether they have conducted Proctor's periodic reviews with the outcomes pre-ordained. We know from DeLutis and Porcelli, the "boots on the ground" whose opinions DOCCS officials accord significant weight, *see* J.A. 635,[8] that Ad Seg may function as the equivalent of indefinite SHU confinement, even

---

[7] *Accord Tavares v. Amato*, 954 F. Supp. 2d 79, 95 (N.D.N.Y. 2013); *Smart v. Goord*, 441 F. Supp. 2d 631, 641–42 (S.D.N.Y. 2006); *Edmonson v. Coughlin*, 21 F. Supp. 2d 242, 252–54 (W.D.N.Y. 1998); *McClary v. Kelly*, 4 F. Supp. 2d 195, 213 (W.D.N.Y. 1998); *Giano v. Kelly*, 869 F. Supp. 143, 149–51 (W.D.N.Y. 1994).

[8] Although the Facility Committee is empowered by statute to issue only a recommendation, not a final decision, on whether to continue an inmate's Ad Seg term, the testimony of Facility Committee members DeLutis and Porcelli may carry significant weight at trial. The Facility Committee is more powerful in practice than it appears on paper. Central Office Committee members Kelly and Miller, as well as Deputy Commissioner Bellnier, all testified that they accord Facility Committee recommendations substantial weight. In fact, Kelly, Miller, and Bellnier all affirmed that they have never disagreed with the recommendation of the Facility Committee.

though section 301.4(d) reviews are nominally being conducted on a regular basis. According to the deponents, the standard DOCCS practice is that an inmate "never" gets out once he has been placed in Ad Seg. *See* J.A. 572, 770. No witness to date has been able to identify a single inmate confined in Ad Seg after an escape from a DOCCS facility who was later returned to the general population. The Due Process Clause, of course, commands a process, not a particular result. But, when process is nominally afforded to inmates over a significant period of time without any hint of success it may raise questions in a reasonable jury's mind about whether that process has been meaningful as it relates to Proctor.

Defendants' statements indicate that Proctor's section 301.4(d) reviews in particular are no more than hollow formalities. LeClaire believes that Proctor's "criminal history alone" can support continuing his Ad Seg term. J.A. 714. If that were true, it would obviate the need to conduct periodic reviews of Ad Seg and make a mockery of *Hewitt*'s admonition against indefinite confinement, as it would permit the continuation of Ad Seg based solely on past events that will never change. Porcelli's descriptions of his section 301.4(d) reviews confirmed that he and LeClaire are of the same mind. Proctor's counsel walked Porcelli through five years of reports that indicate Proctor's behavior in Ad Seg has been genuinely positive, and still Porcelli insisted that Proctor should be held in Ad Seg simply because he escaped in 1994.

As for Bellnier, it is unclear what if any standard he uses to evaluate Proctor. A reasonable jury could justifiably view Bellnier's testimony as the illustration of a rubber stamp. It appears that the portion of the section 301.4(d) review report indicating the deputy commissioner's final decision is filled out for Bellnier by a Central Office Committee member before

Bellnier conducts any review himself, and that Bellnier merely signs the bottom of the form. Bellnier admitted that he has never changed the Central Office Committee member's decision. Perhaps that may be why Bellnier failed to respond adequately when asked by Proctor's counsel to articulate a reason why Defendants have continued to hold Proctor in Ad Seg. Bellnier suggested that Proctor might not be released from Ad Seg even if he did everything asked of him; that is, even if Proctor's "attitude with staff and inmates improved considerably and he exhibited no negative behavior over a considerable period of time and he accepted responsibility for past crimes and misconduct," Bellnier still might not view him as appropriate for release to the general population. J.A. 505.

One comes away from these depositions with nagging skepticism about whether there is anything Proctor could ever do to be released from Ad Seg. And indeed when Proctor's counsel asked DeLutis that very question, DeLutis made clear that the answer is no, stating that there is *nothing* that Proctor can do that would convince DOCCS officials to release him. *See* J.A. 585. DeLutis affirmed that he disregards evidence of Proctor's recent behavior when conducting section 301.4(d) reviews because that information has no effect given Proctor's two-decade-old escape. *See* J.A. 585–86.[9] It is as if DOCCS

---

[9] It is important to note that Proctor has not just pointed to evidence of his good behavior. If he had merely done that and Defendants countered that they had reviewed and either genuinely discredited his good behavior or found that his poor behavior outweighed it, then Proctor's procedural due process claim would amount to an impermissible substantive appeal of his section 301.4(d) reviews. *See Graziano*, 689 F.3d at 116. Here, Proctor has produced evidence of his good behavior and evidence that DeLutis may have failed to consider that information. That raises constitutional concerns.

officials are not just moving the goalposts on Ad Seg inmates like Proctor—there are no goalposts at all. That cannot satisfy *Hewitt*.

The paper evidence raises additional questions about whether Proctor's section 301.4(d) reviews have been designed to evaluate or to perpetuate his Ad Seg term. Much of the section 301.4(d) review paperwork is repetitive and rote. The years of virtually identical reports may suggest to a reasonable jury that Proctor's reviewers treated the process as satisfied by boilerplate explanations instead of a forthright review. *Cf. Sourbeer v. Robinson*, 791 F.2d 1094, 1101 (3d Cir. 1986) (finding repeated careless errors in documentation and rote application of Ad Seg's "purported justifications" evidence of meaningless reviews). The review paperwork also contains inexplicable logic that raises red flags about whether the underlying reviews were conducted genuinely. It is hard to understand why the Facility Committee concluded that Proctor's *good* behavior, which served as a legitimate basis to reduce his time in the SHU for Disciplinary Segregation, somehow morphed in the context of his Ad Seg determination to indicate that he remained a security risk. No witness explained how the Facility Committee reached that conclusion. *See* J.A. 810 (Porcelli: "I can't explain that."). Defendants' interpretation of Proctor's daily cooperation with prison officials in Ad Seg as "superficial" and an attempt to "mask his resistance to authority" is bizarre and unsupported. J.A. 360–66. And Defendants' dismissal of Proctor's good behavior as irrelevant because the SHU is so restricting that it precludes opportunities for misbehavior is patently circular. *Cf. Williams v. Hobbs*, 662 F.3d 994, 1002 (8th Cir. 2011) (relying on prison warden's attribution of inmate's "years of incident-free conduct to his isolation from the general population" as evidence of meaningless reviews). These unusual comments in

the paperwork that continues to justify Proctor's Ad Seg may cause a reasonable jury to question the fulsomeness of their authors' analyses.[10]

It is important to recognize that not all of the evidence points in favor of Proctor. Some of the evidence could lead a reasonable jury to conclude, as Defendants urge, that DOCCS officials have analyzed Proctor's good behavior in their section 301.4(d) reviews and "found it to be outweighed by other facts," specifically Proctor's multiple escape attempts and violent acts towards other prisoners. Appellees' Br. 30. The deposition transcripts and section 301.4(d) review reports contain a

---

[10] Proctor also argues (unsuccessfully) that whether Defendants have used Ad Seg to impose impermissible punishment is a triable issue. If Defendants have confined Proctor in Ad Seg solely to discipline him then section 301.4(d) reviews, which purport to comply with *Hewitt* but not with the heightened procedures required to impose Disciplinary Segregation, are insufficient as a matter of law. *See Patterson*, 761 F.2d at 891. We have made clear, however, that compliance with *Hewitt* satisfies due process where prison officials confine an inmate in the SHU for "administrative reasons" that are sufficient standing alone, even if the officials also intend the confinement "as a form of punishment." *Sher v. Coughlin*, 739 F.2d 77, 83 (2d Cir. 1984); *see Deane v. Dunbar*, 777 F.2d 871, 877 (2d Cir. 1985). Proctor's evidence, even when viewed in a light most favorable to him, demonstrates such a situation. For example, while Porcelli testified that "[Ad Seg] is being used for disciplinary reasons for Mr. Proctor," J.A. 797, he also stated repeatedly that the "[n]umero uno" justification for Proctor's Ad Seg term continues to be that Proctor remains an escape risk. J.A. 802. Similarly, although some of Proctor's review reports state that Proctor's "[Ad Seg] status has a disciplinary aspect to it," they do not prove that discipline is the essential purpose for his confinement. J.A. 368–74.

substantial amount of evidence that a jury may view as demonstrating DOCCS officials' methodical approach to conducting periodic Ad Seg reviews, including but not limited to the testimony of Kelly and Miller who recounted measured review procedures and the reports' objection-by-objection responses to Proctor's written statements. It is not our role on review of a grant of summary judgment, however, to weigh that evidence against the evidence favorable to Proctor's claim. *See Kaytor*, 609 F.3d at 545. It is no answer to the evidence Proctor has amassed to point to countervailing evidence. That Proctor has produced evidence to raise a fair question about the procedural sufficiency of his reviews is all that is required today.

\*          \*          \*

In sum, periodic reviews of Ad Seg satisfy procedural due process only when they are meaningful. Reviews are meaningful only when they involve real evaluations of the administrative justification for confinement, they consider all of the relevant evidence that bears on whether that administrative justification remains valid, and they ensure that Ad Seg is used as neither a form of punishment nor a pretext for indefinite confinement. Proctor has produced sufficient evidence to raise factual questions about whether his section 301.4(d) reviews have met that standard.

## II

Proctor also argues that the District Court's *sua sponte* grant of summary judgment for Defendants on his substantive due process claim violated Federal Rule of Civil Procedure 56(f). Rule 56(f) permits a court to grant summary judgment *sua sponte* only "[a]fter giving notice and a reasonable time to respond." FED. R. CIV. P. 56(f); *Willey*, 801 F.3d at 62. The District Court did not notify Proctor or Defendants that it intended to consider substantive due process on its own motion. Without notice of the

District Court's motion, of course, neither party had a "reasonable time to respond" to it. *See* FED. R. CIV. P. 56(f); *Willey*, 801 F.3d at 62. Indeed, Defendants concede that they failed to move for summary judgment on substantive due process and that the District Court violated Rule 56(f) in granting them relief. Accordingly, we vacate the District Court's summary judgment decision with regard to substantive due process. We express no opinion as to the merits of this claim.

## CONCLUSION

We have considered the parties' remaining arguments and find them to be without merit. The judgment of the District Court dated October 14, 2015, is hereby **VACATED** in its entirety and the case is **REMANDED** to the District Court for further proceedings.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit